## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK SANDOVAL, Individually and on behalf of all others similarly situated, | |
| Plaintiff, | CIVIL ACTION NO.: |
| vs. | CLASS ACTION |
| CHARTER COMMUNICATIONS, INC., JESSICA FISCHER and CHRIS WINFREY, | DEMAND FOR A JURY TRIAL |
| Defendants. | |

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Mark Sandoval ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Charter Communications, Inc. ("Charter" or the "Company"), with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Charter; and (c) review of other publicly available information concerning Charter.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of all persons and entities who purchased or otherwise acquired Charter securities, purchased call options on Charter common stock, or sold put options on Charter common stock, between July 26, 2024, and July 24, 2025, inclusive (the

"Class Period"). Plaintiff pursues claims against the Defendants (defined herein) under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Charter is a leading broadband, or high-speed Internet, connectivity company and cable operator. The Company operates in 41 states with services available to more than 57 million homes and businesses.

3.      Charter's core business is providing residential Internet services. Historically, approximately 90% of Charter's annual revenues have been generated from monthly subscription fees charged to more than 30 million residential Internet customers. Leading into the Class Period, however, Charter was experiencing declines in Internet customers.

4.      As part of a "transformative" plan to expand the Company's broadband Internet footprint and stem Internet customer losses, Charter participated in the Federal Communications Commission's ("FCC") Affordable Connectivity Program ("ACP"). Under the ACP, the FCC provided funding to Charter and similar providers, in exchange for subsidizing high-speed Internet plans for low-income households.

5.      The ACP ended shortly before the beginning of the Class Period. By this time, millions of Charter's new and existing residential Internet customers were enrolled in the ACP. Notwithstanding, throughout the Class Period, the Defendants made materially false and misleading statements that conditioned investors to believe the Company could manage and reverse the causes of Internet customer declines. Charter repeatedly assured investors that the Company was executing a plan to minimize and move beyond risks the end of the ACP had on customer declines and earnings. Further, the Company continuously reported that the strategy for certain customers post-ACP was part of a larger execution plan that would continue the Company's growth in earnings, and particularly EBITDA.

6.    In truth, Defendants failed to disclose material adverse facts about the Company's business, operations, and outlook. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the impact of the ACP end was a material event the Company was unable to manage or promptly move beyond; (ii) the ACP end was actually having a sustaining impact on Internet customer declines and revenue; (iii) neither was the Company executing broader operations in a way that would compensate for, or overcome the impact, of the ACP ending; (iv) the Internet customer declines and broader failure of Charter's execution strategy created much greater risks on business plans and earnings growth than reported; (v) accordingly, the Company had no reasonable basis to state the Company was successfully executing operations, managing causes of Internet customer declines, or provide overly optimistic statements about the long term trajectory of the Company and EBITDA growth; and (iv) as a result of the foregoing, Defendants materially misled with, and/or lacked a reasonable basis for, their positive statements about the Company's business, operations, outlook during the Class Period.

7.    On July 25, 2025, Charter issued a press release announcing second quarter 2025 financial results. The Company reported EBITDA of $5.7 billion, which suggested 0.5% **growth** year-over-year. However, analysts and investors quickly realized that the so-called growth was on account of a $45 million one-time benefit to "other revenue." Had this event been excluded, EBITDA would have missed consensus estimates by 2.4% and shown a second quarter **decline** of 0.3% year-over-year.

8.    At the same time, Charter reported total Internet customers decreased by 117,000 for the second quarter of 2025. The decline of Internet customers was nearly double from the 66,000 reported in the prior quarter. Internet customer declines had also increased year-over-year when compared to a loss of 99,000 customers reported in the second quarter of 2024.

9.      These events caused Charter's stock price to fall $70.25 per share, or 18.4%, to close at $309.75 per share on July 25, 2025.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Charter securities trade on the NASDAQ Stock Market ("NASDAQ"), located within this Judicial District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired Charter securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Charter is a Delaware corporation with principal executive offices located at 400

Washington Blvd., Stamford, Connecticut, 06902. Charter securities trade in an efficient market on the NASDAQ under the ticker symbol "CHTR".

17.     Defendant Chris Winfrey ("Winfrey") has served as Charter's President and Chief Executive Officer at all relevant times.

18.     Defendant Jessica Fischer ("Fischer") has served as Charter's Chief Financial Officer at all relevant times.

19.     Defendants Winfrey and Fischer are sometimes referred to herein collectively as the "Individual Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of Charter's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Charter's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Charter, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Charter is a leading broadband, or high-speed Internet, connectivity company and cable operator. The Company operates in 41 states with services available to more than 57 million homes and businesses.

22.     Historically, approximately 90% of Charter's reported annual revenues have been attributed to monthly subscription fees charged to customers for its Internet, video, mobile, voice and commercial services, as well as regional sports and news channels.

23.     With respect to revenues, Charter uses EBITDA and Adjusted EBITDA as key metrics to report on various aspects of its business and as a measure of its financial performance. The Company defines Adjusted EBITDA as "net income attributable to Charter shareholders plus net income attributable to noncontrolling interest, net interest expense, income taxes, depreciation and amortization, stock compensation expense, other income (expense), net and other operating (income) expenses, net, such as special charges and (gain) loss on sale or retirement of assets."

24.     In December 2021, Charter began participating in the FCC's ACP as part of a strategy to expand its broadband Internet footprint. The ACP offered low-income households a discount on their monthly internet bill and a one-time discount on the purchase of computer devices. In return for providing connectivity, Charter would receive funding from the government based on the Company's enrolled participants, to subsidize reduced monthly bills.

25.     In June 2024, lack of federal funding caused the ACP to end. Around this time, Charter reported that approximately 5 million customers received ACP benefits.

**The Defendants' Materially False and
Misleading Statements Issued During the Class Period**

*The Second Quarter 2024 Financial Results*

26.     The Class Period begins on July 26, 2024, when Charter issued a press release announcing second quarter 2024 financial results. The Company reported second quarter Adjusted EBITDA of $5.7 billion, which grew by 2.6% year-over-year. Charter also announced that residential Internet customers decreased by 154,000, largely driven by the end of the FCC's ACP subsidies. Despite the loss, Defendant Winfrey was quoted in the press release stating:

*We are executing well on several transformational initiatives[1]*, growing EBITDA through efficiencies, and improving our service and sales capabilities. We remain fully focused on driving customer growth, with a unique, high quality product set that continues to evolve, creating long term value for shareholders.

27.     On the same day, the Defendants held an earnings call to discuss Charter's latest

financial results. In prepared remarks, Defendant Winfrey explained that the loss of residential

Internet customers due to the end of the ACP was being managed, stating in part:

We put a lot of effort into the ACP program and it wasn't renewed. Beginning early this year, we've been actively working with customers to preserve their connectivity. *Our service and retention teams are handling the volume of calls well, and we've retained the vast majority of ACP customers so far.*

\*\*\*

So stepping back, we're executing well on many multi-year transformational programs. *We're growing EBITDA despite the loss of ACP and a competitive cycle by driving efficiency without impacting our service and sales capabilities.* We remain fully focused on driving growth using our unique set of scaled assets and the highest quality products and services in order to create long-term value for shareholders.

28.     On the same call, Defendant Fischer provided prepared remarks reinforcing that the

loss of Internet customers was not impacting the Company's ability to execute its growth strategy,

stating in part:

Including residential and SMB, we lost 149,000 Internet customers in the second quarter while, in mobile, we added 557,000 mobile lines. Video customers declined by 408,000 and wireline voice customers declined by 280,000. *As Chris mentioned, our second quarter Internet losses were primarily driven by the end of the ACP program.* ACP program connects ended in early February. In May, the program's original $30 subsidy was reduced to $14 and, in June, that subsidy was reduced to zero. *We estimate that the end of the program's impact on our second quarter Internet gross additions and churn drove over 100,000 of our 149,000 Internet losses in the quarter.*

\*\*\*

*Overall, our goal is to deliver solid EBITDA growth, and we believe we can continue to do that even as we make significant investments in the business and face a challenging competitive environment and the end of the ACP program.* Our expense management process is working with growing realization of impacts

---

[1]  Emphasis added to bolded and italicized words unless otherwise noted.

in the second quarter. We continue to expect accelerating EBITDA growth in the back half of the year, given our expense management initiatives, Spectrum One promotional roll-off and political advertising revenue.

***We continue to be confident in the long-term trajectory of the business.*** We have the best products at the best prices in our industry, and we remain underpenetrated relative to our long-term potential. That, combined with the investments that we're making in the business and our expense savings initiative, will continue to drive strong EBITDA growth and value creation for many years to come.

### *The Third Quarter 2024 Financial Results*

29.    On November 1, 2024, Charter issued a press release announcing third quarter 2024 financial results. The Company reported third quarter Adjusted EBITDA of $5.6 billion, which grew by 3.6% year-over-year. Charter also announced residential Internet customers decreased again by 110,000, driven by the end of the ACP. Defendant Winfrey, however, maintained the Company was executing as planned, stating:

We executed well during the third quarter, building on our operating strategy and foundational investments. Now and in the future, we have the best, fully deployed network uniquely capable of delivering seamless connectivity and entertainment, everywhere we operate. ***We have pricing and packaging that saves customers money with the best products, and a service capability and investment that has yet to be fully realized as a competitive advantage.***

30.    On the same day, the Defendants held an earnings call to discuss Charter's latest financial results. In prepared remarks, Defendant Winfrey repeatedly touted that the end of the ACP was being well managed, stating, in relevant part:

We had a busy quarter, executing our operating strategy and building on the foundational investments of the past couple of years. ***We're also successfully managing the transition of customers previously on the government's affordable connectivity program in a period of new competition. And while we expect some normalization of external factors as we head into 2025 and much lower capital intensity beyond 2025, we're not standing still***, evidenced by the series of announcements we made in September. A market leading customer service commitment, new pricing and packaging that makes better use of our unique assets in the marketplace, encapsulated in a brand refresh through Spectrum's life unlimited promise.

***

***Were it not for the impact of the end of the ACP program in June, we would have grown our Internet customers during the Q3. Importantly, we've been successful in keeping low-income households connected.*** We continue to compete well against both wireline overbuild and cell phone Internet, each with expanded footprints. And we remain confident in our ability to return to healthy long-term growth. Our Internet product is faster and more reliable.

***

***Our new pricing and packaging will drive more sales with higher selling of our best products, grow customer ARPU at Connect despite lower product pricing, and reduce billing, service and retention calls while reducing churn.***

***

So we remain underpenetrated despite having a differentiated and superior offering with market leading pricing at promotion and retail. ***As we work through the one time impacts of ACP this year, new competition with expanded footprint and our unique non recurring subsidized network expansion investment, we remain confident in our ability to drive healthy long term connectivity customer growth.*** Now in the future, we have the best fully deployed network uniquely capable of delivering seamless connectivity or convergence everywhere we operate.

31.     On the same call, Defendant Fischer reiterated that the loss of ACP customers was under control, stating:

Video customers declined by 294,000 and wireline voice customers declined by 288,000. ***The end of the ACP program drove higher third quarter non-pay and voluntary churn among former ACP customers for a total estimated Q3 impact of approximately 200,000 Internet losses.***

***

***We continued to do a very good job in managing the end of the program, and we've retained the vast majority of our customers who were previously receiving an ACP benefit.*** Beyond ACP, we competed well across our footprint.

***

Fourth quarter customer results will include impacts from the storms and about 100,000 incremental non pay disconnects and some lagging voluntary disconnects, both related to the end of ACP. ***After those effects in the Q4, we expect the onetime impacts from ACP to be behind us.***

9

32.     During the question-and-answer portion of the call, Defendant Winfrey had the following exchange with an analyst asking for insight on broadband internet trends:

**<Q> Katgun Morel, Analyst, Evercore ISI:** Good morning and thanks for taking the question. Just one on broadband. Net adds in the quarter were very encouraging with a return to quite meaningful sub growth excluding ACP. Is there any color you can provide on the competitive backdrop and perhaps any early reads on the underlying broadband trends in the 4th quarter excluding the incremental ACP net loss as you called out?

**<A> Defendant Winfrey:** Sure. A very much anticipated question. So maybe I tried to talk about the market more generally both inside of the Q3, what we think about the Q4 and where that does or doesn't position us for next year. But I think as you mentioned, there's a lot of puts and takes inside the Q3. ***Underlying all that is that we are competing very well in a marketplace that still has lots of competition, lots of new competition with expanded footprint.***

In the Q3, we did have some benefits that are unique to the Q3, seasonality, which is typical. We also had a some, not large, but some impact from positive impact from a competitor at a work stoppage. I think that's well understood. ***And then we had obviously the downside of significant ACP primarily through non pay disconnects and voluntary churn, but we're managing that well.*** And in the Q4, when you think about the seasonality and the work stoppage benefits, we won't have those inside the Q4.

We'll still have approximately 100,000 non-pay to deal with from ACP that we expect to see early in the quarter in Q4. And we also have some hurricane impacts. And so that will impact subscribers, credits, as well as Jessica mentioned some capital and rebuild. ***And so then I think the bigger question is, as you look out, where does that leave us? We're not about managing for short term for quarters.***

We're really about thinking about the long term for the business. In 2025, there won't be ACP and we'll still have the continued tailwind of newly built passings both organic as well as rural footprint. And then I think there's just the big questions or variables that will exist is lower interest rate environment, does that impact mortgages in a way that drives higher move rates? Have we seen the peak cell phone Internet impact? It appears that that's the case.

And can we drive even higher Internet sales as well as all of the additional bundling and higher product value packaging that I described through our new pricing and packaging and really even more so than today start to fully realize the benefits of mobile not just through churn but through additional Internet acquisition rates. And then finally, really a bogey variable one that we wouldn't bet on but I think is out there in terms of option value is can video a reconstituted video can that really provide broadband acquisition and retention support? So that's probably much

longer as you look towards the tail end of next year and beyond. ***But I think we're making the right investments and doing the right things to compete. We are still very much in a atypical low churn environment when you exclude ACP.***

<u>*The Fourth Quarter and Full Year 2024 Financial Results*</u>

33.     On January 31, 2025, Charter issued a press release announcing fourth quarter and full year 2024 financial results. The Company reported fourth quarter Adjusted EBITDA of $5.8 billion, which grew by 3.4% year-over-year. Charter also announced residential Internet customers decreased once more by 177,000, driven by the end of the ACP and adverse weather events. Defendant Winfrey, however, maintained the Company's business strategy was working, stating in the press release:

> ***Our multi-year investments in network evolution, expansion and execution are delivering tangible results.*** By having the best network, the best products and delivering customers the most value with unmatched service, ***we are well-positioned for customer and profitability growth and have clear visibility to free cash flow growth following this unique one-time investment cycle.***

34.     On the same day, the Defendants held an earnings call to discuss Charter's latest financial results. In prepared remarks, Defendant Winfrey claimed that Internet customer decline from the end of the ACP had been resolved, stating, in relevant part:

> In 2024, ***we managed the end of the affordable connectivity program successfully.*** Outside of normal churn, we kept roughly 90% of former ACP customers connected.
>
> <div align="center">***</div>
>
> As we look to 2025 and beyond, the environment for broadband, mobile and video remains competitive, but we have better visibility than this time last year. ***The impact of the elimination of the ACP is now behind us.***

35.     On the same call, Defendant Fischer commented on how financial results would no longer be hindered by the termination of the ACP, stating, in relevant part:

> ***Beyond ACP and hurricane impacts, we were generally pleased with our Q4 customer results, and core Internet results, which exclude ACP and storm-related***

*losses, were better than last year.* We continue to compete well across our footprint.

<p style="text-align:center">***</p>

As laid out, we've invested in a strong platform for growth, which we expect to see materialize across the business over the next several years. *And as our capital spending peaks this year, we are poised for strong free cash flow growth and shareholder returns.*

36.    During the question-and-answer portion of the call, Defendant Winfrey had the following exchange with an analyst asking how the Company planned to grow internet subscriptions without ACP:

**<Q> Benjamin Swinburne, Analyst, Morgan Stanley:** Good morning. You had I think it's about 450,000 ACP related subscriber losses or impact in 2024. I'm just wondering if you guys are thinking you can grow you can improve your broadband results in 2025 versus 2024 when you consider no ACP. Obviously, storms are a wildcard, but you'll have more and more rural footprint behind you. And then, Chris, I can't remember the last time your video subscriber numbers outperformed both customer metrics and broadband metrics. Sounds like you guys are maybe selling into the base a bit and subsidizing that with some broadband. I wonder if you could talk a little bit about what's happening inside of your offers and inside the business that's creating this kind of mix shift and how we might think about that as we move forward?

**<A> Defendant Winfrey:** *Look, Ben, from an outlook perspective, we're really confident about the midterm our ability to grow Internet.* But we're also sensitive to the fact that there's [] on the cusp in particular periods of time between net loss versus net gain. And so I'm not going to comment on short term small impacts to gross adds or disconnects can have a big impact. But we won't have the ACP losses this year. And so that's a huge benefit.

<p style="text-align:center">***</p>

*It's only going to get better.* And that doesn't mean that's not a quarterly outlook on video, don't get me wrong. *It's just saying that over time, as our capabilities increase or selling capabilities and trading to rebundle these services is enhanced. I think it gives us real benefit not just to video, but also into broadband and to mobile….*

### *The First Quarter 2025 Financial Results*

37.    On April 25, 2025, Charter issued a press release announcing first quarter 2025

<p style="text-align:center">12</p>

financial results. The Company reported first quarter Adjusted EBITDA of $5.8 billion, which grew by 4.8% year-over-year. Charter also announced residential Internet customers decreased once again, this time by 66,000, including approximately 9,000 customer disconnects related to California wildfires. Notwithstanding the substantial losses, Defendant Winfrey remained firm that the Company was executing well, stating in the press release:

> We continue to execute on our long-held strategy of delivering the best network and products, at the best value, combined with unmatched service. ***That strategy is working, as evidenced by our first quarter results. We remain on track to deliver customer, EBITDA and robust free cash flow results for many years to come***, driving outstanding shareholder value.

38.     On the same day, the Defendants held an earnings call to discuss Charter's latest financial results. In prepared remarks, Defendant Winfrey claimed that the Company remained competitive with Internet customer subscriptions after the ACP, stating, in relevant part:

> ***Our Internet customer results improved year over year as we continue to compete well and with the affordable connectivity program headwind now behind us.*** Revenue was relatively flat year over year, while EBITDA growth accelerated to 4.8%, driven by a strong contribution from mobile growth and continually improving service quality through employee and technology investments, which also reduced service transactions and cost. The operating environment remains competitive, but ***the impact of the elimination of the ACP is behind us.***

40.     On the same call, Defendant Fischer commented the Company's execution mitigated Internet disruptions caused by wildfires, stating, in relevant part:

> As Chris mentioned last quarter, we are committed to these communities and to actively rebuilding them. Our first quarter customer results include approximately 9,000 disconnects related to the fires. We provided credits to impacted customers and also incurred some incremental expenses, but ***first quarter adjusted EBITDA was not meaningfully impacted by either.***

39.     During the question-and-answer portion of the call, Defendant Winfrey had the following exchange with an analyst who asked how the Company planned to grow internet subscriptions without ACP:

**<Q> Jim Schneider, Analyst, Goldman Sachs:** I was wondering if you could maybe give us a bit of an update on what you see in terms of the broader consumer behavior in your base. One of your peers sort of called out higher mobile substitution in some of their cohorts. I'm wondering if you're seeing any of those effects. But then more broadly, maybe talk about any consumer trade down effects, pressure in credit mix, although they didn't seem to show up this quarter in any way. Just kind of wondering what you're hearing anecdotally from the consumer side based on all the sort of macro uncertainty we have right now.

**<A> Defendant Winfrey:** Look, I don't think what we're seeing is that different, and I'll come to that. But I just want to be clear. Our sales are up, and our churn is relatively stable despite the higher nonpay disconnect that that Jessica mentioned. So we feel good about our own trends. ***The factors that are going into broadband industry growth right now, the end of ACP. It's largely behind us.***

I assume that's the same for the industry as a whole. As you mentioned, mobile substitution, including some low-end cell phone Internet migration, is almost back to where it was pre pandemic, so it's continuing. But my hope is that slows and gets back to where it was, and that's our expectation. So both of those, I think, are going our direction in terms of industry growth.

The one of the big bogeys here is, you know, we'll have to see where the housing market goes, and that's always been a contributor to broadband industry growth that hasn't changed. ***So the first two I mentioned, end of ACP, mobile substitution reversion, I think, are going our direction.*** The housing climate is a is a little bit unknown right now, and that'll have an impact. But even that, you know, tends to be temporary in nature. And then the other thing that you asked about is essentially, I think the market climate really is a recession question.

***We have not seen anything significant with the consumer so far and neither in nonpay disconnect rates. They're up slightly only because of the lack of ACP.*** And I would say in a in a market environment where customers are rightfully tightening their wallet, our strategy is to go back and think about what I just said with Ben and Jonathan. Our strategy of having the very best products and service at attractive prices and focusing on saving customers money. If you look at that slide that's in the presentation that we had today, it's huge money….

40.    The statements referenced in paragraphs 21-39 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and outlook. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the impact of the ACP end was a material event the Company was unable to manage or promptly move beyond; (ii) the ACP end was actually having a sustaining impact on

Internet customer declines and revenue; (iii) neither was the Company executing broader operations in a way that would compensate for, or overcome the impact, of the ACP ending; (iv) the Internet customer declines and broader failure of Charter's execution strategy created much greater risks on business plans and earnings growth than reported; (v) accordingly, the Company had no reasonable basis to state the Company was successfully executing operations, managing causes of Internet customer declines, or provide overly optimistic statements about the long term trajectory of the Company and EBITDA growth;  and (iv) as a result of the foregoing, Defendants materially misled with, and/or lacked a reasonable basis for, their positive statements about the Company's business, operations, outlook during the Class Period.

### The Truth Begins to Emerge

41.    On July 25, 2025, before the market opened, Charter issued a press release announcing its second quarter 2025 financial results.  The Company disclosed second quarter Adjusted EBITDA of $5.7 billion "***grew*** by 0.5% year-over-year." The figure, however, missed analyst consensus estimates.

42.    Charter also reported total Internet customers decreased by 117,000, compared to a decline of 149,000 during the second quarter of 2024. The drop included the impact of approximately 50,000 disconnects related to the end of the ACP in the second quarter of 2024. The Internet customer decrease number also marked a dramatic reversal of slowing customer losses, when compared to the prior quarter of only 66,000 Internet customer decreases.

43.    While the Company simply missing consensus estimates for EBITDA would have been sufficient to surprise investors, the reported EBITDA growth would later be categorized as a decline coming out of earnings call later in the morning (before the market opened). Similarly, the full impact of the Internet customer decline was not confirmed until the same Company's earnings

call.

44.     During the Company earnings call, Defendant Fischer disclosed that "Other revenue" earned during the quarter was driven by higher mobile device sales and "a $45 million onetime benefit." This disclosure indicated that EBIDTA actually *declined* during the quarter, but for the one-time event. Defendant Fischer conceded this point during the question-and-answer portion of the earnings call in the following exchange with an analyst:

> **<Q> Sebastiano Petti with JPMorgan:** [O]n EBITDA. So you reiterated expectations to grow EBITDA within 2025. Quick just a housekeeping question. So the — Jessica, the $45 million one-timer on other revenue. What's the flow through to the bottom line there? *I'm just trying to see if EBITDA would have grown in the second quarter, excluding that*.

> **<A> Defendant Fischer:** Yes. So Sebastiano, *the $45 million does fall all the way to the bottom line.* There was a little bit of bad debt expense against it, I think, around $7 million. So maybe it's like $38 million that falls all the way down. We did point out there was this sort of unusual storm activity as well. I think when you factor those couple of things in, you end up pretty close to flat. From a cost to serve, and I guess if I just sort of go through the outlook for expense line items, it really hasn't changed. So cost to serve had a difficult comp inside of last year. If you look across the quarters last year, this is really the only quarter that suffers from that issue. So I think still flat to *slightly down in the year-over-year*.

45.     Also during the earnings call, Defendant Fischer acknowledged that Internet customer losses had actually increased from the prior year second quarter, after adjusting for the impact of the ACP, stating in relevant part:

> Including residential and small business, we lost 117,000 Internet customers in the still seasonal second quarter, compared to a loss of about 100,000 in last year's 2Q when adjusted to remove last year's impact of about 50,000 ACP-related disconnects.

46.     On the same earning call, Defendant Winfrey additionally revealed that, despite previously claiming it was behind the Company, the ACP continued to plague Internet subscription revenues. This information came to light during the question-and-answer portion of the earnings

call when Defendant Winfrey had the following exchange with an analyst:

> **<Q> John Hodulik, Analyst UBS:** [S]witching to broadband, Chris, you gave some sort of high-level sort of detail on sort of gross adds, non-pay churn and voluntary churn. And it seems like the nonpay churn might have been one of the drivers of the sort of core declines. Is there any way you could give a little bit more color on that? It sounds like you're having such success getting new customers in, but that nonpaid churn, maybe stemming from ACP, stepped up a bit. So any color on sort of that dynamic would be great.

> **<A> Defendant Winfrey:** So the nonpay, just taking a step back, is still at relatively low historic levels. However, it's stepped up year-over-year. And the reason that nonpay has stepped up year-over-year is because twofold. ***One is you have former ACP customers, who are economically challenged and have a higher nonpay rate systemically without the benefit of the subsidy from a year-over-year standpoint. But in addition to that, from a year-over-year standpoint, you have newly acquired customers, who would have qualified for the ACP, who don't have ACP today and therefore, they have — those newly acquired customers have a higher nonpay rate than they would otherwise.*** But just take a step back to be clear, non-pay is up year-over-year. It's not dramatic, and it's not at a level that exceeds, where we were certainly pre-pandemic, but it's enough that on the cusp of net gain versus net loss that it has some impact that's offsetting the benefit that we have from higher sales and lower voluntary churn.

47. Investors and the market immediately reacted to these disclosures. For instance, BNP Paribas issued an alarming analyst note soon after the earning call. Regarding EBITDA, the note stated, "EBITDA – already declined in 2Q. The CFO confirmed 2Q EBITDA included a full flow through of a $45m one off in revenue, without this item ***EBITDA would have missed expectations by -2.4% in 2Q and would have declined -0.3% y/y***."

48. Barclays also published a research note after the earnings call. The note cast doubt on the Company's supposed execution plan, and specifically, its broadband Internet operations, stating:

> **Execution quality narrative will need more consistent performance**
>
> Charter has benefited from a narrative of better execution vs. peers on the back of expectations of better broadband subscriber performance vs. peers. The quarter will make it tougher to defend this narrative.

***

**Broadband sub weakness:** ***Charter management had outlined expectations for broadband sub growth***, which is the primary KPI focus for investors, to turn around this year and has indicated that it might get back to growth in the future. ***This in part has helped support a narrative of better execution at Charter*** and anchored expectations for Charter's broadband performance to be better than Comcast and was reflected in consensus estimates into the quarter of ~70k net sub losses at Charter vs. ~240 losses at Comcast. ***However, Charter came in worse vs. these estimates at 111k net broadband sub losses…***

49.    On these events, Charter's stock price fell $70.25 per share, or 18.4%, to close at $309.75 per share on July 25, 2025.

50.    Further, after the close of trading, BNP Paribas analysts published a second research note, in which it lowered Chater's price target to $285 from $340, or 16%. BNP Paribas led the note with, "***EBITDA, ex[cluding]-one offs, likely declined for the first time in history.***" BNP Paribas also called the broadband Internet customer losses ***"accelerated, with 'core' markets likely suffering the worst ever decline."*** In response to price decline for the day, the note stated, "***Charter stock is down close to 18% on the 2Q25 miss. Is this fair? We think yes…***"

51.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Charter securities, purchased call options on Charter common stock, or sold put options on Charter common stock, between July 26, 2024, and July 24, 2025, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their

legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Charter's securities were actively traded on the NASDAQ. The Company reported more than 136 million shares of Class A common stock outstanding as of June 30, 2025. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Charter securities were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Charter or its transfer agent, and may be notified of the pendency of this action by mail or email, using a form of notice similar to that customarily used in securities class actions.

54.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' actions as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the

Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Charter; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

57.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

58.    The market for Charter's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Charter's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class, relying upon the integrity of the market price of the Company's securities and market information relating to Charter, purchased or otherwise acquired Charter's securities and have been damaged thereby.

59.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Charter's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Charter's business, operations, and prospects as alleged herein.

60.    At all relevant times, the material misrepresentations and omissions particularized

in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Charter's financial well-being and prospects. These material misstatements and/or omissions had the effect of creating, in the market, an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

61.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

62.     During the Class Period, Plaintiff and the Class purchased Charter's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

63.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Charter, and, as to the Management Defendants, their control over, and/or receipt and/or modification of Charter's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Charter, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

64.     The market for Charter's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Charter's securities traded at artificially inflated prices during the Class Period. On June 24, 2024, the Company's common stock price closed at a Class Period-high of $163.85 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Charter's securities and market information relating to Charter, and have been damaged thereby.

65.     During the Class Period, the artificial inflation of Charter's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Charter's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Charter and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company

securities. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

66.    At all relevant times, the market for Charter's securities was an efficient market for the following reasons, among others:

(a)    Charter securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market.

(b)    As a regulated issuer, Charter filed periodic public reports with the SEC and/or the NASDAQ.

(c)    Charter regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Charter was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

67.    As a result of the foregoing, the market for Charter's securities promptly digested current information regarding Charter from all publicly available sources and reflected such information in Charter's common stock price. Under these circumstances, all purchasers of Charter's securities during the Class Period suffered similar injury through their purchase of Charter's securities at artificially inflated prices and a presumption of reliance applies.

68.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

69.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of

Charter who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

70.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 21-69 above as if fully set forth herein.

71.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Charter's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

72.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Charter's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

73.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the wires and/or mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Charter's financial well-being and prospects, as specified herein.

74.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Charter's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Charter and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

75.    Each of the Management Defendants' primary liability and controlling person liability arises from the following facts: (i) the Management Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

76.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Charter's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

77.    As a result of the dissemination of materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Charter's securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Charter's securities during the Class Period at artificially high prices and were damaged thereby.

78.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Charter was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Charter securities, or, if they

had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

79.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against the Management Defendants

81.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 21-69 above as if fully set forth herein.

82.    Management Defendants acted as controlling persons of Charter within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the

83.    Company with the SEC and disseminated to the investing public, Management Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Management Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

84.    In particular, Management Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

85.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Management Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

86.    WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

87.    Plaintiff hereby demands a trial by jury.

DATED: August 14, 2025                    Respectfully submitted,

                                          **SHAMIS & GENTILE, P.A.**

                                          By: */s/ Andrew J. Shamis*
                                          Andrew J. Shamis (NY Bar No. 5195185)
                                          14 NE 1st Avenue, Suite 705
                                          Miami, FL 33132
                                          Tel: (305) 479-2299
                                          Email: ashamis@shamisgentile.com

                                          **EDELSBERG LAW, P.A.**
                                          Scott Edelsberg (*pro hac vice* forthcoming)
                                          Gabriel Mandler (*pro hac vice* forthcoming)
                                          20900 NE 30th Avenue, Suite 417
                                          Aventura, FL 33180
                                          Tel: (786) 289-9471
                                          Fax: (786) 623-0915
                                          Email: scott@edelsberglaw.com
                                          Email: gabriel@edelsberglaw.com

                                          *Attorneys for Plaintiff Mark Sandoval*

## PLAINTIFF'S SWORN CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Mark Sandoval, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification and to institute legal action against Charter Communications, Inc. ("Charter") and other defendants.  I have reviewed a complaint filed against Charter and other defendants, alleging violations of the federal securities laws on behalf of all those who purchased or otherwise acquired Charter securities, and authorize its filing and/or the filing of a Lead Plaintiff motion.

2.      I did not purchase or acquire Charter securities or options at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.

4.      My transactions in Charter securities and options during the Class Period are identified in the annexed table.

5.      I have not served nor sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years.

6.      I will not accept payment for serving as a lead plaintiff beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of August, 2025.          _____

                                                  Mark Sandoval

**ANNEX**
**TABLE OF TRANSACTIONS**
**Charter Communications, Inc.**
**(NASDAQ: CHTR)**

**Common Stock**

| DATE | TRANS TYPE | PRICE | QUANTITY |
|---|---|---|---|
| 5/19/2025 | Buy | $423.13 | 2 |
| 4/21/2025 | Buy | $331.05 | 1 |
| 4/21/2025 | Buy | $331.07 | 1 |
| 6/9/2025 | Sell | $395.63 | 4 |

**Options**

| OPTION | DATE | TRANS TYPE | PRICE | LOT QUANTITY |
|---|---|---|---|---|
| 01 Aug 25 Call @ $397.50 | 7/23/2025 | Buy | $19.60 | 2 |

Doc ID: 3b87486d3e3db96df51c52fc92258b03ee46ce84