**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK SANDOVAL, Individually and on behalf of all others similarly situated, | No.: 1:25-cv-06747-LJL |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | **<u>JURY TRIAL DEMANDED</u>** |
| CHARTER COMMUNICATIONS, INC., JESSICA FISCHER, and CHRIS WINFREY, | |
| Defendants. | |

**[CORRECTED] AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................ 2

II.     JURISDICTION AND VENUE ......................................................................... 10

III.    PARTIES ........................................................................................................... 11

        A.      Lead Plaintiff .........................................................................................11

        B.      Defendants .............................................................................................11

                1.      Charter...........................................................................................11

                2.      Individual Defendants....................................................................11

        C.      Non-Defendant Senior Executives at Charter Mentioned in Complaint ...............13

IV.     CONFIDENTIAL WITNESSES CITED IN COMPLAINT ............................. 15

V.      SUBSTANTIVE ALLEGATIONS ................................................................... 18

        A.      Overview of the Company .....................................................................18

        B.      The Government Creates the ACP, Which Becomes a Major Boon to Charter's Internet Business .....................................................................21

        C.      By Late 2023, Before the ACP Even Ended, Charter's Internet Subscriber Trends Were Deteriorating .................................................24

        D.      Once The ACP Was Set to End, Investors and Market Commentators Worried About a Potential Outsized Negative Impact on Charter's Business ...................................................................................................25

        E.      Leading Up to the Class Period, Defendants Assured Investors That They Were Well Prepared to Weather the ACP's End, and That the Impacts to Charter's Business Would Be Minimal ................................27

        F.      Throughout the Class Period, Defendants Assured Investors That They Were Managing the ACP's End Well, the Any Impacts Were a "Onetime" Event, and That, By January 2025, the ACP's Impact Was "Behind Us".............30

        G.      Liberty Broadband and Cox Communications Acquisitions ................34

                1.      Liberty Broadband Acquisition....................................................35

                2.      Cox Acquisition ............................................................................36

VI.    THE TRUTH IS REVEALED: CHARTER ANNOUNCES SUBSCRIBER LOSSES RELATED TO THE END OF THE ACP, RESULTING IN THE LARGEST STOCK DROP IN COMPANY HISTORY ................................................. 39

VII.   FORMER CHARTER EMPLOYEES CONFIRM DEFENDANTS' KNOWLEDGE OF ONGOING EFFECTS OF THE END OF THE ACP ON CHARTER'S INTERNET SUBSCRIBER BASE WHICH CONTRADICTED DEFENDANTS' PUBLIC STATEMENTS ........................................................ 43

A.    Charter's Aggressive Use of ACP Program as a Sales Tool Drove Short-Term Growth, but Created a Cohort of Customers at High Risk of Churn Once the ACP Ended ........................................................... 43

1.    Charter's ACP Enrollment Strategy and Onboarding of High-Risk Customers ........................................................... 43

2.    Charter Prioritized Subscription Numbers Over Payment Collection from ACP Subscribers ................................................... 46

3.    As the End of ACP Approached, Widespread Concern Mounted Regarding Post-ACP Fallout.................................................... 47

B.    Charter Converted ACP Subscribers to Other Pay Plans They Couldn't Afford to Avoid a Onetime ACP Churn Bomb in 2024 ....................... 50

C.    ACP Customers Start Not Paying And Disconnecting Once the ACP Ends ......... 54

D.    Charter's Struggle to Keep Up with its Competition Intensifies as ACP Customer Churn Increases ................................................... 57

E.    Senior Executives Including the Individual Defendants Internally Tracked ACP Subscriber Data and Discussed Worsening Trends Among This Cohort ................................................... 58

1.    ACP Reports and Data Tracking................................................... 58

2.    Meetings Where ACP Metrics and Churn Were Discussed ..................... 61

VIII.  THE DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .......................................... 65

A.    July 26, 2024: Q2 2024 Financial Results ........................................... 66

B.    September 4, 2024: BofA Securities Media Communications & Entertainment Conference ................................................... 73

C.    November 1, 2024: Q3 2024 Financial Results ...................................... 75

D.    November 14, 2024: Liberty Media Investor Day.................................... 80

E.      January 31, 2025: Q4 2024 Financial Results .......................................................81

F.      March 3, 2025: Morgan Stanley Technology, Media & Telecom Conference ............................................................................................................................84

G.      March 10, 2025: Deutsche Bank Media, Internet & Telecom Conference ...........86

H.      April 25, 2025: Q1 2025 Financial Results .........................................................88

IX.     ADDITIONAL INDICIA OF SCIENTER ........................................................................ 90

A.      The Individual Defendants Closely Monitored ACP Impacts Yet Repeatedly Assured Investors During the Class Period That the Effects of the End of the ACP Were "Behind" the Company ...............................................92

B.      Defendants Had Strong Financial Incentives to Artificially Inflate Charter's Stock Price to Complete the Acquisitions of Liberty Broadband and Cox Using Charter Stock ...............................................................................................93

C.      Core Operations: Broadband Was the Core Revenue Driver of Charter's Business ...............................................................................................................95

D.      Statements by Former Charter Employees and Consultants Corroborate That Defendants Knew or Recklessly Disregarded the Falsity of Their Statements and Omissions at the Time the Statements Were Made ......................98

X.      LOSS CAUSATION/ECONOMIC LOSS ...................................................................... 100

XI.     CLASS ACTION ALLEGATIONS ............................................................................... 103

XII.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE........... 105

XIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................................... 107

XIV.    CONTROL PERSON ALLEGATIONS.......................................................................... 108

XV.     CAUSES OF ACTION .................................................................................................. 110

COUNT I  FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 (AGAINST DEFENDANT CHARTER AND THE INDIVIDUAL DEFENDANTS) ..................................................................... 110

COUNT II  FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST THE INDIVIDUAL DEFENDANTS)......................................... 111

XVI.    PRAYER FOR RELIEF .................................................................................................. 112

XVII.   JURY TRIAL DEMANDED........................................................................................... 113

Court-appointed Lead Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of the Employees' Retirement System of the State of Rhode Island ("Lead Plaintiff" or "Rhode Island"), by and through its undersigned counsel, hereby brings this Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") against Charter Communications, Inc. ("Charter" or the "Company"), Christopher L. Winfrey ("Winfrey"), and Jessica M. Fischer ("Fischer," collectively with Charter and Winfrey, the "Defendants").[1]  Lead Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, on behalf of itself and all other persons and entities who purchased or otherwise acquired the publicly traded common stock and exchange-traded call options, or sold the exchange-traded put options of Charter between July 26, 2024 through July 24, 2025, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

The allegations herein are based on Lead Plaintiff's personal knowledge as to its own acts, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of the undersigned Co-Lead Counsel, which included, among other things, a review of: SEC filings by Charter; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews with former employees of Charter[2] and others with knowledge of the matters alleged herein; and consultation with experts in

---

[1] Defendants Winfrey and Fischer are referred to herein as the "Individual Defendants."

[2] Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2).  All CWs will be described in the masculine to protect their identities.

the areas of loss causation and damages. Co-Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Lead Plaintiff alleges as follows:

## I.     INTRODUCTION

1.     Charter is a national provider of high-speed internet, video, mobile, and voice services to residential and commercial customers. Throughout the Class Period, Charter's largest and most important business was its residential internet business, and the Company's single most important performance metric was its broadband internet subscriber growth. Indeed, a Barclays investment analyst referred to Charter's "**broadband sub[scriber] growth**" as the "**primary [Key Performance Indicator] focus for investors**."[3]

2.     In November 2021, Congress enacted the Affordable Connectivity Program ("ACP"), a $14 billion plan to provide high-speed internet service to low-income rural customers at no cost to the customer. Under the ACP, the Federal Communications Commission ("FCC") would directly reimburse broadband providers for offering discounted internet plans to eligible low-income subscribers.

3.     The ACP was a major boon to Charter's internet subscriber base and overall revenues. Indeed, by 2023, Charter was the single largest ACP participant in the United States, with approximately five (5) million of its broadband customers receiving ACP benefits, representing nearly 17% of Charter's broadband subscribers. In the first year of the ACP, Charter

---

[3] Unless otherwise noted, all emphasis has been added.

2

received roughly $1 billion in reimbursement from the federal government's subsidy of ACP internet customers.

4.      However, funding for the ACP was slated to run out in 2024.  In early 2024, the FCC announced that, because additional funding had not been secured, no new ACP subscribers would be enrolled after February 7, 2024 and all ACP subsidies would terminate in May 2024. This development posed a significant problem for Charter.  As of late 2023—when it became increasingly clear that ACP funding would not be renewed—securities analysts and investors began expressing concern that the loss of federal subsidies would leave millions of Charter's low-income ACP subscribers unable to afford internet service, resulting in cancellations or non-payment.  For example, during a December 5, 2023 investor call, a UBS analyst observed that "a question we get a lot from investors is the ACP program."  Similarly, at a March 12, 2024 investor conference, a Deutsche Bank analyst noted that "the end of funding for ACP has been a concern for investors, given the exposure that you have."  And in a July 12, 2024 report, Morningstar cautioned that "Charter's heavy exposure to the Affordable Connectivity Program, a federal broadband subsidy, may [] impair growth in the short term as funding dries up in 2024."

5.      Accordingly, throughout the Class Period, in response to mounting market concerns, Defendants continued to assure investors that the impact of the ACP's expiration was temporary, manageable, and would be fully behind the Company by the end of 2024.  For example, on July 26, 2024—the first day of the Class Period—during Charter's Q2 2024 Earnings Call, Defendant CEO Winfrey told investors that the impact of the ACP's recent end was "***temporary***" and "***onetime in nature***."  While Winfrey acknowledged that Charter had lost some subscribers during this quarter due to the ACP expiring, he stated that any further impact from the end of the ACP would only last through "Q3" of 2024 and "***trailing . . . a little bit into Q4***," because Charter

was doing well at "*managing through that onetime impact*."  Moreover, Charter was *"doing really well" at "preserv[ing]" ACP customers*—i.e., keeping them on as internet subscribers even after the ACP funding ended.

6.     Analysts and investors were reassured by Defendants' statements about the end of the ACP and broadband subscriber retention.  For example, Deutsche Bank headlined its July 26, 2024 report "No ACP, No Problem," while, on the same day, UBS cited "limited ACP impact," and Evercore ISI noted, on July 29, 2024, that "[h]eadwinds from the ACP sunset in 2Q were not as bad as we and the Street had anticipated," and fully credited Defendants' claim that the impact was "onetime," stating that "the net impacts from this 1x event are shaping up to be manageable."

7.     As the Class Period progressed, Defendants continued to emphatically and repeatedly affirm to investors that the "onetime" impact of the ACP's end would be over before the end of 2024, and that the Company had been "successful" in keeping ex-ACP customers as subscribers.  For example, at the September 4, 2024 Bank of America Conference, Defendant Winfrey claimed that the impact of "voluntary" terminations by ACP customers—subscribers who proactively canceled their internet service when the ACP ended—"has largely made its way through the system[,] [s]o I think we've seen what we're going to see in voluntary [terminations]." And as for "nonpay" terminations by ex-ACP customers—terminations that occurred automatically after a customer failed to pay their bills for a specified amount of time—Winfrey again emphasized that this risk would soon subside, as "*most of the highest risk nonpay . . . makes its way through over the next 2 months from right now.  So some of that will fall in Q3.  Some of it will fall in Q4*."  As such, Winfrey reemphasized, "*it's a onetime issue, right, in terms of the impact of ACP going away*."

8.      During a September 11, 2024 conference, Defendant Winfrey, Charter's CEO, emphasized that the "*majority of the nonpay disconnect that we'll experience will be through September and October and a little bit inside of November*."  During the Company's Q3 2024 Earnings Call, on November 1, 2024, Winfrey stated that the Company was "*successfully managing the transition of customers previously on the government's Affordable Connectivity Program*."  Winfrey reiterated that, while some additional nonpay customers would have their services terminated in Q4 2024, that would effectively be the end of the "onetime" impact, i.e., "*[a]fter those effects in the fourth quarter, we expect the onetime impacts from ACP to be behind us*."  Winfrey further reaffirmed his statements in a November 14, 2024 CNBC interview, stating that "*with ACP fully behind us, which it will be after the fourth quarter . . . we expect to return to a healthy rate of growth for broadband*."

9.      Defendants' statements reassured securities analysts that the ACP's impact on Charter's internet subscriber numbers would not continue past the end of 2024.  JPMorgan headlined its November 1, 2024 report "ACP Anxieties Alleviated Again."  On November 3, 2024, RBC Capital Markets emphasized the projected "internet losses in 4Q24 as the last one-time impact from the ACP funding unwind."  Morgan Stanley cited the "good news"[4] that "drag from Charter's industry high participation in the [ACP] in 2024 will be wrapped in 4Q24."  Oppenheimer reported that "ACP headwinds will . . . disappear next year[.]"

10.     On January 31, 2025, as Charter reported its financial results for Q4 2024, Defendant Winfrey triumphantly affirmed to investors that things had played out just as Defendants had promised they would.  Indeed, Winfrey now unequivocally asserted that the impacts of ACP customer losses were entirely over, i.e., "*[t]he impact of the elimination of the*

---

[4] Emphasis in original.

*ACP is now behind us*.”  Winfrey left no doubt as to his meaning, emphasizing that “*we won't have the ACP losses this year*,” which he emphasized was a “*huge benefit*.”

11.    Defendants continued to reiterate these assurances throughout the first half of 2025. For example, during a March 3, 2025 Morgan Stanley conference, Defendant Winfrey stated that the “*ACP*” was “*clearly behind us*.”  During a March 10, 2025 Deutsche Bank conference, Defendant Fischer emphasized that “*the onetime impact from the end of the ACP program is over*.”  And even as late as Charter's April 25, 2025 Q1 2025 Earnings Call, Winfrey again reiterated that “*the [ACP] headwind [is] now behind us*.”  Fueled by Defendants' statements, Charter's stock price reached a Class Period high of $437.06 per share on May 16, 2025.

12.    Meanwhile, with the ACP impact supposedly “behind” Charter—and its stock price artificially inflated by Defendants' statements—Charter was quietly negotiating the second largest merger in the Company's history, which was predominantly aimed at adding broadband customers to bolster Charter's otherwise stalling broadband business.  In January 2025, Charter began negotiations to merge with cable provider Cox Communications, Inc. (“Cox”)—a combination that promised to unseat Comcast Corporation (“Comcast”) as the nation's largest broadband internet provider.  Charter announced the merger and signed the definitive agreement on May 16, 2025.  Critically, most of the consideration Charter would pay to Cox's owners was tied to the price of Charter's common stock, as the merger consideration included billions of dollars' worth of partnership units convertible to common stock.  Indeed, according to the press release announcing the merger, at least $12 billion of the total $22 billion in estimated consideration value was directly based on Charter's volume weighted average stock price between February 24, 2025 and April 25, 2025.  Thus, Defendants were highly incentivized to maintain the value of Charter

stock at artificially inflated prices by postponing the disclosure of additional subscriber losses and negative ACP impacts until Charter signed the merger agreement with Cox.

13.     However, as was subsequently revealed, Defendants' repeated assurances regarding the end of the ACP and its impact on Charter were materially false and misleading.  The truth was revealed on July 25, 2025—just two months after the Cox merger agreement was signed—when Defendants disclosed that, contrary to their prior claims that the ACP's "onetime" impacts were "behind us," the opposite was true.  In reality, the end of the ACP had materially impacted Charter in two key ways: first, the Company had continued to lose significant numbers of former ACP subscribers who could no longer afford Charter's services without the ACP subsidy; and second, Charter would continue to lose recently-acquired customers who would have qualified for the ACP, as its "non-pay[s]" (customers at risk of termination) had also dramatically risen.  Specifically, Defendant Winfrey admitted that Charter's business was deteriorating because (i) former ACP customers had a "*higher nonpay rate systemically without the benefit of the [ACP] subsidy*," and (ii) "*newly acquired customers, who would have qualified for the ACP, who don't have ACP today . . . have a higher nonpay rate than they would otherwise*."  As a result, the Company revealed that it had continued to churn former ACP customers well into 2025, reporting "*50,000 disconnects related to the end of the FCC's Affordable Connectivity Program subsidies* in the second quarter of 2024."  Accordingly, far from being "behind us," the "headwind" from the ACP's end would continue to impact the Company into the foreseeable future, and Charter remained at high risk of losing even more of its millions of former ACP internet subscribers.

14.     On the news, Charter's stock price plummeted more than *18% in a single day*, from a closing price of $380.00 per share on July 24, 2025 to a closing price of $309.75 per share on

July 25, 2025, wiping out more than $10 billion in market capitalization, and representing the largest one-day stock price decline in the Company's history.  Charter's stock price has not recovered, and today, trades at approximately $188 per share.

15.    Analysts and market observers were stunned by these disclosures, noting that they stood in stark contrast to Defendants' representations mere months earlier that the impacts of the ACP were entirely over.  A July 25, 2025 *MarketWatch* article announced that "Charter [] is bleeding subscribers — and the stock had its worst day ever."  On July 27, 2025, analysts at Pivotal Research Group noted that "a worse than expected result highlighted by a y/y acceleration in net data subscriber losses" was what "drove a whopping nearly 20% decline in the shares."  On July 28, 2025, Raymond James reported that the "ACP hangover bites back" and that "[w]e had expected the last part of the ACP hangover to hit Charter in [the first quarter], so we were surprised when it did not." TD Cowen analysts lamented that a significant part of the "Charter disappointment is self-inflicted given the pain is partially coming from its large former ACP base," because "non-pay churn was up as former ACP customers struggle to pay their bills."  TD Cowen further warned that the new disclosure meant that, far from being "behind" Charter, the risk of losing even more ex-ACP subscribers was ongoing, as the "narrative [was] materializing" that there remained a significant ongoing "risk" to "Charter's sizable former ACP base (we estimate to be 4MM+ subscribers)."

16.    Lead Plaintiff's investigation has confirmed that, unbeknownst to investors, Defendants' Statements about the ACP, detailed herein, were materially false and misleading when made. Former Charter employees reveal, among other things, that:

(a)    Charter had leaned into the ACP far more aggressively than its competitors and used ACP as a sales tool to inflate broadband subscriber metrics in the short-term. Internally,

executives recognized that this would create a lasting structural hole in Charter's broadband base once ACP ended.

(b)     ACP-related subscriber losses were not temporary or "one-time" in nature, but they would repeat, well into 2025, driven primarily by post-ACP churn and continuing non-pay disconnects, as Charter lacked any viable long-term strategy for retaining the ACP cohort once their short-term retention promotions, credits and downgraded plans expired.

(c)     Charter executives tracked and had regular, detailed visibility on ACP subscribers and metrics, on a daily and weekly basis, through a combination of a proprietary system called Realtime, along with Power BI, Tableau, Salesforce, and BI MicroStrategy tools. This data showed how many former ACP subsidy customers were still on temporary promotions/offers (including in: (i) Offers Reports distributed to CCO Adam Ray, EVP, Sales Christian Ruiz and other senior executives; and (ii) through a program called Real Time Results), how many former ACP subscribers converted to other plans or promotions, how many were not paying, and how many disconnected their Charter service. This information also was used to create financial models to illustrate the impact of ACP ending. This data showed as of July 2024, that Charter was experiencing accelerating internet disconnects, rising nonpay churn, and intensifying customer distress among the former ACP subscribers who were internally recognized as a highly price-sensitive cohort prone to nonpay disconnects.

(d)     senior Charter executives, including Chief Commercial Officer, ("CCO") Adam Ray, EVP, Sales Christian Ruiz, and Chief Marketing Officer ("CMO") Sharon Peters, attended meetings to discuss the impact of ACP ending and how to offset its impact.  The effects of the ACP also were discussed at Regional Review Meetings, Quarterly Business Reviews, Quarterly Operational Reviews, Town Halls, and Web-ex meetings with senior leadership.

(e)     senior Charter executives frequently acknowledged that Charter would be hit harder and longer than its peers due to its disproportionate reliance on the ACP.

(f)     bridge promotions, temporary credits, and mobile bundling could not replicate the value of the ACP subsidy for Charter and were not economically viable or sustainable long-term. These offerings were, in many cases, still unaffordable for the ACP subscribers, did not replace the full ACP benefit in terms of revenues, and, due to their temporary nature, merely postponed—rather than prevented—the inevitable subscriber losses among the ACP cohort. CWs described these measures as a stop-gap or Band-Aid, and a way to "defer the problem."

(g)     Charter internally discussed "pain," "clear panic," and a "rough couple of years" the Company would face following ACP's end—facts that rendered Defendants' statements about successful mitigation, stable churn, and a limited or onetime impact of the end of ACP materially false and misleading when made.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Charter's securities when the truth was revealed and artificial inflation was removed from their prices, Lead Plaintiff and Class members suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Jurisdiction is conferred by Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Charter common stock trades on the NASDAQ Stock Market ("NASDAQ"), located within this Judicial District.

20.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiff

21.    Court-appointed Lead Plaintiff Rhode Island is a public pension fund whose investment portfolio includes $11.8 billion of State of Rhode Island pension assets, managed by the Office of the General Treasurer's investment team under policies set by the State Investment Commission.  The Treasury's investment division is tasked with investing the State's assets, most notably the defined benefit plan, which is the primary source of retirement income for more than 60,000 active and retired teachers, first responders, and state and municipal employees. As set forth in the Certification previously submitted to the Court (ECF No. 11-1), Rhode Island purchased Charter's common stock and notes series during the Class Period and suffered damages as a result of Defendants' fraud.

### B.    Defendants

#### 1.    Charter

22.    Defendant Charter is incorporated in the state of Delaware, with its principal executive offices located at 400 Washington Blvd., Stamford, Connecticut 06902.  During the Class Period, the Company's shares traded on the NASDAQ under the ticker symbol "CHTR."

#### 2.    Individual Defendants

23.    Defendant Christopher L. Winfrey ("Winfrey") was, at all relevant times, the President and Chief Executive Officer ("CEO") of Charter and served in that role during the Class Period.  Specifically, Winfrey has been President & CEO since December 2022 and was appointed

to Charter's Board of Directors in November 2023. In his role as President and CEO, Winfrey signed Charter's annual reports and signed Charter's certifications required pursuant to the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act of 2002 that were filed with Charter's annual and quarterly reports during the Class Period. Throughout his tenure as CEO, Winfrey also participated in the Company's quarterly earnings conference calls described herein. Prior to his appointment as President & CEO, Winfrey served in various roles at the Company. Winfrey originally joined Charter in 2010 as Chief Financial Officer ("CFO") and was later named Chief Operating Officer ("COO") in 2021.

24. Defendant Jessica M. Fischer ("Fischer") has served as Charter's CFO since 2021. According to the Company's website, "Fischer leads Charter Communications' accounting and finance operations, tax and risk management, investor relations, procurement, equity and capital markets strategy and execution, and M&A and investing activity. Jessica oversees the Company's capital allocation strategy that supports key initiatives including network evolution, broadband expansion and execution." The Company's website also notes that "[i]n 2024, [Fischer] played a key role in negotiating the definitive agreement between Charter and Liberty Broadband." Prior to her role as CFO, Fischer served as the Executive Vice President, Finance from January 2021 to October 2021, and served as the Senior Vice President, Finance and Corporate Treasurer from May 2018 to January 2021. She joined the Company as Corporate Treasurer in 2017. In her role as CFO, Fischer signed Charter's annual reports and signed Charter's certifications required pursuant to the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act of 2002 that were filed with Charter's annual and quarterly reports during the Class Period. Throughout her tenure as CFO, Fischer also participated in the Company's quarterly earnings conference calls described herein.

25.    Defendants Winfrey and Fischer are collectively referred to herein as the "Individual Defendants."    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Charter's SEC filings, press releases, and public presentations and statements alleged herein to be misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.    Because of their positions with Charter, and their access to material information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading.    The Individual Defendants are liable for the false statements and omissions pleaded herein.

### C.    Non-Defendant Senior Executives at Charter Mentioned in Complaint

26.    Throughout the Class Period, Adam Ray ("Ray") was Charter's Executive Vice President CCO.    According to Charter's website, Ray leads "Spectrum's residential and commercial sales and marketing efforts that introduce customers to the connectivity products and services they rely on every day.  Named Executive Vice President, Chief Commercial Officer in 2022, Adam oversees the Company's marketing, residential sales, Spectrum Business and Spectrum Community Solutions organizations, as well as operations business planning.  Adam's broad oversight of Spectrum's business operations drives sales and marketing alignment, operational efficiency and customer growth."  During the Class Period, CCO Ray reported directly to Defendant CEO Winfrey.

27.    Throughout the Class Period, Tom Monaghan ("Monaghan") was Charter's Executive Vice President, Field Operations.  According to Charter's website, Monaghan "leads a team of approximately 30,000 employees across 41 states.  In his role, Tom oversees the

Company's nine operating regions, serving its 31.2 million customers, as well as Field Operations' engineering and construction teams, supply chain management, and business planning. . . . He joined Spectrum in 2014 and has held multiple roles in operations management, including most recently as Senior Vice President, Field Operations." During the Class Period, Monaghan reported directly to Defendant CEO Winfrey.

28. Throughout the Class Period, Christian Ruiz ("Ruiz") was Charter's Executive Vice President, Sales. According to Charter's website, Ruiz "oversees Spectrum's residential sales efforts across its 41-state footprint. As Executive Vice President, Sales, he drives strategic direction and leads the execution across Spectrum's full range of sales channels, including digital, affiliate partnerships, Spectrum stores, direct sales and customer solutions, as well as inbound and outbound call centers. . . . Christian joined Spectrum in 2014 as Regional Vice President, Commercial Sales, and was promoted to Senior Vice President of Sales & Customer Solutions before stepping into his current position in 2022." During the Class Period, Ruiz reported to CCO Ray, who reported to Defendant CEO Winfrey.

29. Throughout the Class Period, Sharon Peters ("Peters") was Charter's Executive Vice President, CMO. According to Charter's website, Peters was "[n]amed Executive Vice President and Chief Marketing Officer in 2022 [and] leads all aspects of the Company's marketing and brand strategy, all B2B and B2C marketing and advertising campaigns, customer insights and research, media planning, and content and creative for Spectrum residential, Spectrum Business and Spectrum Community Solutions audiences."

**IV.    CONFIDENTIAL WITNESSES CITED IN COMPLAINT**

30.    This complaint references numerous former employees of Charter that support Lead Plaintiff's allegations herein.[5]

31.    CW-1 was employed by Charter for over a decade until the Spring of 2025 and worked out of Charter's offices in Stamford, Connecticut. CW-1's final role was as a Director in Marketing. CW-1 explained that he reported to a VP, who reported to an SVP, who reported to CMO Sharon Peters. According to CW-1, he had regular interactions with Peters.

32.    CW-2 was a Senior Director of Regional Stores from before the Class Period started through Spring 2025. Prior to that role, he oversaw a call center that interacted directly with potential ACP subscribers. As a Senior Director of Regional Stores, CW-2 oversaw 600 employees in 6 – 8 states depending on the month. CW-2 reported to Vice President, Spectrum Stores Brad Waggoner who was two to three levels below Executive Vice President, Sales Christian Ruiz. CW-2 noted that he had access to their numbers, sales/disconnects, and Real-Time. According to CW-2, those metrics were reported to the executive level once a week. CW-2 was able to see in real-time when they were getting their "tail kicked."

33.    CW-3 was a Director in Sales from well before the Class Period until after the Class Period ended. CW-3 managed more than 100 employees. According to CW-3, his responsibilities included meeting subscriber targets, implementing promotions, and reporting results up the chain of command. CW-3 attended regional and company-wide meetings and had regular access to performance reports for those he managed and who reported to him.

---

[5] Plaintiffs believe that the details of the responsibilities of all of the CWs contained herein are sufficient to satisfy the requirements of the PSLRA. However, Plaintiffs can provide additional specificity, including exact titles, for CW-1, CW-2, CW-3, CW-8, CW-9, and CW-13, to the Court through an *in-camera* submission.

34.    CW-4 was employed by Charter from September 2022 to early March 2025 as a Retention Specialist at a Spectrum call center in Austin, Texas. CW-4 explained that he fielded calls from disgruntled customers, and that it was his job to convince people wanting to terminate service to stay with Charter.

35.    CW-5 was employed at Charter in Digital Analytics before the Class Period through early 2024 and then re-employed on a contractual basis in the same capacity from Fall 2024 through the end of the Class Period. CW-5 explained that his responsibilities included collaborating on gathering data insights; facilitating the creation of precise quarterly and annual budgets for executive stakeholders; maintaining and developing daily, weekly, monthly, and trending reports as well as ad hoc analysis; and developed dashboards, custom segments and KPIs to align with business goals. CW-5 advised that in his final reporting structure he reported to a Director who reported to Senior Vice President, Digital Sales and Retail Rohan Kumar.

36.    CW-6 was a Financial Planning Analyst at Charter's office in Stamford, Connecticut from November 2021 through March 2025. CW-6 stated that in his role, he was responsible for modeling, budgeting and forecasting the financial impact of the ending of ACP.

37.    CW-7 worked for Charter from June 2021 until February 2025 in the following roles: Senior Manager of Stores (June 2021-August 2022); Director of Sales (August 2022-July 2023); and Director of Stores (July 2023-February 2025). In his last role as Director of Stores, CW-7 was responsible for managing six district managers and 78 stores in seven states.

38.    CW-8 was employed by Charter as a Senior Manager in Sales from before the start of the Class Period until the end of 2024. CW-8's responsibilities included operational and facility oversight. CW-8 reported to a Senior Vice President who reported to Executive Vice President, Sales Christian Ruiz, who reported to Chief Commercial Officer Adam Ray. CW-8 advised that

16

in this role, multiple directors reported to him, along with managers, supervisors, and frontline agents, and his organization also included the training department and a facility manager.

39.    CW-9 was employed by Charter as a VP of Marketing from September 2022 until June 2024. CW-9 served in other roles at Charter prior to September 2022.

40.    CW-10 was employed by Charter in a variety of roles from July 2007 until May 2024. CW-10's previous roles included Business Process Analyst, Sales and Retention Supervisor, and Inbound Sales Specialist before he transitioned to his final role, Senior Manager sales and marketing operations, which he occupied from February 2012 until his departure in May 2024 in Madison, Wisconsin.  According to CW-10, in his role he was in charge of compliance metrics, which was essentially an auditing, fraud, and compliance role. CW-10 explained that he was responsible for ensuring policies for selling, work orders, and returns were done properly. CW-10 further noted that this included making sure credit risk reports were done properly, along with responsibilities over the equipment supply chain in his region and ensuring that returns were carried out correctly. CW-10 added that as a part of his role he had exposure to return figures and metrics in his region.

41.    CW-11 joined Charter as an Inbound Sales Supervisor prior to the Class Period and then served as an Inbound Retention Supervisor from May 2024 through the end of the Class Period. CW-11 worked out of a site in North Carolina and then Florida.

42.    CW-12 was employed by Charter as a Director from November 2022 through August 2024 in Cincinnati, Ohio. In his role as Director, CW-12 reported to Jody Finn, Vice President of Direct Sales for Central Division and Finn reported to Kelly Meisner, Regional Vice President, who reported to Christian Ruiz, Executive Vice President.  There was a period of CW-12's tenure where Finn was not at Charter, but he later returned to the Company.

43.    CW-13 was employed by Charter as a Director in the Marketing Department from June 2024 through March 2025 in Stamford, Connecticut. CW-13 held other positions in that department prior to June 2024. CW-13 explained that he was in charge of communications to prospective customers. CW-13 explained that in his role, he was responsible for a targeted mail program, which included mailings that were sent out to ACP-eligible households to try to get them to sign up for the program.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Overview of the Company

44.    Charter is a leading broadband connectivity company that offers a range of communications services—high-speed internet, mobile, video, and voice—to residential and commercial customers across the United States under the "Spectrum" brand.  Charter serves approximately fifty-eight (58) million homes and businesses in forty-one (41) states, making it one of the largest internet and cable providers in the country.  Historically, the Company has generated approximately 80% of revenue from residential customers.  For example, in 2024, Charter reported approximately $55.1 billion in total revenue, of which $43 billion came from residential services, followed by commercial services (approximately $7.3 billion), and advertising sales (approximately $1.8 billion).

45.    Charter's primary and most durable revenue driver is providing residential internet service.  For example, in 2024, residential internet services accounted for the majority of Charter's total residential services revenue—generating approximately 55% of Charter's total residential revenue—and made up 42% of its overall total revenue.  Moreover, over 95% of Charter's overall residential customer relationships have the Company's internet services.  As such, growth in internet subscribers has always been fundamental to Charter's overall financial performance and earnings.  In comparison, approximately only 27.5% of Charter's total revenues came from video

18

service in 2024, and approximately 5.6% of Charter's total revenues came from mobile service. Moreover, because virtually all of Charter's customers (roughly 95%) are internet subscribers, Charter uses its internet service as the foundational product upon which to build service bundles, and thus its broadband internet subscribers are the main customer base to which Charter markets other products.

46.    Because of the critical importance of broadband internet to Charter's overall business, the most important performance metrics to Charter's investors are its internet subscriber metrics, and especially its net broadband subscriber adds.  Indeed, Barclays analysts referred to the Company's "***broadband sub[scriber] growth***" as the "***primary [Key Performance Indicator] focus for investors***."  Wolfe Research similarly called net broadband adds a "critical KPI[]" for Charter's business.  And Defendant Winfrey himself acknowledged, in a call subsequent to the Class Period (on December 8, 2025), that "***priority #1 is to position the [C]ompany to return to broadband growth***."  Indeed, broadband internet is the Company's most important product and the core driver of revenue, customer growth, and Adjusted EBITDA[6]—a critical measure of the Company's profitability.  Moreover, because virtually all of Charter's customers are internet customers, the Company's broadband internet serves as the foundation for Charter's bundled mobile, video, and voice offerings, making broadband customer retention essential to the Company's overall business model.

47.    From 2016 through 2020, Charter invested more than $25 billion to expand its broadband infrastructure, particularly in rural and underserved areas.  The success of these investments depended on Charter's ability to attract and retain customers in these markets,

---

[6] Adjusted EBITDA is a non-GAAP financial measure the Company uses to evaluate its operating performance.  It modifies traditional EBITDA to exclude certain items that Charter's management considers non-operational or non-cash.

including through federal subsidy programs such as the ACP. Indeed, Charter invested more than $5.5 billion toward upgrading its network speeds.

48.     From year-end 2021 through the end of the ACP in June 2024, Charter's reported broadband internet subscriber count remained relatively constant at approximately thirty (30) million customers.  Specifically, Charter reported approximately 30.1 million internet customers at year-end 2021, 30.4 million at year-end 2022, 30.6 million at year-end 2023, and 30.4 million internet customers as of June 30, 2024, the close of the ACP benefit period.

49.     At the time the ACP ended, a substantial portion of Charter's core broadband customer base was reliant on federal subsidies, rendering broadband subscriber trends, churn, and revenue highly exposed to the program's expiration.  Indeed, by late 2023 and into the first half of 2024, Charter itself disclosed that "just over" five (5) million households were receiving ACP subsidies, which equated to approximately 15% to 17% of Charter's total broadband subscribers as of June 30, 2024.  This was a far higher contingent than Charter's close competitors in the ACP provider space—e.g., Comcast (~7-8% ACP), AT&T (~7-8% ACP), Cox (~7% ACP).

50.     Defendants, and Defendant Winfrey in particular, acknowledged that even small declines in internet subscriber "gross adds," and small increases in internet subscriber churn had an outsized effect on Charter's net adds, a metric watched closely by analysts.  For example, on the Company's April 26, 2024 Q1 2024 Earning Call, Defendant Winfrey stated: "small shifts in gross adds in particular, or even churn . . . really has an outsized impact on net adds.  And so that's going to definitely, as I mentioned before, it's going to be the case in the seasonal Q2, also with the end of ACP, all of which is temporary in nature."

**B.     The Government Creates the ACP, Which Becomes a Major Boon to Charter's Internet Business**

51.     In response to the COVID-19 pandemic and rising need for affordable internet access, Congress included funds in the Consolidated Appropriations Act of 2021 to create the Emergency Broadband Benefit ("EBB").  The FCC adopted the EBB program in February 2021, offering eligible households up to $50/month toward internet and up to $75/month on Tribal lands, plus a one-time device discount.

52.     In November 2021, Congress passed the Infrastructure Investment and Jobs Act, which allocated $14.2 billion to establish a longer-term broadband affordability program—the ACP.

53.     ACP officially replaced the EBB and began operations as a successor program on December 31, 2021.  The ACP was administered by the FCC.

54.     The ACP offered low-income households up to a $30 discount on their monthly internet bill and a one-time discount on the purchase of computer devices.[7]  In return for providing connectivity, service providers like Charter would receive funding from the government based on the Company's enrolled participants.

55.     The federal program enabled millions of economically distressed customers to purchase broadband service they otherwise could not afford.[8]  As a result, the program became one of the largest federal drivers of broadband adoption in U.S. history.

56.     ACP eligibility fell into three primary categories: (i) Income-Based Eligibility—a household qualified for ACP if its income was less than or equal to 200% of the Federal Poverty

---

[7] For households on qualifying tribal lands, the internet discount was up to $75/month.

[8] *Id.*

21

Guidelines for the household size; (ii) participation in certain other federal government programs;[9] or (iii) Tribal Eligibility.

57.     The FCC established a centralized system, the National System of Eligibility Verification ("National System"), to confirm eligibility for ACP.  Using database checks with federal and state agencies, the National System was used to confirm whether a household met ACP eligibility through participation in other programs or through confirmation of income levels.  The National System also prevented, or at least reduced, the likelihood of households enrolling multiple times in ACP and service providers artificially inflating their ACP subscriber numbers.

58.     Service providers in the ACP were not allowed to run credit checks on ACP participants, and if they ran such checks, they could not use the results to deny access to the ACP.  Additionally, service providers were not permitted to approve consumers on their own.  Service providers had to rely on the National System or conduct limited pre-screening.[10]

59.     On December 31, 2021—when the FCC officially launched the ACP, the $14.2 billion successor to the EBB—Charter was a day-one participant in the ACP.  Charter began

---

[9] These federal government programs included: (i) Supplemental Nutrition Assistance Program (SNAP)—formerly known as food stamps, (ii) Medicaid—health coverage for low-income individuals and families, (iii) Supplemental Security Income (SSI)—cash assistance for elderly, blind, or disabled people with limited income, (iv) Special Supplemental Nutrition Program for Women, Infants, and Children (WIC)—nutrition assistance for pregnant women and young children, (v) Federal Public Housing Assistance (FPHA)—housing support including Section 8 and public housing, (vi) Veterans Pension and Survivors Benefit Programs—benefits for qualifying veterans or surviving family members, (vii) Lifeline Program—another FCC benefit offering discounted phone or internet service, (viii) Free and Reduced-Price School Lunch or Breakfast Program, and (ix) Federal Pell Grants.

[10] A participating service provider could still run credit checks, if it did so for all customers as part of its normal business process—but the results of those credit checks could not be used to decide whether someone could enroll in ACP or which ACP-supported plan they could get.  Service providers also could use credit checks for determining eligibility for non-ACP services or equipment that wasn't covered by the ACP benefit.

participating in the program as part of a deliberate strategy to expand its broadband internet footprint, particularly in low-income and rural markets.

60.     For ACP customers, the $30 ACP government subsidy (a $75 subsidy on tribal lands) was typically applied to Charter's lowest speed/most budget friendly internet offerings, including Charter's Internet 100 and Internet Assist plans, which were priced at approximately $29.99 and $24.99 per month, respectively.

61.     The ACP quickly became one of Charter's most significant growth channels and retention tools.  Charter aggressively expanded its participation in the program and used ACP subsidies not only to attract new customers, but also to retain existing subscribers who had fallen behind on payments.

62.     From the start of the ACP through February 28, 2023, the Company received nearly $1 billion in federal ACP reimbursements, which directly supported Charter's reported broadband revenue, subscriber counts, average revenue per user ("ARPU"), and Adjusted EBITDA. [11]

63.     By 2023, Charter was the single largest ACP participant in the United States, with approximately five (5) million broadband customers receiving ACP benefits through Charter, representing a material portion of Charter's entire broadband subscriber base, something which Charter often touted to investors.

64.     Indeed, Charter publicly acknowledged its reliance on ACP during its October 27, 2023 Q3 2023 Earnings Call, when Defendant Winfrey stated: "we're proud to be the largest ACP provider in the country," and further emphasized Charter's expectation that these customers would

---

[11]As of February 2023, Charter total ACP obligations reached approximately $909.97 million, confirming Charter's outsized reliance on the program compared to its peers. FCC data shows Charter is largest ACP provider at $910M.

remain on its network, stating: "And because of the value we provide and that connectivity, I do think that we'll continue to retain these customers."

**C.    By Late 2023, Before the ACP Even Ended, Charter's Internet Subscriber Trends Were Deteriorating**

65.    By late 2023, Charter's broadband business had already begun to deteriorate due to a convergence of competition, pricing, and product-level pressures that predated the end of the ACP.  Former Charter employees (described below) confirm that Charter was increasingly losing broadband customers to fiber-based competitors offering faster, symmetrical speeds at lower or comparable prices, including AT&T, Google Fiber, Frontier, and regional providers, particularly in Charter's most competitive markets.

66.    Internally, employees recognized that Charter's cable-based infrastructure lagged competitors' fiber offerings, especially with respect to upload speeds, making Charter's broadband product increasingly inferior and harder to justify at prevailing price points.

67.    As a result, Charter faced mounting pressure on both gross additions and retention well before ACP funding uncertainty became public.

68.    As Charter's core broadband trends weakened, the Company grew increasingly reliant on ACP households to stabilize subscriber counts and mitigate rising non-pay churn.  ACP subscribers became a critical support mechanism for reported broadband performance because the federal subsidy allowed Charter to retain customers who otherwise could not afford service at market rates.

69.    Internally, Charter recognized that a substantial portion of ACP subscribers were highly price-sensitive, financially constrained, and at elevated risk of churn, with many lacking the ability to continue broadband service absent the $30 monthly subsidy.  Rather than reflecting durable broadband demand, increased ACP enrollment masked underlying weakness in Charter's

core broadband business by temporarily offsetting rising nonpay churn and competitive subscriber losses.

70.    Accordingly, Charter's broadband subscriber performance entering 2024 was materially dependent on the continued existence of the ACP.  At this time, even though the end of ACP was approaching, Charter made a huge push to onboard as many ACP customers as possible before its expiration.

71.    However, internally, Charter tracked ACP subscribers as a distinct population and internally modeled the significant subscriber losses that would follow ACP's termination, underscoring management's understanding that reported broadband stability was contingent on continued federal support.

72.    Additionally, Charter intensified efforts to cross-sell ACP subscribers into mobile and bundled offerings in an attempt to compensate for broadband weakness further reflecting internal awareness that the Company's core broadband business was under strain even before ACP funding formally ended.

**D.    Once The ACP Was Set to End, Investors and Market Commentators Worried About a Potential Outsized Negative Impact on Charter's Business**

73.    By November 2023, Congress was discussing the lack of continued funding for ACP.  At that point, there were more than twenty-three (23) million customers enrolled in ACP.

74.    Then, on January 11, 2024, the FCC issued an order directing ACP service providers and other stakeholders to begin the orderly wind-down of the program due to lack of additional funding.  This guidance included provider responsibilities for notifying their ACP customers about the eventual end of the program and how ACP benefits would stop being applied to bills.  As part of that FCC wind-down directive, providers were required to send the first written notice to ACP subscribers by January 25, 2024.  That notice was to advise households about the

25

possibility of the program ending and describe potential effects on their broadband service and bill.

75.    Service providers were prohibited from enrolling new participants into the ACP after February 7, 2024.  On March 4, 2024, the FCC issued a public notice stating that April 2024 would be the last fully funded month of ACP.  This announcement triggered further notification duties for providers—specifically additional notices to customers indicating that the ACP was ending, the last billing cycle with the benefit, and post-ACP charges.  April 2024 was the last month ACP households received the full ACP subsidy.

76.    In May 2024, ACP households received a $14 federally funded ACP subsidy (or about half of what they previously been receiving).  As of June 1, 2024, the ACP was officially over, and ACP households no longer received any ACP benefits.

77.    At the time, Charter had approximately five (5) million customers receiving ACP benefits—one of the largest, if not the single largest, concentrations of subsidized broadband customers in the country.

78.    The termination of the ACP created an immediate and substantial risk to Charter's broadband subscriber counts, ARPU, bad-debt expense, and overall financial performance.  A significant portion of Charter's ACP subscribers were low-income, credit-challenged households, with historically high incidence of nonpay churn.

79.    For instance, at the May 24, 2023 J.P. Morgan Global Technology Conference, Defendant Fischer stated: "We've been a big proponent of the program.  We've done a lot of work to try to sign up a lot of our subscribers for that program.  And it's because it's really valuable to consumers. ***So if you think about the more price-sensitive segment of the market, that pretty sensitive segment often sort of, let's say, came in and out of our subscriber numbers over time***

26

*because they're customers that had more issues with churn, whether that was non pay churn or voluntary churn related to a lack of ability to pay. . . . And what we see with ACP is that customers are able to be constantly subscribed to our product*, which it's good for us in terms of a consistent subscription revenue[,]" noting further that "[w]e hope that it continues."

80.   Again, at the December 5, 2023 UBS Global Media Communications Conference, Defendant Fischer reiterated that "we're huge advocates of ACP.  We hope that it continues to get additional funding.  And it's really because of what it does for consumers in terms of providing them with continuous connectivity.  *So if you think about customers who take advantage of the ACP program, their profile prior to the program would have been a higher nonpay profile*."

**E.    Leading Up to the Class Period, Defendants Assured Investors That They Were Well Prepared to Weather the ACP's End, and That the Impacts to Charter's Business Would Be Minimal**

81.   Despite the Company's heavy reliance on ACP-supported customers— approximately five (5) million out of Charter's 30.4 million total customers at the time the program ended as of June 1, 2024—Defendants repeatedly assured investors that the ACP's termination would have only a limited, temporary, or "onetime" impact on Charter's business.

82.   Starting in Fall 2023, Defendants fielded frequent questions from analysts about how the Company would handle the ACP's imminent 2024-end, especially given that Charter was by far the largest beneficiary of the ACP.  As such, leading up to the Class Period, Defendants sought to assure investors that they would be able to weather the impacts of the ACP's end, and that ACP's expiration would not materially affect Charter's long-term growth trajectory or internet subscriber base.

83.   For example, at the Goldman Sachs Communacopia Technology Conference, on September 7, 2023, in response to direct analyst inquiry regarding Defendants' "confidence level"

27

as to whether ACP customers would "be able to stay with Charter" after the ACP's end, Defendant

Winfrey assured investors that, "at the end of the day, many of these customers were existing

Spectrum internet customers to begin with," "they are paying," and "we have places we can move

them with the low-income broadband." Defendant Winfrey assured investors that Charter would

be able to retain ACP customers if the program was not renewed by promoting "low-income

broadband programs," and "$1,000 of savings a year . . . with mobile," asserting that "we have a

number of tools available to us to preserve that [ACP] relationship." Specifically, Winfrey said

the following about the program:

> What I mean by that, most of our customers, most of the ACP, the vast majority are taking flagship or above. And so they are paying. And so we have places we can move them with the low-income broadband. Maybe most importantly, if somebody calls up and says, "Look, I need to save money," which is usually how the conversation starts. I have a great way for you to save money. If you have 2 mobile lines in a household, you're probably paying $140 or $150 a month. And if you take it from Spectrum, forget about the first-year promotion where it'd be $30 for 2 lines. But if you take them from Spectrum, it's $60. It's $1,000 of savings a year. So I can fund your broadband. I can fund a lot of broadband by saving you money with mobile, which is an interesting and really consumer-friendly way to preserve that relationship. So I don't want it to happen. I think it should get refunded. I think it's been a very good program, but we have a number of tools available to us to preserve that relationship and it all starts with having a high-quality service.

84.     Similarly, on October 27, 2023, during the Company's Q3 2023 Earnings Call,

Defendant Winfrey reiterated that, while Charter was "the largest ACP provider in the country,"

even if the ACP was no longer funded, "we'll continue to retain these customers," reiterating that

the Company had "a lot of tools" for these customers "to make sure that they stay":

> We have ways whether moving them into the lower speed products that we have to be able to save them money, or more importantly, if you think about the mobile bill the vast majority of these customers have inside their home, we can save them hundreds or even thousands of dollars every year, even though ACP disappeared simply by moving them over to our mobile. So we have a lot of tools available to us for these customers to make sure that they stay.

85.     On January 11, 2024, due to a lack of additional funding from Congress, the FCC released an order announcing steps to wind down the ACP, with new applications and enrollments ending in February 2024.  However, Defendants continued to assure investors that the ACP's termination would not affect Charter's long-term success.  At the March 6, 2024 Morgan Stanley Technology, Media & Telecom Conference, Defendant Winfrey asserted that ACP's non-renewal would be immaterial to Charter's future, stating: "I don't think it changes at all our long-term trajectory."  Defendant Winfrey further assured investors that Charter's customer base remained stable regardless of ACP, stating: "And we have a large stable base of customers with or without ACP[,]" and "we have a stable amount of customer relationships with or without ACP."

86.     Similarly, at the March 12, 2024 Deutsche Bank Media, Internet & Telecom Conference, Defendant Fischer downplayed ACP-related risks, stating: "But without a doubt, [the end of ACP] won't be disruptive. . . . [W]hile it might create short-term volatility, if [the ACP's] funding is not renewed, it's not an impediment to long-term growth, right?"  Defendant Fischer further characterized ACP's potential expiration as merely a short-term issue, stating: "And so our belief about the long-term trajectory of the business and our ability to grow the business in the long term isn't impacted by what will ultimately be a short-term issue if it isn't refunded."

87.     Defendants' assurances continued even as ACP's end was only one month away and some ACP subscribers had started to cancel or disconnect.  On the Company's April 26, 2024 Q1 2024 earnings call, Defendant Fischer further minimized the impact of ACP's termination on Charter's financial performance, stating: "Ultimately, we will lose some customers, and our Internet ARPU and bad debt expense may have onetime pressure, ***but we expect the impact to Charter to be mostly limited to the second and third quarters of this year***."  Defendant Winfrey confirmed that the end of ACP was "temporary in nature" and "in the end, I'm really confident

29

we're going to manage through it successfully. [ACP] will be a onetime event, both on subscribers and maybe initial suppression of ARPU, but it's not going to impact our long-term growth potential."

F.    **Throughout the Class Period, Defendants Assured Investors That They Were Managing the ACP's End Well, the Any Impacts Were a "Onetime" Event, and That, By January 2025, the ACP's Impact Was "Behind Us"**

88.    The notion of the ACP being "behind" the Company would become a constant refrain echoed by Defendants and analysts alike throughout the Class Period.  Indeed, throughout the Class Period, Defendants represented that Charter's ACP-related churn would be manageable and that the program's discontinuation on June 1, 2024 would constitute only a temporary, onetime event with no lasting impact on Charter's broadband business.

89.    For example, on the first day of the Class Period, on July 26, 2024, Defendant Fischer informed investors that customer losses would be limited to 2024, stating that "the largest driver of Internet customer losses associated with the end of the ACP program will be in nonpay disconnects.  And they will occur in the third and fourth quarters, slightly weighted to the third." In response to an analyst's inquiry regarding the impact the end of ACP would have on the Company, Defendant Winfrey declared: "*It's temporary.  It's onetime in nature*.  And so as we've spoken about before, it's really about just managing through that onetime impact."  Winfrey stressed to the market, "*ultimately, this ACP transition is a onetime event*."

90.    Defendants continued to reinforce this message in subsequent public statements throughout the second half of 2024 and into 2025, repeatedly assuring investors that ACP-related effects would be short-lived and fully behind the Company.  For example, on September 4, 2024, at the BofA Securities Media & Entertainment Conference, Defendant Fischer made clear that the impact of the ACP's end would be limited to 2024, stating that "most of the highest risk nonpay sort of makes its way through over the next 2 months from right now.  So some of that will fall in

30

Q3. Some of it will fall in Q4 and that group, I think, is paying, consistent with what we expected, maybe the lightest shade better than what we expected. But overall, I think, the message should be it's consistent with where we thought we would be and we should be in okay shape coming through it." Fischer then publicly touted that "*it's a onetime issue, right, in terms of the impact of ACP going away*" and that Charter would "*weather sort of the one-time issue quite well*."

91.    At the Company's November 1, 2024 Q3 2024 Earnings Call,[12] Defendants again assured that they were "successfully managing the transition of customers previously on [ACP]" and after the effects of 100,000 nonpay disconnects in the fourth quarter, they expected the "*onetime impacts from ACP to be behind [them]*." At the November 14, 2024 Liberty Media Investor Day, Defendant Winfrey appeared on CNBC, where he reiterated that ACP would be fully behind the Company after the fourth quarter, stating: "*Our view is that with ACP fully behind us, which it will be after the fourth quarter, . . . we expect to return to a healthy rate of growth for broadband*." [13]

92.    Significantly, once the fourth quarter of 2024 ended, by January 2025, Defendant Winfrey affirmed that his previous assurances had been true: the impact of the ACP's end was now fully "*behind*" Charter. Specifically, Winfrey proclaimed, on January 31, 2025, during Charter's Q4 2024 Earnings Call, that the "*impact of the elimination of the ACP is now behind us*." Defendant Fischer echoed Winfrey, stating: "*we are past the onetime ACP-related impacts to our customers base*." And Winfrey further assured investors that the Company would not experience any ACP losses in 2025, stating that "*we won't have the ACP losses this year, and so that's a huge benefit. . . . [N]ot having ACP losses inside this year is huge*."

---

[13] Liberty Media held its annual Investor Day in New York City on November 14, 2024. Charter CEO Winfrey spoke at the Investor Day in the afternoon session and participated in a Q&A.

31

93.    On March 3, 2025, during the Morgan Stanley Tech Conference, Defendant Winfrey again represented that the Company had moved past the effects of the ACP's termination, stating that "*you put all that together and having ACP now fully behind us . . . .*" One week later, on March 10, 2025, during the Deutsche Bank Media, Internet & Telecom Conference, Defendant Fischer similarly minimized the continuing effects if the ACP's termination, stating: "*So the onetime impact from the end of the ACP program is over*." On April 25, 2025, during Charter's Q1 2025 Earnings Call, Defendant Winfrey again assured investors that "*the impact of the elimination of the ACP is behind us*."

94.    These representations proved misleading. As Defendants knew, or recklessly disregarded, ACP customers would continue to churn well into 2025. Indeed, despite Defendants repeated assurances that the negative impact of the end of the ACP was a "onetime," temporary event that was fully behind the Company by the start of 2025, internet subscriber losses remained elevated throughout 2025.

95.    Between Q4 2023 and the end of the Class Period, Charter's total internet customer losses continued unabated amid increased affordability challenges for its customer base following the sunsetting of the ACP subsidy:

| Quarter | Total internet subscribers (quarter-end) | Net change vs. prior quarter |
|---|---|---|
| Q3 2023 | 30,649,000 | +63,000 |
| Q4 2023 | 30,588,000 | -61,000 |
| Q1 2024 | 30,516,000 | -72,000 |
| Q2 2024 | 30,367,000 | -149,000 |
| Q3 2024 | 30,257,000 | -110,000 |

| Quarter | Total internet subscribers (quarter-end) | Net change vs. prior quarter |
|---|---|---|
| Q4 2024 | 30,080,000 | -177,000 |
| Q1 2025 | 30,020,000 | -60,000 |
| Q2 2025 | 29,903,000 | -117,000 |
| Q3 2025 | 29,794,000 | -109,000 |

96.    Shown here from the beginning of Q1 2022, the first quarter reported following the start of the ACP on December 31, 2021 through Q3 2025:



97.    As shown above, Charter's internet subscriber losses did not normalize, stabilize, or reverse following the termination of the ACP on July 1, 2024.  Instead, subscriber declines continued unabated for multiple consecutive quarters and well into 2025, directly contradicting Defendants' repeated representations that ACP-related impacts were temporary, onetime, and limited to the end of 2024.

33

G.      **Liberty Broadband and Cox Communications Acquisitions**

98.     At the same time they were representing that the impacts of the ACP were "onetime," "manageable," soon to be over and, ultimately, "behind us," Defendants were negotiating and finalizing two massive business combinations that were critical to the future of the Company: the acquisition of Liberty Broadband, agreed to and announced in November 2024, and the acquisition of Cox, agreed to and announced in May 2025.

99.     Each of these critical transactions were structured such that either all or a large part of the consideration paid by Charter was tied to the price of Charter stock.  As such, Defendants had strong financial incentives to artificially inflate and/or artificially maintain Charter's stock price during the Class Period.

100.    Moreover, the Individual Defendants had a strong *personal* incentive to facilitate the acquisition of Cox, as they both stood to gain additional stock compensation contingent on the execution of this transaction.  While not publicly disclosed until after the Class Period, Charter's December 5, 2025 Form 8-K noted that, "[o]n December 3, 2025, the Compensation and Benefits Committee approved the grant of a one-time contingent equity award to all Executive Vice Presidents, *including all of the Named Executive Officers* [which includes Winfrey and Fischer]. *The grant of each equity award will be effective as of, and contingent upon, the closing of the previously announced transaction contemplated by the Transaction Agreement by and among the Company, Charter Communications Holdings, LLC and Cox Enterprises, Inc*.  The grant date value of the award for each executive will be equal to 1.5 times the executive's annual long-term incentive target and will be comprised of 50% stock options and 50% restricted stock units ('RSUs')."

101.    Based on Defendant Winfrey's 2024 long term incentive target of $17 million,[14] this meant that Winfrey stood to receive approximately *$25 million in equity awards* as a result of the closing of Cox deal.  By comparison, in 2024, Winfrey's *total* compensation was roughly $5.7 million, meaning the merger-related equity awards were more than four times the value of his total 2024 compensation.

102.    Similarly, based on Defendant Fischer's 2025 long term incentive target of $7.5 million, Fischer stood to receive approximately *$11 million in equity awards* as a result of the Cox deal.  By comparison, Fischer's total 2024 compensation was roughly $1.9 million, meaning that her merger-related equity awards were nearly four times her total 2024 compensation.

### 1.    Liberty Broadband Acquisition

103.    On November 13, 2024, Charter announced that it had signed a definitive agreement to acquire Liberty Broadband in an all-stock transaction.  As part of the deal, Charter also retired the approximately 45.6 million Charter shares held by Liberty Broadband and issued approximately 34.0 million new Charter shares to Liberty Broadband common stockholders at closing.

104.    Significantly, the entire consideration paid by Charter to Liberty Broadband stockholders would consist of Charter stock.  Specifically, under the merger agreement, each share of Liberty Broadband common stock was exchanged for 0.236 of a share of Charter common stock, and each share of Liberty Broadband preferred stock was exchanged for newly issued Charter preferred stock with substantially similar terms.  Liberty Broadband also agreed to spin off GCI to its stockholders prior to closing.

---

[14] Charter Comms., Inc., Definitive Proxy (Schedule 14A) (Mar. 14, 2024).

105.    On February 24, 2025, Liberty Broadband shareholders voted to approve the transaction.  Just three weeks earlier, on January 31, 2025, Defendant Winfrey had asserted that the impacts of the ACP ending were now "behind" the Company.

106.    The all-stock structure of Charter's acquisition of Liberty Broadband made Charter equity the primary consideration in the transaction, providing strong motivation for Defendants to keep Charter's stock price inflated at the time of the deal.  By maintaining Charter stock at an inflated price, Charter was able to negotiate a more favorable exchange ratio, which both Liberty Broadband and its shareholders agreed to while the stock price remained inflated.

107.    The Liberty Broadband merger also consolidated Liberty Broadband's holdings of Charter stock into Charter itself, paving the way for an even larger and more significant merger—Charter's proposed merger with cable and internet giant Cox.

### 2.    Cox Acquisition

108.    On May 16, 2025, Charter filed a press release with the SEC on Form 8-K, signed by Defendant Fischer, announcing an agreement to acquire Cox—a longstanding Atlanta-based internet and TV provider—for consideration valued at approximately $22 billion—a combination that promised to unseat Comcast as the nation's largest broadband internet provider.

109.    The Cox merger was seen as a critical move for Charter's future in the face of increasing competition from fiber optic and wireless internet.  Indeed, as *The Wall Street Journal* explained, the merger would constitute the "union of two big players . . . trying to defend their core broadband business against intensifying pressure from cellphone carriers charging into their home turf."

110.    According to Charter's proxy statement filed with the SEC on July 2, 2025 (the "July 2025 Proxy Statement"), Defendant Winfrey began discussions with Alexander Taylor, CEO

of Cox, regarding the transaction no later than January 28, 2025—just three days before Winfrey publicly asserted that the ACP's impacts were now "***behind***" Charter.

111.    The diligence process underlying Charter's proposed acquisition of Cox was conducted on an unusually accelerated timetable for a strategic transaction of this size, complexity, and regulatory sensitivity.  According to the July 2025 Proxy Statement, Cox first granted Charter access to a virtual data room on or about April 6, 2025, and the parties' senior management teams began meeting regularly to conduct due diligence and negotiate core transaction terms beginning on April 7, 2025.  Less than six (6) weeks later—by May 16, 2025—Charter and Cox had executed a definitive transaction agreement.

112.    Throughout April 2025, Defendants Winfrey and Fischer held discussions with Taylor, informing him that Charter would seek to accelerate the closing of the Liberty Broadband merger to immediately precede the Cox closing in order to facilitate a smooth governance transition, to which Liberty Broadband ultimately agreed.

113.    Critically, the majority of the consideration Charter would pay to Cox's owners was tied to the price of Charter's common stock, as the merger consideration included billions of dollars' worth of partnership units convertible to common stock.  Indeed, according to the press release announcing the merger, at least $12 billion of the total $22 billion in estimated consideration value was directly based on Charter's volume weighted average stock price between February 24, 2025 and April 25, 2025.  Thus, Defendants were highly incentivized to maintain the value of Charter stock at artificially inflated prices by postponing the disclosure of additional subscriber losses and ACP impacts until Charter signed its merger agreement with Cox.[15]

---

[15] Specifically, Charter's consideration for the Cox acquisition was comprised of: (i) $4 billion in cash; (ii) $6 billion notional amount of convertible preferred units in Charter's existing partnership paying a 6.875% coupon and convertible into partnership units exchangeable for Charter common

114.     Charter reported that the acquisition of Cox would be completed contemporaneously with the Liberty Broadband acquisition.  Liberty Broadband also agreed to accelerate a spin-off of GCI to help push both deals forward.  Liberty Broadband completed the GCI spin-off on July 14, 2025.

115.     The July 2025 Proxy noted that the Charter Board's decision to approve the Cox acquisition was based on a variety of factors, including "to provide better marketing and service capabilities, to pursue additional growth opportunities, enhance sales and reduce churn"; "the ability of the combined company to better compete in video and advertising against Big Tech competitors"; "the ability of the combined company to use Cox Communications' larger commercial footprint . . . to more effectively compete for larger business customers"; "greater operating efficiencies"; "the deployment of higher quality internet, video and mobile services over a larger footprint"; and "new opportunities for insourcing to drive better customer service and satisfaction."

116.     Analysts were bullish on both Charter's acquisitions of Liberty Broadband and Cox.  At the time that the Cox transaction was announced, with Investing.com reporting, on May 19, 2025, that "[t]he [Cox] acquisition is set to expand Charter's reach, increasing its footprint to around 70 million passings . . . [and] UBS analysts project that the deal may be around 10% dilutive to Charter's free cash flow per share over the next two to three years, but they anticipate it will become accretive as operational synergies are achieved and Charter applies its strategic approach

---

stock; and (iii) approximately 33.6 million common units in Charter's existing partnership, exchangeable for Charter common shares and implied to be worth approximately $11.9 billion based on Charter's 60-day volume-weighted average price of $353.64 as of April 25, 2025.  The combined entity also assumed Cox's approximately $12 billion in outstanding debt.  The Cox acquisition explicitly referenced approximately 33.6 million units exchangeable into Charter shares valued at a $353.64, underscoring the equity-sensitive nature of the consideration.

to the newly acquired Cox territories." The article further noted that "Loop Capital Markets upgrad[ed] Charter's stock to Buy and increase[ed] the price target to $510[,] [and] Raymond [] James also upgraded Charter's stock rating to Market Perform, highlighting the financial benefits expected from the merger."[16]

## VI. THE TRUTH IS REVEALED: CHARTER ANNOUNCES SUBSCRIBER LOSSES RELATED TO THE END OF THE ACP, RESULTING IN THE LARGEST STOCK DROP IN COMPANY HISTORY

117. After spending the prior year repeatedly assuring investors that the end of the ACP subsidies would only have a "temporary" and "onetime impact" on Charter's business—and the prior six months unequivocally claiming that those impacts were conclusively "over" and "behind us"—Defendants ultimately were forced to admit that the exact opposite was true.

118. On July 25, 2025, before the market opened, Charter filed a press release with the SEC on Form 8-K, announcing the Company's financial results for the second quarter of 2025. Charter reported that total internet customers had decreased by 117,000, far exceeding the 60,000 internet subscriber losses reported in Q1 2025, and the "**50,000 disconnects related to the end of the FCC's Affordable Connectivity Program subsidies** in the second quarter of 2024." As a result of the continued impact of the ACP's end, Charter reported weak Q2 2025 results, including flat revenue, an EPS miss ($9.18 vs. $9.77 consensus estimates). Significantly, when onetime mobile revenue of $45 million was excluded, it represented the first EBITDA decline in the Company's history.[17]

---

[16] *UBS maintains Charter stock neutral with $400 target post-Cox deal*, INVESTING.COM (May 19, 2025), https://ca.investing.com/news/analyst-ratings/william-blair-upgrades-starbucks-stock-rating-to-outperform-on-expected-sales-recovery-93CH-4415306.

[17] Sam McHugh and Nicco Liu, "The Second Wave Hits," BNP PARIBAS EQUITIES (July 25, 2025).

119. On July 25, 2025, the Company held an earnings call to discuss Charter's second quarter financial results (the "Q2 2025 Earnings Call"), in which Defendants Winfrey and Fischer, among others, participated.  During the question-and-answer segment of the Q2 2025 Earnings Call, in response to a question from UBS about whether "nonpaid churn" from ACP increased during the quarter and was "one of the drivers" of the "core declines[,]" Defendant Winfrey admitted that "**nonpay has stepped up year-over-year**" and that, in contrast to his prior assurances that the ACP impact was "behind us," the end of the ACP continued to have a material impact on financial results. Specifically, Winfrey admitted that Charter's business was deteriorating precisely because of the lack of ACP subsidies, as: (i) former ACP customers had a "**higher nonpay rate systemically without the benefit of the [ACP] subsidy**," and (ii) "**newly acquired customers, who would have qualified for the ACP, who don't have ACP today . . . have a higher nonpay rate than they would otherwise**."  As a result, Defendants disclosed that, excluding a onetime financial benefit of $45 million, Charter's EBITDA would have missed consensus analyst estimates by 2.4% and *declined* 0.3% year-over-year.

120. On the news that the effects of the end of ACP were continuing to negatively and materially affect Charter one year after the June 1, 2024 end of the ACP, and long after Defendants repeatedly represented to the market that the effects of ACP were behind the Company, Charter's stock price plummeted $70.25 per share, more than 18.4%, to close at $309.75 per share on July 25, 2025—*representing the largest single-day decline in the history of the Company*.

121. The market was stunned by the Company's disclosures, emphasizing that the "self-inflicted" revelations came in stark contrast to Defendants' prior representations.  For example, on July 25, 2025, TD Cowen published a report emphasizing that "the Charter disappointment is self-inflicted" given that the "non-pay churn was up as former ACP customers struggle to pay their

bills in this macro environment. . . . [T]he potential risk of Charter's sizable former ACP base (we estimate to be 4MM+ subscribers) could rear its head again, and that narrative is materializing."

122.    On July 25, 2025, Barclays published a report emphasizing that Charter's poor results represented a sharp turn from Defendants' prior statements to investors, stating: "Charter management had outlined expectations for broadband sub growth, which is the primary KPI focus for investors" and "helped support a narrative of better execution at Charter."  Instead, Barclays noted that the "higher non-pay churn" represented "the reverse of this positioning," and "given that ~20% of the base at the peak was part of the ACP program, this churn is likely to remain elevated to some extent[,]" and thus "it remains tough to get behind Charter's broadband turnaround narrative."

123.    On July 25, 2025, Goldman Sachs issued a report specifically linking the Company's stock price decline to the continuing ACP impacts, highlighting that "[w]e expect the stock to remain under pressure in light of weaker subscriber and EBITDA metrics[.]"  In their note, the Goldman Sachs analysts observed that, "[a]s wireless carriers have started to offer more device promotions, it appears that Charter's wireless net additions have come under pressure, with slowing wireless subscriber growth over the last four quarters."

124.    A July 25, 2025 *MarketWatch* article underscored the significance of Charter's ACP subscriber losses, highlighting that "Charter [] is bleeding subscribers — and the stock had its worst day ever." *MarketWatch* went on to emphasize that, "for Charter investors, it's all about the internet" and, "[a]s always, the market's assessment of Charter's results . . . will begin, and largely end, with broadband net adds[.]"  (internal quotation marks and citation omitted).

125.    On July 25, 2025, BNP Paribas likewise lowered Charter's stock price target to $285 from $340 and noted that without a one-time revenue benefit of $45 million, "EBITDA would

have missed expectations by -2.4% in 2Q and would have declined -0.3% y/y"—marking the "first time in history" that Charter's EBITDA had declined.  In the BNP Paribas report, the analyst stated, "[o]ur bearishness was predicated on their inability to stem customer losses, which leads to EBITDA decline" and emphasized that "2Q25 provided strong support of this thesis[.]"  The BNP Paribas analysts further observed that these dynamics "likely explain[] their enthusiasm for the Cox deal," which the analysts viewed as providing "cover to reduce leverage targets and [bringing] potential synergies to help buffer EBITDA trends."  BNP Paribas noted that the Company's broadband internet customer losses "accelerated, with 'core' markets likely suffering the worst ever decline[.]"  As a result, BNP Paribas concluded: "Charter stock is down close to 18% on the 2Q25 miss.  Is this fair?  We think yes . . ."

126.    Other analysts also cited Charter's continued losses in broadband as the primary reason for Charter's stock decline on July 25, 2025.  For example, on July 28, 2025, *The Measure*, an online research platform, noted that "the continuing loss of broadband subscribers was the biggest reason why Charter's stock plunged more than 18% on Friday after the numbers were released."

127.    A July 28, 2025 Raymond James report expressed surprise that Charter continued to report an "ACP hangover," given management's prior representations that ACP-related impacts would cease by the beginning of the year, highlighting that the "ACP hangover bites back" and explaining that "[w]e had expected the last part of the ACP hangover to hit Charter in [the first quarter], so we were surprised when it did not[.]"

128.    Finally, a Wells Fargo report on August 21, 2025 further emphasized that "CHTR shares were down >20% in the two days following its Q2 earnings report" precisely because, based

42

on Defendants' prior representation, "investors believe[ed] the impact from ACP was fully behind

CHTR."

## VII.    FORMER CHARTER EMPLOYEES CONFIRM DEFENDANTS' KNOWLEDGE OF ONGOING EFFECTS OF THE END OF THE ACP ON CHARTER'S INTERNET SUBSCRIBER BASE WHICH CONTRADICTED DEFENDANTS' PUBLIC STATEMENTS

129.    Former high-level Charter employees, including employees with senior positions

and employees who reported to executive management, confirmed that Defendants' public

messaging about mitigating the impact of the end of ACP did not match what Charter was

experiencing.

### A.    Charter's Aggressive Use of ACP Program as a Sales Tool Drove Short-Term Growth, but Created a Cohort of Customers at High Risk of Churn Once the ACP Ended

130.    The ACP program was a huge boon for Charter's internet subscription business.

Numerous CW accounts detail that Charter used ACP as a sales tool to accelerate Internet net adds

across various channels by targeting higher-risk customers. Senior leaders at Charter tracked ACP

subscribers as a distinct cohort, modeled expected losses after the program's end, and orchestrated

a transition plan that at best deferred, rather than avoided, subscriber losses once the ACP program

ended. But rather than disclose this to the market, Defendants repeatedly told the market the effects

of the ACP would be temporary and would not last past Q4 2024.

#### 1.    Charter's ACP Enrollment Strategy and Onboarding of High-Risk Customers

131.    According to multiple CWs, from the start of the ACP, Charter used the ACP as a

marketing and sales tool to aggressively expand Charter's internet subscriber base.  Charter's ACP

onboarding practices prioritized bringing in as many customers as possible over scrutinizing risk

profiles and household incomes.

43

132.    Because ACP eligibility was based on household income or participation in qualifying government programs such as SNAP, WIC, and free/reduced school lunch, and ACP did not allow credit checks as part of its eligibility and enrollment requirements, Charter's robust enrollment of approximately five million ACP subscribers, the largest in the ACP provider pool, resulted in a cohort of Internet subscribers comprised of high-risk, price-sensitive customers who were predisposed to significantly higher non-pay churn once ACP subsidies ended.

133.    Charter also paired ACP with aggressive promotions and cross-sell to inflate short-term reported metrics, obscuring that customers who bought into these promotions did so while relying heavily on the ACP credit and were therefore at high risk of churn once ACP ended. In order to meet sales goals, also known as personal sales unit ("PSU") goals, Charter paired ACP eligibility with deliberate upsell paths designed to increase customers' buy-in to Charter's other products and services such as TV and mobile subscriptions.

134.    CW-9 noted that his role in marketing was "critical" in the roll out and offering of Charter's ACP program. CW-9 explained that the government requirements of ACP required Charter to on board "riskier" customers. CW-9 noted that when ACP began, he was a member of the Committee for Strategic Onboarding at which time he vocalized his concerns about the long-term viability of certain customers enrolled in the program.

135.    CW-9 explained that Charter was required by the government to loosen previously established credit requirements that would have prevented "recidivist debtors" from becoming Charter subscribers. CW-9 recalled that under the ACP, the Company was no longer allowed to prevent these customers [recidivist debtors] from onboarding and was only able to add additional guidelines to prevent certain customers with significant debt from enrolling in services beyond the basic ACP internet offering. CW-9 explained that "many" ACP customers previously had bad debt

with Charter, and some had multiple instances of bad debt that the Company had been unsuccessful in collecting.

136.    CW-9 noted that in these instances, Charter could not require that previous debts were paid prior to onboarding for ACP. CW-9 explained that the loosening of typical requirements only extended to ACP eligible services and Charter was not required to provide these customers with services that were not covered by the subsidy. CW-9 recalled raising his concerns regarding recidivist debtors.

137.    CW-10 explained that ACP was being used as a selling incentive rather than a subsidy to help those who truly needed it. CW-10 added that this approach came directly from the "brass" or senior leadership.

138.    According to CW-10, Charter utilized the National System initially when ACP started but became less reliant on it over time. CW-10 stated that while the National System looked at more specific information such as whether occupants were enrolled in Medicaid or [free] school lunch programs, the Charter system was more lenient.

139.    CW-10 confirmed that Charter's verification system relied on the customer's zip code and if someone provided a zip code in an ACP qualified area that they were "getting it [ACP enrollment]." According to CW-10, Charter prioritized quicker approvals to generate sales and elected to use their own verification system.

140.    CW-12 described that no credit checks were required to be signed up for ACP benefits. CW-12 explained that if a customer had a balance owed [to Charter] from previous service, ACP waived the overdue balances. According to CW-12, Charter frequently found equipment still in boxes at abandoned homes because the person never signed up for the ACP service, but Charter automatically signed them up and sent equipment.

141.    CW-1 was responsible for marketing efforts targeting new customer acquisitions, including during the period in which the ACP was active. According to CW-1, these customers were targeted even though there was an acknowledgment internally that these customers were more likely to churn once the promotional pricing had ended.

142.    CW-1 noted that once a customer churned or discontinued their service with Charter, they went "back in the pool" of prospective new customers to be targeted after a certain number of months.

### 2.    Charter Prioritized Subscription Numbers Over Payment Collection from ACP Subscribers

143.    CW accounts detail that Charter prioritized maintaining their internet subscriber numbers at the cost of their bottom line.

144.    CW-9 recalled the Company having an "artificially positive" outlook on the long-term prospects of ACP customers. CW-9 detailed how he voiced his concerns when the program began and throughout his tenure given his experience working in Charter's Credit Services Department. CW-9 explained that he voiced his concerns both in casual conversations with leadership in his vertical as well as during Monthly Business Reviews with Senior Vice Presidents.

145.    CW-9 explained that the concerns he voiced related to the negative impact of ACP eventually ending. CW-9 stated that he was concerned by the fact that ACP customers would not need to be re-onboarded and if they were, they would be re-onboarded as existing rather than new customers. According to CW-9, if customers did not need to be re-onboarded at all then they would not need to go through the standard credit qualification process and if onboarded as existing customers those qualifications were less rigorous and much more lenient. CW-9 added that ultimately his concerns were that former ACP customers would ignore making payments following the conclusion of the program. CW-9 recalled voicing these concerns to his EVP and being

46

"stifled" from sharing "doom and gloom" outlooks. CW-9 explained that when concerns were raised, he was told "it's working" and "it'll be fine" and CW-9 "learned to remain silent," but continued to voice concerns when opportunities to do so arose.

146.    CW-9 stated that the Company had a "false narrative" around the recidivist debtors in the ACP cohort and he eventually reached the point where he realized that continuing to vocalize his concerns was not beneficial to him. CW-9 noted that employees who were "boots on the ground" saw that the ACP customer group was "unsustainable" and "untenable," but leadership was focused on subscriber numbers over everything else. CW-9 added that Charter is a very "top-down" company and "everyone knew" where the directives were coming from, referencing senior leadership.

147.    CW-9 stated that he deemed the ACP customer group as unsustainable based on his years of experience seeing the volume of debtors and the behaviors that they displayed. CW-9 explained that his team was responsible for dealing with customers who failed to pay debts immediately and participated in the process of setting up payment plans, some with discounts, or to terminate and disconnect service all together.

148.    CW-1 confirmed there would be separate attempts to get customers who were disconnected for non-pay to sign up again. CW-1 explained that non-pay disconnected customers were offered debt forgiveness if they resubscribed to Charter's services.

**3.    As the End of ACP Approached, Widespread Concern Mounted Regarding Post-ACP Fallout**

149.    Charter lobbied Congress in an attempt to extend the lifespan of the ACP program, however their efforts were to no avail. The FCC announced on March 4, 2024 that the program would come to an end in the coming months.   In the months leading up to the end of ACP, senior leadership at Charter expressed serious concerns in meetings and anticipated post-ACP "pain."

150.    CW-9 recalled beginning to hear about the potential wind down of ACP in the late Fall of 2023. According to CW-9, at this point the Company made a "hard push" organizationally to onboard as many ACP eligible and traditional customers as possible to help mitigate the potential "hemorrhaging" of customers once ACP concluded. CW-9 confirmed that this increase in customer outreach continued from late Fall 2023 through the Spring of 2024. According to CW-9, there was "absolutely" panic in February 2024 when it became clear that ACP was going to be discontinued.

151.    CW-5 recalled, that sometime in 2023, Senior Director, Media Operations, MarTech/AdTech, Matt Reeves said in a group setting, "We're going to have to figure out how to come out okay when ACP comes to an end."

152.    According to CW-4, although notifications regarding the end of ACP had been sent out to ACP customers 60 – 90 days before ACP ended, if ACP customers called Charter's call center, retentions personnel avoided mentioning the end of ACP until the customer asked about it. CW-4 reported that a "good majority" of supervisors directed their retention employees to avoid bringing up the end of ACP unless asked about it by the customer.

153.    CW-12 explained that the Company was aware that ACP was going to end as early as January 2024 and there were meetings held once a week starting in early 2024 where a portion of the meeting was dedicated to discussing ACP. According to CW-12, the company experienced loss of a lot of subscribers in a short period of time and there was "obviously a lot of concern."

154.    CW-10 recalled when "scuttlebutt" emerged in February 2024 that Congress would not be renewing ACP, there was "absolutely" a concern at Charter, that sales goals became "more out of reach," and that it was apparent that the Company was trying to make up for customers that

they felt they were going to lose. According to CW-10, the sales goal quotas were based on historical performance related to prior years and accounted for trends for seasonality.

155. CW-10 described a meeting with current Executive Vice President, Sales Christian Ruiz in approximately March or April 2024 where Ruiz acknowledged that growth had been "exponential" but that there were concerns of future "pain" and a possibility of a "rough couple of years" ahead for the Company once ACP concluded.

156. CW-9 recalled that Charter was advertising ACP "until the 11th hour" and up until the final month of eligibility in Spring of 2024, and that Charter was looking to onboard ACP eligible customers even if the subsidy was only going to be available to them for one or two months.

157. CW-7 stated that the end of the ACP in June 2024 hit Charter "very hard." CW-7 noted that the end of ACP hit Charter the hardest out of all of the broadband companies because they took the most advantage of that program. CW-7 described Charter's internal reaction to the impending end of ACP as trying to "get ahead of it" but a "clear panic" and "oh crap" regarding being prepared for conversions and the potential negative impact on subscriber numbers and in turn overall revenue.

158. CW-2 confirmed that there were a lot of concerns and discussions about the end of ACP at his level because Charter was the biggest participant in ACP and they were therefore going to be hit the hardest. CW-2 recalled EVP Ruiz saying that they all "needed to brace themselves and to hold on and we will get through the loss of ACP." CW-2 confirmed that Ruiz making that statement on a Webex call and stated that it occurred around the end of ACP.

159. CW-10 recalled that the initial messaging regarding ACP ending that was provided to customers was vague and was intended to not spark panic. CW-10 explained that the messaging

49

noted that Charter was unaware of what was going to happen in the future and there was no need to take action at that time. According to CW-10, there were no details contained in the initial messaging that included a specific end date for ACP or for the dollar value associated with the credit that was applied to the customer's account.

**B.    Charter Converted ACP Subscribers to Other Pay Plans They Couldn't Afford to Avoid a Onetime ACP Churn Bomb in 2024**

160.    CW accounts establish how, in the wake of the end of the ACP, Charter offered bill credits, downgraded broadband tiers (meaning, budget plans offering slower internet speeds at reduced prices) and other promotions as a transition plan leading up to the end of ACP.  However, these measures at best deferred - rather than prevented – internet subscriber losses following the end of the ACP. This transition plan sought to cushion the ACP roll-off and, instead, spread it out over a longer period – up to 12 months or longer.

161.    In an effort to postpone losing huge numbers of ACP subscribers all at once when the ACP ended, the Company offered a patchwork of promotions or plans, including: (i) the Internet Assist (a $29.99/month downgraded internet speed plan) and Internet 100 plans (a $24.99 plan); (ii) monthly credits for other Internet promotions (often at least $10-15 per month); and (iii) a bundled Internet and mobile phone promotion where the mobile portion was free ($0) or heavily discounted, which the Company knew were financially unviable alternatives for its ACP subscribers which were low income households, many with prior bad debt with Charter. Significantly, the monthly $10-$15 credit and many of the mobile promotions were only offered to former ACP customers on a limited-time basis (12-months), creating the risk of delayed post-ACP churn once these offers expired and customers were made to pay the full price for these services.

162.    According to CW-6, Charter tried to "defer the problem" by continuing to pay for the service once ACP ended. CW-6 explained that customers would receive a bill for the service and there would be a credit on the bill to cover the cost. CW-6 confirmed that Charter offered this credit to customers for a few months after ACP ended but it became too costly for the company to continue.

163.    CW-11 recalled that once ACP was terminated, there were recurring credits available for 12 months to customers who had previously qualified for ACP.  CW-11 explained that these credits did not cover the full cost of the ACP rebate, but a portion of it, and the rate for internet service was to be "ramped up" to market rate after 12 months on the promotion.

164.    CW-4 explained that there were discounts that could be offered as well as reduced Internet fees; one was called Internet 100 and the other was Internet Assist. CW-4 also noted that Retention Specialists could offer customers a $10 monthly credit on their plan for 12 months.

165.    CW-12 advised that once ACP ended, Charter sent employees out to attempt to get customers to use the service "so they didn't have such high churn numbers."

166.    According to CW-4, there was another promotional offer, separate from these low-cost plans, which could be applied to former-ACP customers' internet bills. CW-4 described it as an "ACP Credit," designated by a checkbox on customer accounts, which could be applied to their account. CW-4 explained that this credit could be applied for 12 months, so with a plan for $29.99, the customer would be paying $19.99 per month until the credit expired. According to CW-4, Charter could apply the ACP credit for higher speeds including 300 Mbps, 500 Mbps, or a gig (1000 Mbps), adding this was a last resort offer if the customer were going to cancel and Spectrum's goal was to offer the lowest price last.

167.    CW-4 explained that Charter would tell customers that they would get a better price if they got more services. CW-4 recalled that this was internally referred to as "Better Together," and customers could bundle services at lower prices, adding that Charter was able to use ACP as a sales tactic to sell other services because the customer was not paying for internet through ACP.

168.    CW-4 advised that the plans that Charter offered were good for 12 months. CW-4 noted that "[i]t never meant that the rate wasn't going to increase," during the 12 months though this possibility was not mentioned during calls. CW-4 stated that there were definitely rate increases that happened, which led to customers calling before the 12-months were over.

169.    Regarding expectations that there would be customer churn once the ACP credits expired, CW-8 advised that he was aware of what retention was being told and directed and the expectation of some customer loss because both sales and retention vice presidents discussed their "plan of attack" on how to address the customers leaving.

170.    CW-8 recalled retention agents addressing the volume of calls to disconnect by trying to save the callers with promotions in order to extend them as customers. CW-8 stated that these promotions were intended to be a stop gap with the expectation that these customers would eventually churn after the promotions ended. CW-8 felt these "issues were being pushed out" with one promotional offer, and after that, the ACP customers had to pay retail rate, and that was when Charter would expect to see ongoing reductions in ACP customers.

171.    CW-8 confirmed that retention agents attempted to retain ACP customers by offering promotional credits, such as $15 or $20 per month. According to CW-8, there were no discussions at his level about what would happen when these credits expired.

172.    CW-10 explained that the retention strategy was for the Company to offer ACP eligible customers a $15 per month credit for 12 months once the program ended. CW-10 noted

that this approach was a Band-Aid to give Charter time to develop additional strategies for the ACP cohort.

173.    CW-10 recalled that Charter created a "specialized offer" for approximately $15.00 off for existing ACP customers to be applied once the program ended. CW-10 explained that this offer was valid for approximately twelve months and was also made available in stores. According to CW-10, the offer was "heavily scrutinized" and was only to be offered to customers who specifically said they were going to disconnect and mentioned ACP ending as the reason. CW-10 added that this scrutiny was because now the discount was going to impact Charter directly as it was no longer a government subsidy. CW-10 confirmed that as a part of his role, he was able to see the number of credits added, who had added them, and what accounts they were added to.

174.    CW-2 stated that he was aware of the internet promotion offered to ACP customers to bridge the gap after the subsidies ended but never heard of any plans by Charter as to what to do after former ACP customers were on those promotions for more than 12 months. CW-2 added that Charter attempted "a Hail Mary" with their customers with the promotions offered immediately following the end of ACP.

175.    CW-8 confirmed that CCO Adam Ray and EVP, Sales Christian Ruiz were heavily involved in promotional offers on a day-to-day basis. CW-8 explained this was because marketing developed the promotions, finance had to calculate their impact, and retention ultimately reported to Ray and Ruiz, and that executives – including Ray and Ruiz – needed to sign off every promotional offer.  CW-8 recalled emails from upper management, including "all the way up to" CCO Adam Ray on slight performance deviations regarding Charter's disconnect call queues, or phone calls on slight performance deviations. According to CW-8, this level of involvement "day to day" suggested to CW-8 that CCO Ray and others were aware of the volume of disconnect calls.

176.    CW-7 described the directive to retain ACP subscribers as a "quick pivot" with new promotions that "cascaded from leadership" in an effort to retain the ACP customers. CW-7 recalled that the drop in subscribers who were previously receiving ACP was "quick" and noticeable, adding that incentives and promotions were tied to conversions to turn around the declining ACP customer base. CW-7 added that with those lost customers came noticeably fewer people visiting the Spectrum stores.

177.    CW-1 explained that there was a team in business intelligence that would monitor metrics for marketing and CMO Peters would have been aware of those metrics. CW-1 confirmed that he was sure Peters would have gotten that information, adding that Peters knew everything that was going on at Charter.  According to CW-1, CMO Peters reported directly to CCO Adam Ray, who reported to CEO Chris Winfrey.

178.    CW-1 explained that the promotional offers' low-price points were all for a year (12 months), at most, then bills would go up significantly. CW-1 added that after the 12-month promotional rate was over, the bill would increase automatically. CW-1 explained that if a customer called about cancelling their service because of the end of the promotion, the retention team could sometimes give the customer another offer to keep them subscribed to the services.

179.    CW-1 added that he had concerns over the probability of those customers churning once the free 12 months offered by the promotion expired. CW-1 explained that when he asked questions about what was going to happen in a year when the promotional pricing ended and how those customers would be retained that he did not receive an answer.

C.    **ACP Customers Start Not Paying And Disconnecting Once the ACP Ends**

180.    CW accounts detail how equipment returns, disconnect volumes, and churn spiked once ACP ended contradicting Defendants' claims to the market minimizing the impact of the

54

program's end. Return of equipment activity provided an early, quantifiable indicator of impending churn that intensified after ACP's end.

181.    According to CW-3, the Company's public messaging about mitigating the impact of the end of ACP did not match what he saw in the field. CW-3 stated that he and his team continued to see increasing numbers of ACP customers who were disconnecting well after corporate leadership suggested the effects of the end of the ACP were behind the Company. CW-3 recounted how there was a disconnect between how leadership talked about the end of the ACP program and what his group was still dealing with on the ground, especially as the temporary credits expired.

182.    CW-10 recalled that the number of equipment returns "started climbing" in approximately January 2024 and continued through May 2024, that returns of modems and routers were growing "exponentially," and that he observed return figures that were 25% to 30% greater than the historical figures beginning in March or April 2024.

183.    CW-10 explained that the majority of customers making returns were internet only customers and he saw "lines of people" at stores preparing to return their equipment during this period.

184.    CW-2 stated that when he worked on the retail side, he was out in the field visiting his locations often. CW-2 spoke to many ACP customers that were returning their equipment when ACP funding was over.

185.    CW-2 confirmed that after the June 2024 announcement, their stores were inundated with ACP customers coming in to return their equipment, specifying that the internet equipment being returned included modems and Wi-Fi routers.

186.    CW-2 stated that the lack of funding which ended ACP in June 2024 had a "huge impact" on the Company and a "huge blow" to their low-income customers. CW-2 advised that the internal expectation was that the biggest impact was not going to occur exactly when ACP ended but would really start in the middle to the end of 2024 and continue on.

187.    CW-2 confirmed that high speed internet churn "was way up" from June 2024 and continued through early 2025.

188.    According to CW-6, the impact of the ACP ending was "gigantic," and he recalled bringing it to the attention of his Senior Director who reported to the VP who reported to CCO Adam Ray.

189.    CW-13 recalled a lot of internal concern that ACP ending would have an impact on the company and that it "could be a big loss based on the mailing numbers." According to CW-13, there were discussions within his department that Charter would be impacted by the end of ACP more than other internet providers because Charter utilized the ACP more than any other broadband providers—Charter had more ACP subscribers than other companies.

190.    CW-7 explained that the end of ACP affected Charter's internet churn, and they could see how many ACP customers that they were losing in each market. CW-7 stated that despite whatever strategies the Company offered ACP customers, they "could not put money in people's pockets." CW-7 said that ACP customers were leaving because they could no longer afford their services.

191.    CW-7 explained that he could see these [churn] numbers because of a "backend reporting piece" and explained that Charter in general had the ability to see "on the front end" how many customers were on ACP and "so we knew the potential impact" of the end of ACP. According to CW-7, other indicators were that there was less traffic in stores and customers

56

arriving at the stores were complaining that they were going from being charged $0 per month to $30 per month. CW-7 added that the loss of ACP customers also explained why he and the store employees who reported to him had fewer people coming to the stores.

192.    CW-6 explained that in a subscriber-based model, there was a long-term effect for at least 24 months and the impact of the end of ACP would be "gigantic in terms of future revenue."

**D.    Charter's Struggle to Keep Up with its Competition Intensifies as ACP Customer Churn Increases**

193.    CW-2 described how he ran some of Spectrum's toughest markets within their store channel. CW-2 noted, "They were getting their tails kicked by their competitors in those markets and they didn't want to tell that story." CW-2 stated that many of their competitors had comparable service, and it came down to pricing. CW-2 said that Charter started to have a number of pricing structure conversations after ACP ended. According to CW-2, the Company began offering lower bundled pricing for internet, cable, and telephone.

194.    CW-10 explained that the "biggest hurdle" for Charter was getting symmetrical download and upload speeds for its internet offering.  CW-10 explained that at the conclusion of ACP, customers were able to seek internet service from competitors that could offer faster speeds at lower prices. CW-10 opined that Charter was selling an inferior product at a higher price.

195.    CW-10 explained that he had access to "CAT" or the Competitive Advantage Tool which showed speeds and prices of Charter's competitors. CW-10 recalled a promotion Charter ran that claimed they were the "fastest network," had to be changed shortly after the promotion began to the "fastest growing network" because the claims regarding network speed in comparison to the competition were inaccurate.

196.    CW-12 confirmed seeing significant churn of previous ACP customers switching to competitors.

E.      **Senior Executives Including the Individual Defendants Internally Tracked ACP Subscriber Data and Discussed Worsening Trends Among This Cohort**

197.    According to multiple CW accounts, Charter tracked ACP subscribers metrics including nonpay and churn through daily dashboards and recurring executive meetings, highlighting the importance of ACP subscribers to Charter's business. CWs also detail that the Company internally discussed concerns about potential churn and long-term viability of the ACP cohort.

### 1.      ACP Reports and Data Tracking

198.    According to CW-3, subscriber metrics, including the former ACP subsidy section, were closely tracked. CW-3 explained that a combination of a proprietary system called Realtime, along with Power BI, Tableau, and Salesforce were used to update, track, and export metrics including ACP subscriber levels. CW-3 stated that local results flowed into daily and weekly reports that he reviewed and that were rolled up for regional and corporate leadership. CW-3 confirmed that these reports covered many metrics including how many former ACP subsidy customers were still on temporary promotions/offers, how many former ACP subscribers converted to other plans or promotions, and how many disconnected Charter service. Based on this process, CW-3 understood that senior management had regular, detailed visibility of what was happening with former ACP subscribers.

199.    CW-3 explained that these metrics also contained details based on each type of customer offer, with ACP being one of the offers. CW-3 recalled that the reports included details on post-ACP churn, which he occasionally saw when shared by senior leadership with a specific group such as in a sales meeting.

200.    CW-2 also confirmed that the Company tracked non-pay disconnects very closely.

201.    CW-6 described that he was responsible for creating reports and financial models with respect to the impact of ACP ending. CW-6 recalled using a system called *Microdata* or *Microstrategy*. CW-6 explained that the information would be flagged in the system if it was related to ACP. CW-6 would then use that information to create financial models to illustrate the impact of ACP ending. CW-6 recalled one example where he pulled every ACP subscriber in the database and created a model of potential revenue and EBITDA using the assumed number of customers Charter would lose based on market research. CW-6 also recalled creating a report for customer churn. According to CW-6, there was a 30-40% decrease within Internet sales and retention after ACP ended.

202.    CW-3 described receiving and reviewing weekly reports on ACP breakouts called "Offers Reports" in PowerPoint decks that had metrics on each offer made to replace ACP and any type of retention promotion. CW-3 explained the Offers Report as a very detailed report that included many metrics including new customer numbers, subscriber attrition numbers, and subscriber churn as some examples.

203.    According to CW-3, the "Offers Report" was distributed via email every morning to corporate executives including Chief Commercial Officer Adam Ray and his direct reports. CW-3 recalled that those included on the email distribution for Offers Reports included Adam Ray, Executive Vice President, Sales Christian Ruiz, Group Vice President Residential Field Sales, Kelly Meixner, and Regional Vice Presidents and Directors, including CW-3. CW-3 confirmed that Defendant Winfrey received the daily Offers Report, and he would be surprised if CFO Jessica Fischer did not receive the Offers Reports as well.

204.    According to CW-5, each of Charter's segments, including sales and call center, had their metrics "managed" by the Marketing Database Team, who entered and updated that data

into the Company's BI (business intelligence) MicroStrategy software on a daily basis, including data on ACP subscribers.

205.    CW-5 confirmed that Charter's senior level executives "asked for and got the ACP data all the time." Specifically, CW-5 recalled Executive Vice President – Sales, Christian Ruiz, Group Vice President Marketing Strategy and Performance, Puru Patnekar, and Senior Director, Media Operations, MarTech/AdTech, Matt Reeves, often requested updated ACP data, sometimes on a daily basis.

206.    CW-5 advised that he did not review residential data because it did not fall within his responsibilities, but he saw the slide on residential data that was created and included in the weekly and monthly PowerPoint presentations prepared by a Strategy Analyst because CW-5 would check to see that all slides were included. CW-5 added that along with the residential data slide was a separate slide called "ACP Review" that was also included by the Strategy Analyst. CW-5 described these presentations as often consisting of different types of graphs with corresponding metrics. CW-5 explained that these presentations were sent to Senior Vice President, Digital Sales and Retail, Rohan Kumar and Executive Vice President, Chief Marketing Officer, Sharon Peters to be reviewed with CEO Chris Winfrey and other Charter executives in the weekly Tuesday Afternoon meetings and separate monthly meetings. CW-5 stated he did not participate in these meetings.

207.    CW-5 confirmed that within Charter's BI MicroStrategy software, ACP customers were "bundled" in the top line residential internet subscriber numbers, but that they could be segregated from the regular subscribers into their own distinct subset through a dropdown button or function. According to CW-5, included in this subset of data on ACP subscribers were the

number of subscribers, the number who had been given contracts but did not sign, and ACP customer churn, along with other related metrics."

208.    CW-12 explained that a program called Real Time Results was used to track customer data, and that Directors received reports from the corporate office in Stamford, Connecticut.

209.    According to CW-13, Charter's Offers and Promotions Department was run by David Andreski during CW-13's tenure and tracked ACP customers and disconnects.

### 2.    Meetings Where ACP Metrics and Churn Were Discussed

210.    CW-6 explained that he attended meetings to discuss the impact of ACP ending as early as June 2024. CW-6 recalled these meetings held at least once a month, in person in the Stamford, Connecticut office. CW-6 recalled that members of Charter's C-Suite were present at those meetings, including Executive Vice President - Sales, Christian Ruiz, to CCO Adam Ray, and CMO Sharon Peters. CW-6 described that the meetings he attended focused on how to offset the financial impact of ACP ending.

211.    CW-2 described Regional Review Meetings that he attended for his region twice a year in person. CW-2 explained that a team of executives would travel to each business segment or region. According to CW-2, his Regional Review Meetings were attended by CEO Chris Winfrey, Adam Ray, EVP Field Operations Tom Monaghan and others, including Current VP, Spectrum Stores Brad Waggoner, McMichaels and then Head of Stores, Patrick Longood (who all reported to Ruiz) sometimes. CW-2 recalled Ray asking "pointed questions" at a meeting that he attended; specifically, he asked if they were watching ACP customers by income band, on a regional level. According to CW-2, after that discussion with Ray, there was an effort to get even more granular information including income levels on the ACP recipients. According to CW-2, as

one example, Charter was comparing regions and could see that Ohio was over saturated with ACP customers.

212.    CW-2 also described Quarterly Business Reviews that he did not attend but his direct supervisor (Waggoner) attended. CW-2 knew this because he was asked for data for those meetings. CW-2 advised that in preparation for the QBR meetings, he would prepare narratives of what he and his subordinates were hearing in the field.

213.    CW-3 described Chris Winfrey as a "very hands on" CEO and recalled that Winfrey and a team of other executives would travel on a quarterly basis to visit with different teams at various locations. According to CW-3, these visits were referred to as Quarterly Operational Reviews and occurred at call centers with field operations and sales personnel present. CW-3 stated that for these meetings, they brought packets of detailed information and metrics. CW-3 described one of these meetings held in Myrtle Beach, South Carolina on approximately February 27 and 28, 2024, that was attended by CEO Chris Winfrey; CCO Adam Ray; EVP – Field Operations, Thomas Monaghan; Executive Vice President, Customer Operations Cliff Hagan; Senior Vice President Field Operations John Quigley; Executive Vice President, General Counsel & Corporate Secretary Jamal Haughton, and other senior executives. According to CW-3, these senior executives arrived with physical, bound copies of reported metrics that were reviewed with each department.  CW-3 recalled that ACP subscriber numbers were part of these Quarterly Operational Review discussions and that the physical, bound reports included ACP metrics. CW-3 stated that Charter's Retention Team was responsible for the ACP information and identified Executive Vice President, Sales Christian Ruiz and CCO Adam Ray – who Ruiz reported to – as overseeing ACP retention.

214.    CW-3 recalled that at the Myrtle Beach Quarterly Operational Review, in February 2024, there was a "big roundtable" with 50 – 60 people sitting around a huge table where they

reviewed the metrics for each department, adding that he only saw metrics for his department. CW-3 added that his team spoke about ACP because if an address that his team sold to was also flagged as ACP eligible, then his team sold ACP to them as well. CW-3 noted that they also discussed what impact the end of ACP would have.

215.    CW-3 described CEO Chris Winfrey and CCO Adam Ray as speaking in a more polished way about the ending of ACP, while Ruiz used more direct language about the importance of making up for lost ACP subscribers such as "We need to offset this ACP crap."

216.    CW-12 recalled having town hall meetings led by Executive Vice President, Christian Ruiz, where the ending of ACP benefits was discussed. CW-12 recounted that Ruiz and other senior leadership came in person to discuss ACP. According to CW-12, one meeting was held in early 2024 before ACP ended and focused on how to overcome the loss of ACP and the second meeting was held after ACP ended, where members of the C-Suite discussed incentive options to retain ACP customers.

217.    CW-3 also described the town hall-style meetings where the ACP subsidy and transition programs were discussed by senior leadership, including a townhall in late 2023 where Chris Winfrey and Christian Ruiz openly discussed the "sunsetting of ACP." CW-3 recalled conversations about ACP ending, converting ACP customers into regular customers, promotions for those ACP customers, and discussions about the length of the bridge promotions taking place at town hall meetings.

218.    CW-3 recalled EVP, Sales Christian Ruiz often talking at quarterly town halls about plans for and the need to retain ACP subscribers after the existing bridge promotions ended. CW-3 recalled that CEO Chris Winfrey was present for some of these discussions.

219.    CW-3 described a town hall at Charter's new call center on Forest Point Boulevard, Charlotte, North Carolina where Ruiz talked about the impact of ACP and the need to push new sales to offset the loss of the subsidy and ACP subscriber churn.

220.    According to CW-3, on February 26, 2025, CEO Chris Winfrey, Chief Commercial Officer Adam Ray, Executive Vice President – Field Operations, Thomas Monaghan, and other C-suite executives spoke at a quarterly townhall meeting in Kingsport, Tennessee that CW-3 attended. CW-3 described this townhall as a state-of-the-union on the Company which was attended by approximately 200 senior-level employees – mainly field operations and outside sales managers, including CW-3, as well as some other sales teams.

CW-3 recalled that the topic of ACP was brought up extensively at that meeting, including by Winfrey and Ray, who spoke about the impact of the end of ACP to the Company, describing how they tried to put a "positive spin" on how Charter was coming out of the end of ACP.

221.    According to CW-3, at that town hall meeting in Kingsport, in February 2025, ACP was discussed "quite a bit" by Winfrey and Ray. CW-3 stated that Winfrey and Ray confirmed that the ACP subscriber loss was "impactful" and that the Company was "still discussing the pain points" of the ACP customers churning and leaving Charter. CW-3 added that EVP – Field Operations, Thomas Monaghan and Executive Vice President, Customer Operations, Cliff Hagan also spoke at that meeting.

222.    CW-3 recalled Winfrey and Ray saying at the February 26, 2025, Kingsport town hall that Charter had leaned into ACP much more than Comcast and other competitors, so the Company was exposed to more of an impact when ACP ended, and that Charter would mitigate that impact with Internet Assist.

223.    Regarding conversations about next steps in retaining ACP subscribers after the Internet Assist promotions ended, CW-3 recalled that EVP, Sales Christian Ruiz strongly pushed sales teams on weekly Webex meetings to boost other sales to offset ACP subscriber losses. CW-3 described these as Ruiz's Webex meetings with sales leadership, including CW-3 in attendance.

224.    CW-3 described the Webex meetings as sales reviews originally held monthly and then quarterly. CW-3 described Ruiz as giving "a lot of direct messaging" on offsetting ACP and being extremely direct about what needed to be done.

225.    CW-1 attended monthly "program review" meetings with CCO Adam Ray that took place in the Stamford, Connecticut office where various groups would give updates on what was happening at the Company.

226.    CW-1 described regular meetings with CMO Peters occurring one to two times a month.

227.    CW-1 confirmed that Sales Meetings took place every Wednesday for VP-level employees, and although he did not attend, CW-1 believes Christian Ruiz, EVP of Sales, attended the weekly sales meeting.

## VIII.  THE DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

228.    Lead Plaintiff alleges that the statements identified in ***bold and italics*** within this section were materially false and misleading because, among other reasons, they failed to disclose material information that Defendants knew or were reckless in not knowing.  As alleged herein, such statements artificially inflated or artificially maintained the price of Charter securities and operated as a fraud or deceit upon all persons and entities that purchased or otherwise acquired those securities during the Class Period.  Because Defendants chose to speak on the issues described below—and thereby put these subjects into play—Defendants had a duty to fully, fairly,

65

and truthfully disclose all material facts and information regarding these issues. As detailed below, Defendants created a materially false impression of the state of affairs at Charter that differed significantly from reality.

###### A. July 26, 2024: Q2 2024 Financial Results

229. On July 26, 2024, the first day of the Class Period, Charter filed a press release with the SEC on Form 8-K, announcing the Company's financial results for the second quarter (the "Q2 2024 Earnings Release").

230. On July 26, 2024, Charter also hosted its second quarter 2024 earnings call (the "Q2 2024 Earnings Call") in which Defendants Winfrey and Fischer, among others, participated. On the Q2 2024 Earnings Call, Defendant Winfrey emphasized that the loss of residential internet customers due to the end of the ACP was being managed, Defendant Fischer provided prepared remarks reinforcing that the loss of internet customers was not impacting the Company's ability to execute its growth strategy, stating in part: "So far, we are ***performing well*** with ACP retention, ***but the largest driver of Internet customer losses associated with the end of the ACP program will be in nonpay disconnects. And they will occur in the third and fourth quarters, slightly weighted to the third.***"

231. Significantly, during the question-and-answer portion of the Q2 2024 Earnings Call, Defendants emphatically reiterated that the effects of the ACP ending were limited, "temporary" and "onetime in nature." Specifically, in response to a question from Craig Eder Moffett of Moffett Nathanson LLC, about the ACP impact on gross additions, Defendant Winfrey unequivocally stated: "***It's temporary. It's onetime in nature. And so as we've spoken about before, it's really about just managing through that onetime impact and trying to make sure that we're doing all the right things for preserving that base and keeping them connected, which we're doing***."

232. Similarly, in response to an analyst question during the Q2 2024 Earnings Call on broadband market growth trends, Defendant Winfrey emphasized that the Company was successfully preserving ACP customers, stating: "*[T]he most dramatic effect is once you flush out the ACP impact between Q2 and Q3 predominantly, then you'll be able to get back into a much more normalized environment. . . . [W]e're doing everything we can in the meantime to preserve all the ACP customers, doing really well*."

233. Also, during the Q2 2024 Earnings Call, in response to a question from Benjamin Daniel Swinburne of Morgan Stanley about Charter's cost actions, Defendant Winfrey stated: "So, when you step back, I know you know this, but *ultimately, this ACP transition is a onetime event.* And so we're very focused on really isolating the ACP impact internally and evaluating not only obviously our performance on retaining those customers, because we want to keep them connected. We think it's very valuable, and we can."

234. Defendants' Statements in ¶¶230-33 were materially false and misleading when made in that they failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants:

(a) that Charter had leaned into the ACP far more aggressively and used ACP as a sales tool to inflate broadband subscriber metrics in the short-term. Internally, executives recognized that this would create a lasting structural hole in Charter's broadband base once ACP ended. (¶¶131-59).

(b) that ACP-related subscriber losses were not temporary or "one-time" in nature, but that they would repeat, well into 2025, driven primarily by post-ACP churn and continuing non-pay disconnects, as Charter lacked any viable long-term strategy for retaining the

ACP cohort once their short-term retention promotions, credits and downgraded plans expired. (¶¶160-92, 197-205, 210-19, 223-27).

(c)     that Charter executives tracked and had regular, detailed visibility on ACP subscribers and metrics, on a daily and weekly basis, through a combination of a proprietary system called Realtime, along with Power BI, Tableau, Salesforce, and BI MicroStrategy tools. This data showed how many former ACP subsidy customers were still on temporary promotions/offers (including in: (i) Offers Reports distributed to CCO Adam Ray, EVP, Sales Christian Ruiz and other senior executives; and (ii) through a program called Real Time Results), how many former ACP subscribers converted to other plans or promotions, how many were not paying, and how many disconnected their Charter service. This information also was used to create financial models to illustrate the impact of ACP ending. (¶¶197-209). This data showed, as of July 2024, that Charter was experiencing accelerating internet disconnects, rising nonpay churn, and intensifying customer distress among the former ACP subscribers who were internally recognized as a highly price-sensitive cohort prone to nonpay disconnects.  (¶¶180-92, 197-209).

(d)     that senior Charter executives, including CCO Adam Ray, EVP, Sales Christian Ruiz, and CMO Sharon Peters, attended meetings to discuss the impact of ACP ending and how to offset its impact.  The effects of the ACP also were discussed at Regional Review Meetings, Quarterly Business Reviews, Quarterly Operational Reviews, Town Halls, and Web-ex meetings with senior leadership. (¶¶210-19, 223-27).

(e)     that bridge promotions, temporary credits, and mobile bundling could not replicate the value of the ACP subsidy for Charter and were not economically viable or sustainable long-term. These offerings were, in many cases, still unaffordable for the ACP subscribers, did not replace the full ACP benefit in terms of revenues, and, due to their temporary nature, merely

68

postponed—rather than prevented—the inevitable subscriber losses among the ACP cohort. CWs described these measures as a stop-gap or Band-Aid, and a way to "defer the problem." (¶¶160-79, 180-92).

(f)    that senior Charter executives frequently acknowledged that Charter would be hit harder and longer than its peers due to its disproportionate reliance on the ACP. (¶¶132-142, 150-59, 185-92).

(g)    that Charter internally discussed "pain," "clear panic," and a "rough couple of years" the Company would face following ACP's end—facts that rendered Defendants' statements about successful mitigation, stable churn, and a limited or onetime impact of the end of ACP materially false and misleading when made. (¶¶149-59).

235.    On July 26, 2024, the Company filed with the SEC its quarterly report for Q2 2024 (the "Q2 2024 10-Q"), accompanied by SOX Certifications signed by Defendants Winfrey and Fischer. The Q2 2024 10-Q reported that:

> During the second quarter of 2024, we lost 149,000 Internet customers while adding 557,000 mobile lines. Our Internet customer growth was challenged by the end of the Federal Communication Commission's Affordable Connectivity Program ("ACP"), lower customer move rates and the competitive environment. While our retention programs for the customers impacted by the end of ACP subsidies have been successful in retaining the vast majority of ACP customers, ***the end of the ACP subsidy program was disruptive to our business and resulted in customer losses during the quarter***. ***We expect to see additional one-time impacts on customer net gains, revenue per customer and bad debt in the third and fourth quarters of this year.***

> \* \* \*

> We participated in the ACP and continue to participate in the RDOF subsidy program. The ACP program previously provided up to a $30 monthly subsidy enabling eligible low-income households to purchase our Internet products at a discount or, for a portion of those households, at no cost. The FCC prohibited service providers from enrolling new participants into the ACP after February 7, 2024 and

69

April 2024 was the last month ACP households received the full ACP subsidy. ACP households received a $14 federally funded ACP subsidy in May 2024. As of June 1, 2024, ACP households no longer received the ACP benefit. ***The end of the ACP benefit has been, and will continue to be, disruptive to our business. We have lost and will continue to lose customers and revenues and could face greater difficulty in providing services to low-income households in the future.***

236. Defendants' Statements in ¶235 were materially false and misleading when made for the reasons set forth in ¶234.

237. Further, Defendants' statements in ¶235 were false and misleading because Charter's Q2 2024 10-Q continued to falsely assert that the impacts from the end of the ACP would be only "one-time," and would be limited to the third and fourth quarters of 2024. Accordingly, Defendants' statements that the end of the ACP would "continue to be disruptive" were clearly limited to the Q3 2024 and Q4 2024. Indeed, in a prior section of the same Q2 2024 10-Q, Defendants affirmatively represented that Charter expected only "one-time impacts" to customer net gains, revenue per customer, and bad debt limited to Q3 and Q4 2024 due to the end of ACP, thereby conveying that any lingering ACP effects were short-lived and already in the process of being resolved. This created a misleading impression that any lingering effects from the ACP's expiration would be resolved before Q1 2025, which was materially false and misleading because Defendants knew, or recklessly disregarded, that ACP-related subscriber losses would continue well into 2025.

238. At the same time Defendants emphasized the transitory nature of the ACP's expiration, they did not disclose that Charter's retention of former ACP customers depended heavily on short-term promotions and credits, creating a significant risk that the ACP customers would discontinue service once those offers (typically 12 months or shorter) expired, particularly given the high risk, low income nature of the ACP subscriber cohort. Additionally, as discussed

70

below, these risk disclosures were conspicuously absent from Charter's 2024 10-K and Q1 2025 and Q2 2025 10-Qs.

239. As a result of Defendants' misrepresentations and omissions on July 26, 2024, Charter's stock price was artificially inflated and/or artificially maintained. Indeed, Defendants' statements drove the price of Charter's shares up by $52.39 per share, approximately 16.62% percent, to close on July 26, 2024 at $367.62 per share.

240. Securities analysts reacted favorably to Defendants' statements and Charter's Q2 2024 financial results. On July 26, 2024, analysts at Bank of America published a report titled "Ahead; broadband beat and EBITDA better," stating: "Revenue was above our estimate driven by both better residential and commercial results than forecast. Charter EBITDA grew 2.6%, which was above our -0.6% estimate due to better than forecast expenses and the revenue beat. . . . Overall, results were much better than forecast as the broadband subscriber and financial results beat our projections." In their note, the Bank of America analysts emphasized the upside: "(1) greater than forecast broadband resiliency including better than projected share gains of broadband subscribers as well as still strong pricing power, (2) faster than projected capital returns, (3) significant net additions from the company's rural build-out and (4) greater than expected benefit from government broadband subsidies."

241. In its July 26, 2024 report titled "No ACP, No Problem," Deutsche Bank noted:

> **The impact from ACP (Affordable Connectivity Program) in 2Q was more muted than we had forecasted and, while there's more impact to be absorbed in 3Q and 4Q, ACP is proving to be less of a headwind across the industry than the market anticipated.**[18] Management estimated that more than 100K of Charter's 149K broadband subscriber net decline was a result of ACP ending, with approximately half of the losses due to voluntary churn and the other half due to reduced gross add activity. **Furthermore, management**

---

[18] Emphasis in original.

71

**noted that they will not have a full picture of ACP's impact until the middle of 4Q**, as the company expects non-pay disconnects to be the largest driver of ACP-related broadband subscriber losses, although these disconnects will be more skewed toward 3Q than 4Q. 2Q had little to no incremental disconnects related to ACP because outstanding bills haven't yet had sufficient time to become past due.

242.    Analysts at Bank of America published another report on Charter on July 29, 2024, titled "Encouraging early ACP churn results," and stated that "2Q: broadband better; managing well through ACP 'so far'. . . In addition to better than forecast broadband results, healthy EBITDA growth moved Charter leverage to 4.32x[.]" In their note, the Bank of America analysts emphasized that "[w]hile it is still early in 3Q, management did note, 'so far, we're performing well with ACP retention.' . . . During 2Q, underlying broadband sub results were also better than projected as the impact of seasonality seems to be waning. . . . [W]e are encouraged by both better ACP churn and improving underlying trends[.]"

243.    That same day, on July 29, 2024, securities analysts at Morgan Stanley published a report titled "Better Than Feared – Reiterate EW," stating that "Charter is navigating a number of challenges in 2024 better than expected.  This includes maintaining broadband ARPU growth, navigating the end of ACP, and finding cost efficiencies."  In their note, the Morgan Stanley analysts emphasized "the Affordable Connectivity Program (ACP) impact has so far been lower than feared. . . . Charter is on track to see an acceleration of growth in 2H."

244.    On July 29, 2024, Evercore ISI published an analyst report that noted that "[h]eadwinds from the ACP sunset in 2Q were not as bad as we and the Street had anticipated," and while there was some "uncertainty" given that non-pay would "tick up" in the third quarter, "the net impacts from this 1x event are shaping up to be manageable."  The Evercore ISI analysts further highlighted that "[b]roadband net adds [were] meaningfully better than feared."

72

245. The next day, on July 30, 2024, securities analysts at Bank of America published a report titled "Resetting the router," and stated that "Charter reported 2Q24 results on Friday, beating expectations. . . . Charter expects to have a better view of the total ACP impact in 4Q, with subscriber losses weighted to 3Q though management noted 'so far, we're performing well with ACP retention.'"

**B.     September 4, 2024: BofA Securities Media Communications & Entertainment Conference**

246. On September 4, 2024, Defendants participated in the BofA Securities Media & Entertainment Conference. During the conference, in response to an analyst's question about the ACP and customers' ability to pay, Defendant Fischer again assured investors that Charter had weathered the ACP's termination "extraordinarily well" and that those issues had "largely made its way through the system":

> So we continue to do everything that we can to keep customers connected to reliable broadband. ***I think in terms of what we saw in voluntary churn coming out of ACP, that actually has gone quite well***. . . . And so if I break those 2, voluntary, we expected to take a lot of calls related to the end of ACP credits, which really happened for us in May and June with them stepping down and then fully going away. ***That call volume now has largely made its way through the system. So I think we've seen what we're going to see in voluntary***. . . .
>
> * * *
>
> And then I know that this is the second question on your list because it's what people are excited about, but I would be remiss not to remind folks, ***it's a onetime issue, right, in terms of the impact of ACP going away.***
>
> ***I think that ultimately will weather sort of the onetime issue quite well.*** But we have always done a great job of serving customers who were more challenged to pay across the market. ***We have products in place to sell to them. We have a sales infrastructure that's successful at selling to them. And I think we'll continue to serve that customer group quite well even in a post ACP market.***

247. Moreover, Fischer underscored that "in the post ACP environment," those nonpay customers would remain Charter customers long-term, as "[t]hey'll fall out of the system, *but then they come back [] in another form. So, it doesn't change sort of your overall customer level that much*[.]"

248. As a result of Defendants' misrepresentations and omissions on September 4, 2024, Charter's stock price was artificially inflated and/or artificially maintained.

249. Defendants' Statements in ¶¶246-47 were materially false and misleading when made for the reasons set forth in ¶234. The statements at ¶¶246-47 continued to characterize ACP-related impact as largely completed, temporary, and "onetime," while omitting that Defendants knew the most severe and persistent impacts of ACP's termination were still unfolding and would extend well beyond Q4 2024. CWs confirm that, by September 2024, Charter had already observed accelerating nonpay disconnects, equipment returns, elevated call volumes, and widespread customer distress that contradicted Defendant Fischer's claim that in voluntary churn had "largely made its way through the system" and that payment behavior was tracking expectations. (¶¶180-96).

250. Defendants also falsely represented that ACP losses would not materially affect long-term subscriber levels or competitive dynamics, despite knowing that ACP had created a uniquely large, price-sensitive cohort that Charter internally recognized as unsustainable and disproportionately likely to churn once limited-time, temporary credits and promotions expired. Charter knew that ACP had artificially inflated subscriber counts, that bridge promotions were merely a stop-gap designed to defer churn, and that there was no long-term plan for what would happen when 12-month credits, promotions, and downgraded plans rolled off. (¶¶131-48, 160-92).

251.    On September 6, 2024, analysts at TD Cowen published a report titled "U.S. Broadband - State of the Market - September 2024," stating that "ACP Risk [was] Better than Feared; Providing Some Relief for Cable[,]" and noting that "2Q24 ACP impacts were relatively muted compared to expectations[.]"  In their note, the TD Cowen analysts further highlighted that "CHTR posted good 2Q24 results highlighted by better than feared ACP (a common theme), positive commentary on cost savings and 2H EBITDA, and mobile is now profitable[,]" which "drove a 17% stock rally[.]"  Finally, the TD Cowen analysts reported that Charter, with ">5MM" ACP customers, "[e]xpects impact to largely be non-pay disconnects primarily in 3Q24."

252.    Similarly, on September 10, 2024, analysts at Citi published a report titled "Upgrading Rating on CHTR Share to Neutral," stating: "[T]he core broadband operating environment for 3Q seems stable with prior commentary, and ACP retention seems to be going better than expected for the category."  In their note, the Citi analysts highlighted that "Charter is targeting significant improvement in EBITDA during 2H24 with its previously announced efforts to reduce expenses that can also support flattish EBITDA for 2025[,]" and emphasized that "Charter remains confident it will be able to drive margins[,]" explaining that despite "multi-year headwinds . . . cable firms can manage financial performance with a greater focus on ARPU and operating margins."

**C.    November 1, 2024: Q3 2024 Financial Results**

253.    On November 1, 2024, Charter filed a press release with the SEC on Form 8-K, announcing the Company's financial results for the third quarter of 2024 (the "Q3 2024 Earnings Release").

254.    On November 1, 2024, Charter also hosted its third quarter 2024 earnings call (the "Q3 2024 Earnings Call") in which Defendants Winfrey and Fischer, among others, participated. On the Q3 2024 Earnings Call, Defendant Winfrey repeatedly touted that the end of the ACP was

75

being well managed, and that the end of the ACP would be temporary, "onetime impacts," stating: "*We're also successfully managing the transition of customers previously on the government's Affordable Connectivity Program* in a period of new competition. . . . *As we work through the onetime impacts of ACP this year, . . . we remain confident in our ability to drive healthy long-term connectivity customer growth*."

255.    On the November 1, 2024 Q3 2024 Earnings Call, Defendant Fischer reiterated that the loss of ACP customers was under control, stating: "*We continued to do a very good job in managing the end of the program*, and we've retained the vast majority of our customers who were previously receiving an ACP benefit." Defendant Fischer also represented that Charter experienced, "about 100,000 incremental nonpay disconnects and some lagging voluntary disconnects, both related to the end of ACP. *After those effects in the fourth quarter, we expect the onetime impacts from ACP to be behind us*."

256.    During the question-and-answer portion of the Q3 2024 Earnings Call, securities analysts questioned Defendant Winfrey on the broadband internet trends Charter was seeing. In response, Defendant Winfrey again reiterated that Charter was managing the end of the ACP well, stating: "*And then we had obviously the downside of significant ACP primarily through nonpay disconnects and voluntary churn, but we're managing that well*."

257.    Defendants' Statements in ¶¶254-56 were materially false and misleading when made for the reasons set forth in ¶¶234, 249-50. Defendants' Statements in ¶¶254-56 continued to portray the ACP transition as temporary and well managed, despite sustained residential internet losses following the program's termination. By Q3 2024, Charter had already lost hundreds of thousands of internet subscribers year-over-year, yet Defendants continued to represent that ACP-related impacts were temporary and that the Company was "successfully managing" the transition.

In reality, CWs confirm that nonpay disconnects, equipment returns, retention call backlogs, and churn among former ACP households remained elevated and were expected internally to persist well beyond Q4 2024, as temporary credits and promotions expired. CWs noted that the lasting impact of the end of ACP was frequently discussed at town halls and executive level meetings. As such, Defendants' repeated characterization of ACP impacts as "onetime" was misleading given management's internal recognition of a prolonged post-ACP fallout. (¶¶160-92, 210-19).

258.    On November 1, 2024, the Company filed with the SEC its quarterly report for Q3 2024 (the "Q3 2024 10-Q"), accompanied by SOX Certifications signed by Defendants Winfrey and Fischer. The Q3 2024 10-Q reported that:

> During the third quarter of 2024, we lost 110,000 Internet customers while adding 545,000 mobile lines. Our Internet customer growth was challenged by the end of the Federal Communications Commission's Affordable Connectivity Program ("ACP"), lower customer move rates and the competitive environment. While our retention programs for the customers impacted by the end of ACP subsidies have been successful in retaining the vast majority of ACP customers, ***the end of the ACP subsidy program has been disruptive to our business and resulted in customer losses during the quarter. We expect to see additional one-time impacts on customer net gains, revenue per customer and bad debt in the fourth quarter of this year.***
>
> *   *   *
>
> We participated in the ACP and continue to participate in the RDOF subsidy program. The ACP program previously provided up to a $30 monthly subsidy enabling eligible low-income households to purchase our Internet products at a discount or, for a portion of those households, at no cost. The FCC prohibited service providers from enrolling new participants into the ACP after February 7, 2024 and April 2024 was the last month ACP households received the full ACP subsidy. ACP households received a $14 federally funded ACP subsidy in May 2024. As of June 1, 2024, ACP households no longer received the ACP benefit. ***The end of the ACP benefit has been, and will continue to be, disruptive to our business. We have lost and will continue to lose customers and revenues and could face greater difficulty in providing services to low-income households in the future.***

259. Defendants' statements in ¶258 were false and misleading because Charter's Q3 2024 10-Q continued to falsely assert that the impacts from the end of the ACP would be only "one-time," and would be limited to the fourth quarters of 2024. Accordingly, Defendants' statements that the end of the ACP would "continue to be disruptive" were clearly limited to Q4 2024. Indeed, in a prior section of the same Q3 2024 10-Q, Defendants affirmatively represented that Charter expected only "one-time impacts" to customer net gains, revenue per customer, and bad debt limited to Q4 2024 due to the end of ACP, thereby conveying that any lingering ACP effects were short-lived and already in the process of being resolved. This created a misleading impression that any lingering effects from the ACP's expiration would be resolved before Q1 2025, which was materially false and misleading because Defendants knew, or recklessly disregarded, that ACP-related subscriber losses would continue well into 2025.

260. At the same time Defendants emphasized the transitory nature of the ACP's expiration, they did not disclose that Charter's retention of former ACP customers depended heavily on short-term promotions and credits, creating a significant risk that the ACP customers would discontinue service once those offers (typically twelve (12) months or shorter) expired, particularly given the high risk, low income nature of the ACP subscriber cohort. (¶¶131-48, 160-79).

261. Notably, as discussed below, these risk disclosures were conspicuously absent from Charter's 2024 10-K and Q1 2025 and Q2 2025 10-Qs.

262. As a result of Defendants' misrepresentations and omissions on November 1, 2024, Charter's stock price was artificially inflated and/or artificially maintained.

263. Again, sophisticated analysts relied heavily on Defendants' representations in reporting positively about the Company. On November 1, 2024, analysts at Bank of America

published a report titled "Broadband beats," praising the Company, stating that "Charter management has done an excellent job of navigating through turbulent times for cable, including the cessation of ACP . . . ."

264.    That same day, analysts at Goldman Sachs published a report titled "First Take: Strong subscriber performance vs. expectations, with better EBITDA and FCF," stating: "We expect the stock to trade higher given upside to broadband subscribers and revenue.  We think investors expected better-than-consensus broadband results on the premise that the end of the ACP would have less of an impact on 3Q net adds that the Street was modeling, and because Comcast reported upside to broadband net additions. . . . Given investor focus on the broadband market, any commentary on the call regarding the pace of ACP subscriber losses could move cable and wireless stock. . . . There is significant investor focus on whether Charter will show EBITDA growth for 2024 and 2025 – and commentary on this point will prove important."

265.    On November 1, 2024, analysts at Morgan Stanley published a report titled "CHTR Credit: Dodging ACP Headwinds," which emphasized that "CHTR dodged ACP headwinds with lower-than-anticipated subscriber losses in 3Q24. . . . With ACP now behind us, investor focus should return to competitive dynamics and ability to increase penetration of bundled wireless-broadband offers."  Notably, the analysts at Morgan Stanley highlighted as a "key area of focus" for investors that "management said it was able to retain the vast majority of consumers that were receiving ACP benefits."

266.    Morningstar's "Charter Earnings: Investors Can Breathe a Sigh of Relief; Shares Attractive" analyst note, dated November 1, 2024, stated: "With the worst-case scenario likely off the table regarding ACP, we have increased our near-term growth estimates, lifting our fair value estimate to $500 from $490."

79

267.    On November 3, 2024, RBC increased its price target to $390 (from $345) and pointed out that, "[i]mportantly, management guided to 100K ACP internet losses in 4Q24 as the last one-time impact from the ACP funding unwind. . . . Management guided to nearly 100K ACP related losses in Q4 that are expected to conclude ACP pressures. . . . We view the ACP developments positively[.]"

268.    Bernstein analysts similarly noted, on November 4, 2024, the ACP impact going away after Q4, stating: "ACP is expected to have another 100K net loss in Q4 with some lagging voluntary churn, but the impact will dissipate after Q4."  Morgan Stanley's November 4, 2024 report stated: "The **good news** is that the drag from Charter's industry high participation in the America Connect Program (ACP) in 2024 will be wrapped in 4Q24, setting up 2025 for YoY improvement."  (emphasis in original).

269.    As a result of Defendants' misrepresentations and omissions on November 1, 2024, Charter's stock price was artificially inflated and/or artificially maintained.  Indeed, Defendants' statements drove the price of Charter's stock up by $38.88 per share, approximately 11.87% percent, to close on November 1, 2024 at $366.49 per share.

**D.**    **November 14, 2024:** Liberty Media Investor Day

270.    On November 14, 2024, during an interview with CNBC at the Liberty Media Investor Day, Defendant Winfrey represented that Charter's broadband business would return to sustainable growth following the fourth quarter, when ACP-related effects would be fully behind the Company, stating: "***Our view is that with ACP fully behind us, which it will be after the fourth quarter, . . . we expect to return to a healthy rate of growth for broadband***."

271.    As a result of Defendants' misrepresentations and omissions on November 14, 2024, Charter's stock price was artificially inflated and/or artificially maintained.

272.    Defendants' Statements in ¶270 were materially false and misleading when made for the reasons set forth in ¶¶234, 249-50, 257.

E.    **January 31, 2025: Q4 2024 Financial Results**

273.    After six (6) months of representing to investors that Charter had managed the end of the ACP well and that the impact of the ACP ending would be limited to the third and fourth quarters of 2024, on January 31, 2025, Defendants unequivocally asserted that all ACP-related impacts were now firmly behind the Company.

274.    On January 31, 2025, Charter filed a press release with the SEC on Form 8-K, announcing the Company's financial results for the fourth quarter and full year of 2024 (the "Q4 2024 Earnings Release").

275.    On January 31, 2025, Charter hosted its fourth quarter 2024 earnings call (the "Q4 2024 Earnings Call") in which Defendants Winfrey and Fischer, among others, participated.  On the Q4 2024 Earnings Call, Defendant Winfrey claimed that internet customer decline from the end of the ACP had tapered off and that Charter had retained approximately 90% of its ACP customers, presumably through other promotions, stating, in relevant part: "In 2024, *we managed the end of the Affordable Connectivity Program successfully*. . . . As we look to 2025 and beyond, the environment for broadband, mobile and video remains competitive, but we have better visibility than this time last year.  *The impact of the elimination of the ACP is now behind us*."

276.    On the same Q4 2024 Earnings Call, Defendant Fischer boasted that Charter's results would no longer be hindered by the termination of the ACP, stating, in relevant part: "*Looking forward, we believe we are past the onetime ACP-related impacts to our customers base*."

277.    During the question-and-answer portion of the Q4 2024 Earnings Call, an analyst from Morgan Stanley questioned Defendant Winfrey about how the Company planned to grow internet subscriptions without the ACP.  Winfrey's response is below:

> Look, Ben, from an outlook perspective, we're really confident about the midterm our ability to grow Internet.  But we're also sensitive to the fact that there's [] on the cusp in particular periods of time between net loss versus net gain.  And so I'm not going to comment on short term small impacts to gross adds or disconnects can have a big impact.  ***But we won't have the ACP losses this year, and so that's a huge benefit.***
>
> \* \* \*
>
> In the meantime, we're pushing through for all these things, ***but not having ACP losses inside this year is huge.***  And I'm not going to give a short-term outlook other than to say we better be -- better this year than we were next year -- or last year.

278.    Defendants' Statements in ¶¶275-77 were materially false and misleading when made for the reasons set forth in ¶¶234, 249-50, 257. Defendants' statements at ¶¶275-77 were materially false and misleading because they falsely represented that ACP-related impacts were "behind" the Company and affirmatively asserted that they "won't have the ACP losses this year," despite knowing that ACP-driven churn was ongoing, elevated, and structurally delayed into 2025. As CWs confirm, Charter was still experiencing elevated nonpay disconnects, persistent equipment returns, and permanent defections of former ACP customers.  Internally, Charter executives knew that a large portion of the ACP cohort was being temporarily retained only through short-term bridge promotions, mobile bundling, and other heavily discounted offers that would only "defer the problem" and delay churn, rather than prevent it.  These promotions were known to be financially unviable for low-income ACP households once they expired, and Charter had no long-term strategy for what would happen when these programs expired.  As a result, Defendants knew—or recklessly disregarded—that ACP-related churn would continue well

beyond 2024 and into 2025, directly contradicting their claims that ACP's impact was over and that 2025 would benefit from the absence of ACP losses. (¶¶170-79, 180-87, 190-92, 203, 205, 223-24).

279.    On January 31, 2025, the Company filed with the SEC its annual report for fiscal year 2024 (the "2024 10-K"), signed by, among others, Defendants Winfrey and Fischer.  The 2024 10-K reported that:

> During the year ended December 31, 2024, we lost 508,000 Internet customers while adding 2,117,000 mobile lines. Our Internet customer growth was challenged by the end of the FCC's ACP, lower customer move rates and the competitive environment. ***While our retention programs for the customers impacted by the end of ACP subsidies have been successful in retaining the vast majority of ACP customers***, ***the end of the ACP subsidy program has been disruptive to our business and resulted in customer losses during the year.***

280.    Defendants' Statements in ¶279 were materially false and misleading when made for the reasons set forth in ¶¶237, 238, 259-60.  Further, Defendants' statements in the 2024 10-K did *not* include the prior language from the Q2 2024 and Q3 2024 10-Qs cautioning that the end of ACP "will continue to be disruptive" to Charter's business or that the Company "will continue to lose customers," instead only noting **in the past tense** that the end of ACP "has been disruptive" and "resulted in customer losses" in 2024.  In doing so, Defendants falsely represented that any impact from the ACP was now over.  This was consistent with Defendants' statements on the Q4 2024 Earnings Call when they proclaimed that "***[t]he impact of the elimination of the ACP is now behind us***."  As such, the Defendants' statements at ¶279 were false and misleading, as they omitted the well-known, clear risk that former-ACP customers who had only been retained through short-term promotional offers and credits would be at clear risk of churn once those offers expired.

281.    As a result of Defendants' misrepresentations and omissions on January 31, 2025, Charter's stock price was artificially inflated and/or artificially maintained.

282.    Analysts responded favorably to Defendants' representations concerning the end of any ACP-related impacts on the Company's business.  For example, on January 31, 2025, analysts at Bank of America published a report titled "Strong finish – broadband subs and financials ahead," noting that, "[o]verall, results were better than forecast as the broadband subscriber and financial results beat our projections.  Charter management has done an excellent job of navigating through turbulent times for cable, including the cessation of ACP . . . ."

283.    That same day, on January 31, 2025, analysts at RBC Capital Markets published a report titled "CHTR – 4Q24 Review and Model Update," highlighting that Charter "Management expects no ACP disconnects in 2025 . . . ."

284.    On February 3, 2025, Oppenheimer analysts published a report titled "4Q24 Follow Up: New Bundled Plans Helping Sub Trends," concluding that "ACP is now behind the [C]ompany."

F.    **March 3, 2025: Morgan Stanley Technology, Media & Telecom Conference**

285.    On March 3, 2025, Defendants participated in the Morgan Stanley Tech Conference.  At the conference, in response to a securities analyst's question about Charter's growth trajectory, Defendant Winfrey represented that the Company had already moved past the effects of the ACP termination, stating: "And so along the way, we've also invested in accelerating the speed capabilities of our network through network evolution, symmetrical and multi-gig speeds.  *And you put all that together and having ACP now fully behind us . . . .*"

286.    Defendant Winfrey was also asked about the factors influencing broadband customer growth, Winfrey responded by downplaying any ongoing impact from the ACP's termination and asserted it was "*clearly behind*" the Company:

There's still a lot going on. But if you think about compared to last year, cell phone Internet seems to have had its peak in terms of net add rate. Fiber overbuild, it continues, but it's not anything to do. We've been dealing with that for 10, 15 years. ***ACP, clearly behind us. There's a big benefit to that this year.*** And then the rural builds that continue to produce opportunities for us to drive penetration and growth. And so I think the setup in 2025, there's still external variables. I can cover that. But the setup is a lot better in '25 than it was in '24.

287.    Defendants' Statements in ¶¶285-86 were materially false and misleading when made for the reasons set forth in ¶¶234, 249-50, 257. Defendants' statements in ¶¶285-86 were materially false and misleading when made because they unequivocally represented that ACP was "fully" and "clearly behind" Charter, calling it a "big benefit" in 2025, when Defendants knew that ACP-related churn, revenue pressure, and customer attrition were continuing to materially affect the business and were expected internally to persist well into 2025. CWs confirm that a substantial portion of the ACP cohort was only being retained through short-term, bridge promotions that created a substantial risk of delayed ACP-churn well into 2025 once they expired. These promotions were known internally to be temporary (generally capped at twelve (12) months), financially unviable for low-income ACP households once they expired, and unsupported by any long-term retention strategy. (¶¶170-79, 180-87, 190-92, 203, 205, 223-24).

288.    Further, just days before Defendant Winfrey told investors that ACP was "clearly behind" the Company, senior management—including Winfrey, CCO Ray, and other C-suite executives—internally acknowledged at a quarterly town hall meeting, held on or about February 26, 2025 in Kingsport, Tennessee, that ACP-related subscriber losses remained significant, ongoing, and "impactful." ¶¶220-22. According to a CW, at this town hall, Winfrey and Ray discussed ACP "quite a bit," acknowledged that Charter had leaned into ACP far more than competitors and was therefore being hit harder by its termination, and admitted that the Company was "still discussing the pain points" associated with ACP customers continuing to churn. ¶¶220-

85

22. CWs further confirm that management attempted to put a "positive spin" on how Charter was emerging from ACP, while simultaneously recognizing that subscriber losses were continuing and that retention depended on short-term promotional bridges. ¶¶220-22. These undisclosed internal admissions directly contradicted Defendants' public representations that ACP was "fully" and "clearly behind" the Company.

289.    As a result of Defendants' misrepresentations and omissions on March 3, 2025, Charter's stock price was artificially inflated and/or artificially maintained.

**G.    March 10, 2025: Deutsche Bank Media, Internet & Telecom Conference**

290.    On March 10, 2025, Defendants participated in the Deutsche Bank Media, Internet & Telecom Conference. At the conference, in response to an analyst question about the ACP's "disruptive impact on net adds last year" and whether the Company was "seeing any additional ACP impacts this quarter," Defendant Fischer did not equivocate, stating: "***So the onetime impact from the end of the ACP program is over.***" While Fischer noted that there was "slightly higher nonpay rates across the business[,]" those subscribers would "***come back in the form of gross additions.***"

291.    Defendants' statements at ¶290 were materially false and misleading when made for the reasons set forth in ¶¶234, 249-50, 257. Defendants' statements at ¶290 were materially false and misleading because they continued to characterize the ACP's expiration as a completed "onetime" event whose impact was "over," when Defendants knew ACP-related losses were ongoing and detrimental to Charter's business and revenues. As CWs confirm, Charter was still experiencing elevated nonpay disconnects and ongoing customer attrition into early 2025, and that many former ACP subscribers were being retained only through temporary bridge promotions, which Defendants knew were time-limited, financially unviable once they expired, and unsupported by any long-term retention strategy. (¶¶160-79, 180-92, 198-224).

292.    Furthermore, while Defendants acknowledged that Charter was experiencing "higher nonpay rates," they downplayed the severity and persistence of that problem by characterizing those effects as merely "slightly" higher and suggesting they were temporary and reversible.  CWs confirm that nonpay disconnects were not marginal or isolated but were a primary and worsening driver of ACP-related churn that management internally tracked very closely. Defendants misleadingly suggested that any resulting customer losses were temporary and reversible, stating that customers who did not pay would later "come back in the form of gross additions."  These statements conveyed that the effects of the ACP's termination were limited in scope and duration, despite Defendants' knowledge that many former ACP customers could not afford service at market or near-market rates once subsidies and temporary credits ended and that they were switching permanently to competitors.  (¶¶160-79, 180-81, 185-96, 220-27).

293.    As a result of Defendants' misrepresentations and omissions on March 10, 2025, Charter's stock price was artificially inflated and/or artificially maintained.

294.    Analysts were again reassured that Charter would no longer experience ACP-related impacts to its business.  For example, on March 13, 2025, analysts at Citi published a report titled "Resuming Coverage of Charter Communications with a Buy Rating," highlighting: "After digesting fewer ACP headwinds than we previously anticipated, . . . the [C]ompany has also responded . . . with marketing investments, cost reductions, and product investments that should support stable to modestly-growing revenue, better annual EBITDA growth, and rapid FCF acceleration."  In their note, the Citi analysts highlighted that "broadband expectations for Charter are in a reasonable place for 2025" and emphasized that "Charter is demonstrating an ability to improve financial performance on an annual basis, even while continuing to lose core broadband subscribers."

87

**H.    April 25, 2025: Q1 2025 Financial Results**

295.    On April 25, 2025, Charter filed a press release with the SEC on Form 8-K, announcing the Company's financial results for the first quarter of 2025 (the "Q1 2025 Earnings Release").

296.    On April 25, 2025, the Company also hosted an earnings call for the first quarter of 2025 (the "Q1 2025 Earnings Call") in which Defendants Winfrey and Fischer, among others, participated.  In prepared remarks, Defendant Winfrey touted, not once but twice, that the "[ACP] headwind is now behind us," and that "the impact of the elimination of the ACP is behind us," stating, in relevant part: "Our Internet customer results improved year-over-year as we continue to compete well and with *the affordable connectivity program headwind now behind us*. . . . The operating environment remains competitive, *but the impact of the elimination of the ACP is behind us*."

297.    During the question-and-answer portion of the Q1 2025 Earnings Call, Defendant Winfrey also was asked how the Company planned to grow internet subscriptions in such a competitive environment, to which Winfrey responded that Charter was benefitting from ACP being "*largely behind*" the Company:

> Look, I don't think what we're seeing is that different, and I'll come to that.  But I just want to be clear, our sales are up and our churn is relatively stable despite the higher nonpay disconnect that Jessica mentioned.  So we feel good about our own trends.  The factors that are going into broadband industry growth right now, *we got the end of ACP, it's largely behind us.*
>
> \* \* \*
>
> *We have not seen anything significant with the consumer so far and neither in non-pay disconnect rates, they're up slightly only because of the lack of ACP.*

298. Defendants' statements in ¶¶296-97 were materially false and misleading when made for the reasons set forth in ¶¶234, 249-50, 257. Defendants' statements in ¶¶296-97 were materially false and misleading because they repeatedly asserted that the ACP headwind was "behind" or "largely behind" Charter, that they "had not seen anything significant" in consumer behavior or disconnect rates, and that broadband trends were improving, while omitting that ACP-related churn and revenue pressure continued to materially affect the Company's internet business. As CWs confirm, Charter was still experiencing elevated nonpay disconnects and churn, as ACP-transition credits rolled off. (¶¶160-79, 180-81, 185-96, 220-27).

299. CWs further confirmed that, through 2025, discussions at town halls and recurring meetings with executives and senior management—including Winfrey—reflected acknowledgement that Charter had leaned into ACP far more than competitors and was therefore being hit harder, ongoing discussions regarding post-ACP retention efforts, and admissions that the Company was "still discussing the pain points" regarding ACP customers churning and leaving Charter. (¶¶210-27).

300. On April 25, 2025, the Company filed with the SEC its quarterly report for the first quarter of 2025 (the "Q1 2025 10-Q"), accompanied by SOX Certifications signed by Defendants Winfrey and Fischer.

301. Defendants' purported "risk disclosures" in Charter's Q2 2024 10-Q and Q3 2024 10-Q, that the end of the ACP "will continue to be disruptive" to Charter's business and that the Company "will continue to lose customers," alleged herein to be materially false and misleading, were notably absent from the Company's Q1 2025 10-Q.

302. As a result of Defendants' misrepresentations and omissions on April 25, 2025, Charter's stock price was artificially inflated and/or artificially maintained. Indeed, Defendants'

89

statements drove the price of Charter's shares up by $38.32 per share, approximately 11.43% percent, to close on April 25, 2025 at $373.65 per share.

303. Again, the market was reassured by Defendants' representations.  For example, on April 27, 2025, analysts at Oppenheimer published a report titled "1Q25: Relatively Solid Quarter, New Prices/Promotions Helped Subscriber Growth," emphasizing that "**ACP is now behind the [C]ompany**, and new promos are helping[.]"

304. The next day, on April 28, 2025, analysts at Bank of America published a report titled "Chartering the course on convergence," rating Charter a BUY, while underscoring that "**ACP related losses are now behind the company**" and that "**concerns over ACP related churn are largely behind the [C]ompany.**"

305. Similarly, on April 28, 2025, analysts at Bernstein published a report titled "Charter 1Q25: Execution leads the way," concluding that, "[o]verall, Charter's net loss has been improving now that **the impact from ACP has already played out** . . . ."

306. Also, on April 28, 2025, analysts at Raymond James published a report titled "1Q25: Better than Feared; Broadband Pressure Continues," stating that "[w]e continue to view Charter and the cable sector as being in the midst of a multi-year share shift in broadband, but we have to give it credit for weathering that storm better than we had feared a year ago.  It would appear the fallout from ACP has beaten the odds for broadband subscribers."

## IX.    ADDITIONAL INDICIA OF SCIENTER

307. The Individual Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Charter's materially false or misleading statements and omissions during the Class Period.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements regarding Charter's ability to successfully manage and absorb the termination of the

ACP, characterizing the post-ACP impact as "onetime" and confined to Q2-Q4 2024, and claiming that the effects of the end of ACP were "behind" the Company as of the beginning of 2025, were materially false and misleading when made. Defendants also knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws, including for statements that: (i) ACP-related subscriber losses were limited, manageable, or onetime; (ii) that ACP-related churn and revenue pressure were behind the Company; and (iii) that the elimination of the ACP would not materially affect Charter's broadband subscriber trends or long-term growth trajectory. In addition to the specific facts alleged above, the Individual Defendants' scienter is further evidenced by the following facts.

308.    The following allegations, together, support a strong inference of scienter:

(a)    The Individual Defendants repeatedly assured investors during the Class Period that the effects of the end of the ACP were behind the Company;

(b)    Defendants had strong financial incentives to artificially inflate and/or artificially maintain Charter's stock price to complete the acquisitions of Liberty Broadband and Cox, which were funded, in large part, with Charter common stock; and

(c)    Core Operations—broadband was the growth area of Charter's business going into the Class Period, and Defendants knew or recklessly disregarded that the Company lacked any operational strategy to offset the loss of ACP-subsidized subscribers;

(d)    Statements by former Charter employees corroborate that Defendants knew or recklessly disregarded the falsity of their statements and omissions during the Class Period at the time such statements were made.

A.    **The Individual Defendants Closely Monitored ACP Impacts Yet Repeatedly Assured Investors During the Class Period That the Effects of the End of the ACP Were "Behind" the Company**

309.    Throughout the Class Period, Defendants repeatedly told investors that Charter had successfully managed the termination of the ACP and that any resulting subscriber or financial impacts had already been absorbed and were no longer a headwind to the Company's business, even as they closely tracked ACP-related risks and impacts at the executive level.

310.    For example:

(a)    on the loss of ACP: "***It's temporary.  It's onetime in nature . . . it's really about just managing through that onetime impact***" (Defendant Winfrey, July 26, 2024);

(b)    "***ultimately, this ACP transition is a onetime event***" (Defendant Winfrey, July 26, 2024);

(c)    "***we expect the onetime impacts from ACP to be behind us***" (Defendant Fischer, November 1, 2024);

(d)    "[i]n 2024, ***we managed the end of the Affordable Connectivity Program successfully. . . . The impact of the elimination of the ACP is now behind us. . . . [N]ot having ACP losses inside this year is huge***" (Defendant Winfrey, January 31, 2025);

(e)    "***[b]ut we won't have the ACP losses this year [2025], and so that's a huge benefit***" (Defendant Winfrey, January 31, 2025);

(f)    "***[l]ooking forward, we believe we are past the onetime ACP-related impacts to our customers base***" (Defendant Fischer, January 31, 2025);

(g)    "***ACP, clearly behind us.  There's a big benefit to that this year [2025]***" (Defendant Winfrey, March 3, 2025);

92

(h)    "[o]ur Internet customer results improved year-over-year as we continue to compete well and with **the affordable connectivity program headwind now behind us**" (Defendant Winfrey, April 25, 2025); and

(i)    "**. . . but the impact of the elimination of the ACP is behind us**" (Defendant Winfrey, April 25, 2025).

311.    Through these repeated statements during the Class Period, Defendants consistently conveyed to investors that the termination of the ACP had been absorbed, that ACP-related subscriber losses would not continue to materially affect the Company, and that the program's elimination no longer posed a meaningful risk to Charter's broadband subscriber trends or financial performance—even though, immediately prior to the Class Period, on May 22, 2024, during the J.P. Morgan Annual Global Technology, Media Communications Conference, Defendant Fischer publicly acknowledged that senior management was keeping "a close eye on ACP," demonstrating contemporaneous monitoring of ongoing ACP-related risks that undercuts Defendants' later assurances.

**B.    Defendants Had Strong Financial Incentives to Artificially Inflate Charter's Stock Price to Complete the Acquisitions of Liberty Broadband and Cox Using Charter Stock**

312.    Given the premium placed on Charter equity in the acquisitions of Liberty Broadband and Cox, Defendants had a strong incentive to artificially inflate Charter's stock price throughout the Class Period so that the Company could use less equity to fund these transactions.

313.    On November 13, 2024, Charter announced an agreement to acquire Liberty Broadband in an all-stock transaction.    Under the merger agreement, each share of Liberty Broadband common stock was exchanged for 0.236 of a share of Charter common stock, and each share of Liberty Broadband preferred stock was exchanged for newly issued Charter preferred stock with substantially similar terms.    Liberty Broadband also agreed to spin off GCI to its

93

stockholders prior to closing.  As part of the deal, Charter also retired the approximately 45.6 million Charter shares held by Liberty Broadband and issued approximately 34.0 million new Charter shares to Liberty Broadband common stockholders at closing.

314.    The all-stock structure of Charter's acquisition of Liberty Broadband made Charter equity the primary consideration in the transaction, providing strong motivation for Defendants to keep Charter's stock price inflated at the time of the deal.

315.    Then, on May 16, 2025, Charter announced an agreement to acquire Cox—a longstanding Atlanta-based internet and TV provider—for approximately $22 billion.  According to the July 2025 Proxy Statement, discussions between Defendant Winfrey and Cox CEO Taylor started no later than January 28, 2025.

316.    Charter's consideration for the Cox acquisition was comprised of: (i) $4 billion in cash; (ii) $6 billion notional amount of convertible preferred units in Charter's existing partnership, paying a 6.875% coupon and convertible into partnership units exchangeable for Charter common stock; and (iii) approximately 33.6 million common units in Charter's existing partnership, exchangeable for Charter common shares and implied to be worth approximately $11.9 billion based on Charter's 60-day volume-weighted average price of $353.64 as of April 25, 2025. [19] Indeed, according to the press release announcing the merger, approximately $12 billion of the total $22 billion in estimated consideration value was directly based on Charter's volume weighted average stock price between February 24, 2025 and April 25, 2025.  Thus, Defendants were highly incentivized to maintain the value of Charter stock at artificially inflated prices by postponing the disclosure of additional subscriber losses and negative ACP impacts until Charter signed the merger agreement with Cox.

---

[19] The combined entity also assumed Cox's approximately $12 billion in outstanding debt.

317.    Notably, Defendants Winfrey and Fischer had strong *personal* incentives to facilitate the acquisition of Cox, as they both stood to gain additional stock compensation contingent on the execution of this transaction.  While not publicly disclosed until after the Class Period, Charter's December 5, 2025 Form 8-K noted that, "[o]n December 3, 2025, the Compensation and Benefits Committee approved the grant of a one-time contingent equity award to all Executive Vice Presidents, ***including all of the Named Executive Officers*** [which includes Winfrey and Fischer].  ***The grant of each equity award will be effective as of, and contingent upon, the closing of the previously announced transaction contemplated by the Transaction Agreement by and among the Company, Charter Communications Holdings, LLC and Cox Enterprises, Inc***.  The grant date value of the award for each executive will be equal to 1.5 times the executive's annual long-term incentive target and will be comprised of 50% stock options and 50% restricted stock units ('RSUs')."

318.    Thus, the Liberty Broadband and Cox acquisitions provided a strong financial incentive for Defendants to artificially inflate and/or artificially maintain Charter's stock price during the Class Period, as Charter equity was used, in significant part, to finance these two acquisitions.

**C.    Core Operations: Broadband Was the Core Revenue Driver of Charter's Business**

319.    The Individual Defendants' knowledge of the termination of the ACP, its impact on Charter's broadband subscriber trends, churn, revenues, and the Company's inability to effectively manage or offset those impacts can be inferred because these facts were critical to Charter's core operations.

320.    In particular, broadband subscriptions made up the vast majority of Charter's revenues and was the Company's core product throughout the Class Period.  For each of the years

ended December 31, 2023 and 2024, Charter generated substantially all of its revenues from subscription-based communications services, with residential broadband subscriptions representing over 50% of that revenue base.

321. Both before and during the Class Period, the importance of broadband to Charter's future growth was a recurring theme in public disclosure. A few examples are highlighted below.

(a) On September 16, 2024, CNBC published an article about Charter, characterizing broadband as the "bedrock of the cable industry."

(b) On July 26, 2024, during the Q2 2024 Earnings Call, Defendant Winfrey stated that "**broadband is a really important product**" and that "**our success will be premised on our high-capacity, fully deployed network** and the products it can deliver."

(c) Additionally, in Charter's 2024 Form 10-K, filed on January 31, 2025, Defendants stated: "We are a leading broadband connectivity company . . . [o]ur strategy is focused on utilizing our high bandwidth connectivity network to deliver high-quality, competitively priced products . . . allowing us to increase both the number of customers we serve over our network and the number of products we sell to each customer."

(d) On April 25, 2025, *Light Reading* referred to broadband as the "cornerstone of Charter's business."

(e) Similarly, on May 16, 2025, *The Wall Street Journal* described broadband as Charter's "ultimate moat" and noted that selling broadband connections remained the "main way to reap profits from the internet economy."

322. Even after the Class Period, Defendants acknowledged that broadband was Charter's lifeline and source of growth.

(a)    On September 4, 2025, at the Bank of America Media Conference, Defendant Fischer stated:

> [O]ur first priority is -- what our first priority sort of always been, which is executing against what I think is a well-proven strategy to grow the broadband business, grow EBITDA and grow cash flow.

(b)    On September 9, 2025, at the Goldman Sachs Communacopia Conference, Defendant Winfrey stated:

> [W]e also recognize the importance of EBITDA growth along the way.  And we're focused on that, and we have multiple ways to achieve that EBITDA growth outside of some of the seasonality that you mentioned. **The first and foremost is stabilization of broadband and the ultimate return to growth**.

323.    Analysts covering Charter also frequently wrote about the importance of broadband to the Company's growth rate.  A few examples are highlighted below.

(a)    On July 26, 2024, a Goldman Sachs investment analyst highlighted "investor focus on the broadband market" and stated that they expected "the stock to trade higher given upside to broadband subscribers."

(b)    On July 30, 2024, Wolfe Research similarly called net broadband adds a "critical KPI[]" for Charter's business.

(c)    On July 25, 2025, a Barclays investment analyst referred to Charter's "broadband sub[scriber] growth" as the "primary [Key Performance Indicator] focus for investors."

(d)    A July 25, 2025 *MarketWatch* article emphasized that, "for Charter investors, it's all about the internet" and, "[a]s always, the market's assessment of Charter's results . . .will begin, and largely end, with broadband net adds."

(e)     Walter Piecyk, an analyst at LightShed Partners, noted, during an appearance on CNBC on July 25, 2025, that, "at the end of the day, . . . Charter, the core business, what generates the EBITDA free cash flow, is that broadband business."

324.    Given the core nature of broadband subscribers to Charter's business and operations, there is a strong inference that Defendants knew or recklessly disregarded the lasting negative impact that the end of the ACP would have on Charter's internet subscribers, revenues, and growth.

### D.    Statements by Former Charter Employees and Consultants Corroborate That Defendants Knew or Recklessly Disregarded the Falsity of Their Statements and Omissions at the Time the Statements Were Made

325.    The witness accounts detailed above in Section VII (¶¶129-227) provide factual support for the falsity of Defendants' material misstatements and omissions and for a strong inference of scienter on Defendants' part regarding the false and misleading nature of their statements and omissions during the Class Period.  The witnesses detail that:

(a)     Charter had leaned into the ACP far more aggressively than its competitors and used ACP as a sales tool to inflate broadband subscriber metrics in the short-term. Internally, executives recognized that this would create a lasting structural hole in Charter's broadband base once ACP ended.

(b)     ACP-related subscriber losses were not temporary or "one-time" in nature, but they would repeat, well into 2025, driven primarily by post-ACP churn and continuing non-pay disconnects, as Charter lacked any viable long-term strategy for retaining the ACP cohort once their short-term retention promotions, credits and downgraded plans expired.

(c)     Charter executives tracked and had regular, detailed visibility on ACP subscribers and metrics, on a daily and weekly basis, through a combination of a proprietary system called Realtime, along with Power BI, Tableau, Salesforce, and BI MicroStrategy tools.

This data showed how many former ACP subsidy customers were still on temporary promotions/offers (including in: (i) Offers Reports distributed to CCO Adam Ray, EVP, Sales Christian Ruiz and other senior executives; and (ii) through a program called Real Time Results), how many former ACP subscribers converted to other plans or promotions, how many were not paying, and how many disconnected their Charter service. This information also was used to create financial models to illustrate the impact of ACP ending. This data showed as of July 2024, that Charter was experiencing accelerating internet disconnects, rising nonpay churn, and intensifying customer distress among the former ACP subscribers who were internally recognized as a highly price-sensitive cohort prone to nonpay disconnects.

(d)    senior Charter executives, including Chief Commercial Officer, ("CCO") Adam Ray, EVP, Sales Christian Ruiz, and Chief Marketing Officer ("CMO") Sharon Peters, attended meetings to discuss the impact of ACP ending and how to offset its impact.  The effects of the ACP also were discussed at Regional Review Meetings, Quarterly Business Reviews, Quarterly Operational Reviews, Town Halls, and Web-ex meetings with senior leadership.

(e)    senior Charter executives frequently acknowledged that Charter would be hit harder and longer than its peers due to its disproportionate reliance on the ACP.

(f)    bridge promotions, temporary credits, and mobile bundling could not replicate the value of the ACP subsidy for Charter and were not economically viable or sustainable long-term. These offerings were, in many cases, still unaffordable for the ACP subscribers, did not replace the full ACP benefit in terms of revenues, and, due to their temporary nature, merely postponed—rather than prevented—the inevitable subscriber losses among the ACP cohort. CWs described these measures as a stop-gap or Band-Aid, and a way to "defer the problem."

(g)    Charter internally discussed "pain," "clear panic," and a "rough couple of years" the Company would face following ACP's end—facts that rendered Defendants' statements about successful mitigation, stable churn, and a limited or onetime impact of the end of ACP materially false and misleading when made.

X.    **LOSS CAUSATION/ECONOMIC LOSS**

326.    Defendants' misstatements and omissions, as alleged herein, directly and proximately caused the economic loss (i.e., damages) under the federal securities laws suffered by Lead Plaintiff and the Class.  During, the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to defraud investors.  Defendants' misstatements and omissions artificially inflated and/or artificially maintained the price of Charter securities and operated as a fraud and deceit on the Class.

327.    During the Class Period, Lead Plaintiff and the Class purchased Charter securities at artificially inflated and/or artificially maintained prices, whereby Charter's common stock reached as high as $427.25 per share on May 16, 2025 and were damaged thereby when the price of Charter securities declined when the truth was revealed and/or the risks concealed by Defendants' misrepresentations and omissions materialized.

328.    As a result of the disclosure of the truth of Defendants' fraud and/or materialization of the risks through the series of disclosures described below, investors incurred billions of dollars in losses.

329.    The declines in the price of Charter securities during this period, including the price declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

330.    Each decline in the price of Charter securities, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

331.    The market for Charter's securities was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 1.26 million shares throughout the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, Charter securities traded at artificially inflated and/or artificially maintained prices.  Lead Plaintiff and other Class members purchased Charter securities relying upon the integrity of the market relating to Charter securities and suffered economic losses as a result thereof.

332.    The timing and magnitude of the decline in the price of Charter's common stock and options on July 25, 2025 evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

333.    Specifically, Defendants made false and misleading statements and omissions regarding: (i) Charter's ability to successfully manage and absorb the termination of the ACP, including repeated assurances that ACP-related subscriber losses were limited, manageable, or a onetime event, and that the effects of the ACP's elimination were behind the Company; and (ii) the true extent of ongoing ACP-related nonpay churn, customer affordability challenges, and the resulting adverse impact on Charter's internet subscriber trends and EBITDA.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of Charter securities dropped significantly.

101

334. Defendants' misrepresentations and omissions were revealed before the market opened on July 25, 2025, in connection with the release of Charter's financial results for the second quarter of 2025, when Charter reported that total internet customers decreased by 117,000 for Q2 2025. This significant decline in internet subscribers was nearly double the 60,000 reported in Q1 2025. Moreover, notwithstanding the passage of more than twelve (12) months since the end of ACP, and Defendants' commentary throughout the Class Period that the effects of the ACP end were limited to 2024, internet customer declines due to the end of the ACP remained elevated as compared to internet customers losses in Q2 2024. Defendants specifically tied these internet customer losses to the end of the ACP, i.e., former ACP subscribers could no longer afford Charter's internet services and other lower income households who would have otherwise qualified for ACP before it ended were also unable to afford Charter's internet services. Defendant Winfrey stated on the July 25, 2025 Q2 2025 Earnings Call: "[Y]ou have former ACP customers, who are economically challenged and have a higher nonpay rate systemically without the benefit of the subsidy from a year-over-year standpoint. But in addition to that, from a year-over-year standpoint, you have newly acquired customers, who would have qualified for the ACP, who don't have ACP today and therefore, they have -- those newly acquired customers have a higher nonpay rate than they would otherwise." As such, it became clear that Charter had downplayed the lasting impact that ACP had on the business. Indeed, once Charter's short-term promotional offers designed to retain these customers expired, these subscribers could no longer afford Charter's services and continued to churn well after Defendants' assured that the effects of ACP's end were over. On July 25, 2025, the Company also disclosed that, excluding a onetime financial benefit, Charter's EBITDA would have missed consensus analyst estimates by 2.4% and *declined* 0.3% year-over-year, reflecting sustained broadband losses.

335.    This shocking news that internet subscriber losses due to the end of the ACP were still affecting the Company caused Charter's stock price to fall $70.25 per share, more than 18.4%, to close at $309.75 per share on July 25, 2025, erasing more than $10 billion in market capitalization.

## XI.    CLASS ACTION ALLEGATIONS

336.    Lead Plaintiff brings this action as a class action pursuant to the Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons or entities who or which purchased or otherwise acquired the publicly traded common stock and exchange-traded call options, or sold exchange-traded put options of Charter during the Class Period and were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of Charter during the Class Period and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any excluded person has or had a controlling or beneficial interest; (v) Charter's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

337.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Charter's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Charter shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Charter or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

338.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

339.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.

340.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Charter;

(c)    whether, and to what extent, the market price of Charter securities was artificially inflated and/or artificially maintained during the Class Period because of the material misstatements alleged herein;

(d)    whether Defendants acted with the requisite level of scienter;

(e)    whether Defendants Winfrey and Fischer were controlling persons of Charter; and

(f)    whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

341.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

342.    To the extent that Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    Charter securities traded in an efficient market;

(d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Charter securities;

(e)    Lead Plaintiff and other members of the Class purchased Charter securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)    Charter securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g)    according to the Company's 2024 10-K, filed on January 31, 2025, there were 141,946,426 shares of Class A common stock outstanding as of December 31, 2024, demonstrating a very active and broad market for Charter securities;

(h)    Charter filed periodic public reports with the SEC;

105

(i)      Charter regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the internet, and other wide-ranging public disclosures;

(j)      Charter was followed by numerous securities analysts employed by major brokerage firms—including Bank of America Research, Barclays Equity Research, Bernstein, BNP Paribas Equities, Citi Research, Deutsche Bank Research, Goldman Sachs Research, JPMorgan, Morgan Stanley Research, Loop Capital, Morningstar, Oppenheimer, Pivotal Research Group, Raymond James Research, RBC Capital Markets, TD Cowen Research, and UBS Global Research—which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms, were publicly available, and entered the public marketplace;

(k)      unexpected material news about Charter was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(l)      there were market makers for Charter's securities during the Class Period.

343.    As a result of the foregoing, the market for Charter securities promptly digested current information regarding Charter from publicly available sources and reflected such information in Charter's share price.  Under these circumstances, all persons and entities who purchased or otherwise acquired Charter securities during the Class Period suffered similar injuries through their purchases of Charter securities at artificially inflated and/or artificially maintained prices and the presumption of reliance applies.

344.    The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Charter securities.

106

345.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Charter securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

346.    To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Charter's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XIII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

347.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

348.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.

349.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Charter who knew that the statement was false when made.

## XIV.    CONTROL PERSON ALLEGATIONS

350.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

351.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to Charter during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

352.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse, undisclosed information about Charter's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at

regularly-held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

353.    As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Charter's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of Charter securities would be based upon truthful and accurate information.   The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

354.    The Individual Defendants are liable as primary participants in a fraudulent scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Charter securities during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) concerning the effects of the end of the ACP on Charter's business and revenues.

355.    In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Charter, were acting on behalf of the Company in the regular course of business.   Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## XV.    CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against Defendant Charter and the Individual Defendants)**

356.    Lead Plaintiff repeats, incorporates, and realleges every allegation contained above as if fully set forth herein.

357.    This Count is asserted on behalf of all members of the Class against Defendants Charter, Winfrey, and Fischer for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder.

358.    As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiff and the Class; (ii) artificially manipulate the price of Charter securities; and (iii) cause Lead Plaintiff and members of the Class to purchase Charter securities at artificially inflated and/or artificially maintained prices.

359.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

110

360.    As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Charter securities during the Class Period.

361.    In ignorance of the false and misleading nature of Defendants' statements and omissions and relying directly or indirectly on those statements or upon the integrity of the market price for Charter securities, Lead Plaintiff and other members of the Class purchased Charter securities at artificially inflated and/or artificially maintained prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Charter securities at such artificially inflated and/or artificially maintained prices. As set forth herein, when the true facts were subsequently disclosed, the price of Charter securities declined precipitously, and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Charter securities at artificially inflated and/or artificially maintained prices and the subsequent decline in the price of that stock when the truth was disclosed.

362.    By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

363.    Lead Plaintiff repeats, incorporates, and realleges every allegation contained above as if fully set forth herein.

364.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violation of Section 20(a) of the Exchange Act.

111

365.    The Individual Defendants had control over Charter and made the materially false and misleading statements and omissions on behalf of Charter within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading.  The Individual Defendants were provided with, or had unlimited access to, the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

366.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the preparation and issuance of the allegedly false and misleading statements alleged herein.  Charter, in turn, controlled the Individual Defendants and all of its employees.

367.    By reason of such wrongful conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)    determining that this action is a proper class action, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff's counsel as Lead Counsel for the Class;

(b)      awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained because of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      awarding such other and further relief as the Court may deem just and proper.

## XVII.  JURY TRIAL DEMANDED

Lead Plaintiff demands a trial by jury.

Dated: January 28, 2026

**LABATON KELLER SUCHAROW LLP**

By: */s/ Christine M. Fox*
Christine M. Fox
Carol C. Villegas
Nicolas Apter-Vidler
Jacqueline M. Urbinati
140 Broadway
New York, NY 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
cfox@labaton.com
cvillegas@labaton.com
napter-vidler@labaton.com
jurbinati@labaton.com

**SAXENA WHITE P.A.**
Steven B. Singer
Joshua H. Saltzman
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

Maya Saxena
Lester R. Hooker
Dianne M. Pitre
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
msaxena@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

*Counsel for Lead Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of the Employees' Retirement System of the State of Rhode Island, and the Proposed Class*

114