**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARK SANDOVAL, individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

CHARTER COMMUNICATIONS, INC., JESSICA FISCHER, and CHRIS WINFREY,

*Defendants*.

Case No. 1:25-cv-06747-LJL

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....1

BACKGROUND ....4

A. Plaintiff, Charter, and the Individual Defendants ....4

B. The Affordable Connectivity Program ....4

C. The End of the ACP ....5

D. The Cox and Liberty Transactions ....7

E. Charter Continues to Lose Internet Customers in 2025 ....8

F. This Litigation ....9

ARGUMENT ....10

I. PLAINTIFF FAILS TO ALLEGE A SECTION 10(B) CLAIM ....10

A. Plaintiff fails to plead any actionable misstatements or omissions ....10

1. The statements and alleged omissions concerning the timing of ACP-related losses are not actionable ....10

i. The alleged statements and omissions were not misleading ....11

ii. The statements are inactionable opinion ....14

iii. The statements are inactionable forward-looking statements ....17

2. The statements concerning the management of the ACP transition are not actionable ....21

i. The statements are inactionable opinion ....22

ii. The statements are inactionable puffery ....23

iii. The statements were not false or misleading when made ....24

B. Plaintiff does not plead scienter ....25

1. Plaintiff fails to allege motive ....26

2. Plaintiff does not allege conscious misbehavior or recklessness ....27

i. Plaintiff's allegation that Defendants "closely monitored" ACP impacts is insufficient to establish scienter. ....27

ii. The "core operations" doctrine cannot supply scienter. ....28

iii. Plaintiff's confidential witness allegations fail to plead scienter. ....29

3. The more compelling inference is that there was no fraud. ....34

4. Plaintiff fails to allege corporate scienter. ....36

C. Plaintiff fails to plead loss causation. ....36

II. PLAINTIFF FAILS TO ALLEGE A SECTION 20(A) CLAIM. ....38

III. CONCLUSION ....39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson* v. *Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)....................16, 23

*Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb*,
28 F.4th 343 (2d Cir. 2022)....................10, 25, 38

*ATSI Commc'ns* v. *Shaar Fund*,
493 F.3d 87 (2d Cir. 2007)....................4 n.1, 25

*Bolling* v. *Dendreon Corp.*,
2014 WL 2533323 (W.D. Wash. 2014)....................28

*Chill* v. *Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996)....................26

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings Corp.*, 2021 WL 212337 (S.D.N.Y. Jan. 21, 2021)....................28

*City of Sterling Heights Police & Fire Ret. Sys.* v. *Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)....................16

*Acito* v. *IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)....................27

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)....................23, 26

*Francisco* v. *Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020)....................30

*Frederick* v. *Mechel OAO*,
475 F. App'x 353 (2d Cir. 2012)....................28

*Glaser* v. *The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................30

*Gray* v. *Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020)....................15, 21

*Holbrook* v. *Trivago N.V.*,
2019 WL 948809 (S.D.N.Y. 2019)....................29

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)....................18

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)....................23, 24, 29, 30, 33

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)....................21

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
2015 WL 4931357 (S.D.N.Y. 2015)....................32

*In re Flag Telecom Holdings, Ltd. Securities Litig.*,
574 F.3d 29 (2d Cir. 2009)....................38

*In re Francesca's Holdings Corp. Sec. Litig.*,
2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015)....................36

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008)....................37

*In re New Energy Sys. Sec. Litig.*,
66 F. Supp. 3d 401 (S.D.N.Y. 2014)....................37

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)....................36

*In re Philip Morris Int'l Inc. Sec. Litig.*,
437 F. Supp. 3d 329 (S.D.N.Y. 2020)....................11, 16

*In re Philip Morris Int'l Inc. Sec. Litig.*,
89 F.4th 408 (2d Cir. 2023)....................11, 15, 22

*In re Pretium Res. Inc. Sec. Litig.*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017)....................14

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)....................28

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
675 F. Supp. 3d 273 (E.D.N.Y. 2023)....................12, 13

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022)....................17

*In re UiPath, Inc. Sec. Litig.*,
2025 WL 2065093 (S.D.N.Y. July 23, 2025)....................31, 33

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)....................17, 18

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................30, 35

*Inst. Invs. Grp.* v. *Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)....................18

*Jackson* v. *Abernathy*,
960 F.3d 94 (2d Cir. 2020)....................36

*Janbay* v. *Canadian Solar, Inc.*,
2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ....................38

*Jones* v. *Perez*,
550 F. App'x 24 (2d Cir. 2013) ....................34

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001)....................27

*Kavanagh* v. *Zwilling*,
578 F. App'x 24 (2d Cir. 2014) ....................10

*Kleinman* v. *Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013)....................12

*Kuriakose* v. *Fed. Home Loan Mortg. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012)....................37

*Kusnier* v. *Virgin Galactic Holdings, Inc.*,
639 F. Supp. 3d 350 (E.D.N.Y. 2022) ....................38

*Lachman* v. *Revlon, Inc.*,
487 F. Supp. 3d 111 (E.D.N.Y. 2020) ....................23

*Lentell* v. *Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005)....................37

*Livingston* v. *Cablevision Sys. Corp.*,
966 F. Supp. 2d 208 (E.D.N.Y. 2013) ....................11

*Long Miao* v. *Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................29, 30, 31

*Macquarie Infrastructure Corp.* v. *Moab Partners, L. P.*,
601 U.S. 257 (2024)....................13

*Malin* v. *XL Cap. Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007) ........ 15

*Maso Cap. Invs. Ltd.* v. *E-House (China) Holdings Ltd.*,
2024 WL 2890968 (2d Cir. June 10, 2024) ........ 18 n.3, 20

*Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*,
2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ........ 27

*Monroe Cnty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima*,
15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014) ........ 13

*New Eng. Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*,
122 F.4th 28 (2d Cir. 2023) ........ 14, 22

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000) ........ 10, 23, 26

*Okla. Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018) ........ 24

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ........ 14, 16, 17

*Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*,
153 F. Supp. 3d 628 (S.D.N.Y. 2015) ........ 10

*Plumbers & Steamfitters Loc. 773 Pension Fund* v. *CIBC*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010) ........ 28, 33

*Police & Fire Ret. Sys. City of Detroit* v. *Argo Grp. Int'l Holdings, Ltd.*,
2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) ........ 15, 22

*Pollio* v. *MF Glob.*,
608 F. Supp. 2d 564 (S.D.N.Y. 2009) ........ 24

*Rein* v. *Dutch Bros, Inc.*,
2024 WL 3105004 (S.D.N.Y. 2024) ........ 25

*Richman* v. *Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012) ........ 13

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004) ........ 11, 23, 27

*Saraf* v. *Ebix, Inc.*,
632 F. Supp. 3d 389 (S.D.N.Y. 2022) ........ 29

*Singh* v. *Cigna Corp.*,
277 F. Supp. 3d 291 (D. Conn. 2017)....13

*Slayton* v. *Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)....17

*Tellabs, Inc.* v. *Makor Issues & Rts.*,
551 U.S. 308 (2007)....26, 34, 35

*Tyler* v. *Liz Claiborne*,
814 F. Supp. 2d 323 (S.D.N.Y. 2011)....32

*Wilbush* v. *Ambac Fin. Grp.*,
271 F. Supp. 3d 473 (S.D.N.Y. 2017)....30

*Woolgar* v. *Kingstone Cos., Inc.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020)....30, 33

*Xie* v. *Nano Nuclear Energy*,
2026 WL 63715 (S.D.N.Y. Jan. 8, 2026)....34

**Statutes and Rules**

15 U.S.C. § 78j(b).... *passim*

15 U.S.C. § 78t(a).... *passim*

15 U.S.C. § 78u-4.... *passim*

15 U.S.C. § 78u-5.... *passim*

16 C.F.R. § 233.1(a)....14

17 C.F.R. § 240.10b-5....10

Fed. R. Civ. P. 9(b)....10

## PRELIMINARY STATEMENT

Charter Communications, Inc. ("Charter" or the "Company") is a broadband connectivity company and cable operator providing services to residential and commercial customers throughout the United States. One such service is broadband internet. From 2021 through 2024, Charter tried to grow this business by participating in the federal Affordable Connectivity Program (the "ACP"), which provided subsidies allowing low-income customers access to broadband connectivity. When Congress stopped funding the ACP and the government announced the wind-down of subsidies in 2024, Charter warned investors that the termination of the ACP would harm its residential broadband business, which already faced stiff competition and had already been losing subscribers. Charter forecasted that it expected to lose customers throughout 2024 due to the ACP's termination, but that it believed it could manage this one-time transition and retain many customers who had formerly received ACP benefits and recruit others who would have qualified for them. All the while, however, Charter also cautioned the market that it expected to see higher "nonpay churn" in the post-ACP world: in the longer term, economically disadvantaged customers, like those who at one time received ACP benefits, would likely churn at higher rates due to an expected inability to pay their bills. Although year-over-year results improved, Charter continued to lose subscribers into 2025, including in the second quarter, due to such nonpay churn.

In this action, Plaintiff seeks to transform the foregoing into a securities fraud case to recover damages from Charter and two of its executives, CEO Chris Winfrey and CFO Jessica Fischer (the "Individual Defendants"), based on the drop in Charter's stock price after the announcement of its 2Q25 results. Plaintiff asserts that, from July 26, 2024 through July 24, 2025 (the "Class Period"), Charter and its executives misled investors by falsely assuring them that the Company's ACP issues were "temporary," "one-time," and "behind" Charter after 2024 while failing to confess that Charter was using promotions to entice these customers to stick around for

the short term. Plaintiff seeks to recoup the drop in market value through claims under Sections 10(b) and 20(a) of the Exchange Act.

Those claims do not withstand the exacting scrutiny required by the Private Securities Litigation Reform Act (the "PSLRA"). Put to the test of meeting the particularized pleading required by that statute, the amended complaint fails on every count.

The first problem for Plaintiff is that it has not pleaded any actionable misstatements. The complaint ignores the repeated, clear warnings that Charter and its executives made about the end of the ACP having long-term impacts in order to pretend that Charter promised that any and all effects of the ACP's termination would be over in 2024 . Charter differentiated between the short-term effect of the program's expiration in 2024 and the longer-term, ongoing risk of elevated nonpay churn from economically distressed customers in 2025 and beyond. Plaintiff's theory collapses these two categories into one, ignoring what Charter actually said and the PSLRA's requirement that alleged misstatements be judged in the context of a Company's full disclosures. What's more, the vast majority of the statements are inactionable opinions reflecting management's judgments about the timing of the ACP transition, customer retention, and business performance—none alleged to be disbelieved by the speakers, none containing embedded false facts, and none misleading in context. Many of the challenged statements are also forward-looking and protected by the PSLRA's safe harbor and the bespeaks-caution doctrine, because they concern predictions of subscriber trends, expectations regarding the pace of the ACP transition, and forecasts regarding Charter's 2025 performance—all identified as forward-looking and accompanied by cautionary language.

Second, the complaint fails for the independent reason that it does not plead scienter. Plaintiff alleges no insider sales and no other personal benefit to the Individual Defendants that

would have given them any motive to inflate the stock price. Instead, Plaintiff offers generalized allegations insufficient to support an inference of scienter based on conscious misbehavior or recklessness: that executives monitored ACP impacts, that residential broadband was "core" to Charter's business, and various statements from confidential witnesses. But that Charter monitored the effects of the ACP, or that residential broadband was important to Charter, does not establish scienter where the complaint does not allege Charter was falsely reporting its results. And the statements of the confidential witnesses are insufficient in every way: they held junior positions, lacked any personal contact with Charter's CEO or CFO, and offered no particularized facts about what either executive actually knew at the time any challenged statement was made. None of this comes close to alleging a "cogent and compelling" inference of fraud, as required by the PSLRA. The far more compelling inference is the obvious, nonfraudulent one: Charter made good-faith assessments, disclosed the very risks Plaintiff claims were concealed, and—like the entire broadband industry—faced difficult competitive and market dynamics in 2024 and 2025.

Third, Plaintiff has not pleaded loss causation. The alleged "corrective disclosure" on July 25, 2025 did not reveal any previously concealed information. Charter had publicly disclosed, months before and repeatedly, that elevated nonpay churn among former ACP customers and newly acquired low-income customers was possible in 2025. The stock drop was caused by Charter's EBITDA miss and ongoing subscriber losses attributable to competition and churn risks that were well disclosed.

Having failed to plead a claim under Section 10(b), the derivative Section 20(a) claim must be dismissed too. Plaintiff has failed to state any claim, and the amended complaint should be dismissed in full and with prejudice.

## BACKGROUND[1]

### A. Plaintiff, Charter, and the Individual Defendants

Court-appointed lead plaintiff State of Rhode Island Office of the General Treasurer, on behalf of the Employees' Retirement System of the State of Rhode Island ("Plaintiff") is a public pension fund. Dkt. 34 (Corrected Am. Compl.) ¶ 21. Plaintiff alleges it purchased Charter common stock and notes during the Class Period. *Id.*

Charter is a broadband connectivity company and cable operator offering subscription-based Internet, video, mobile, and voice services across the United States. ¶ 44. Charter's residential internet services accounted for 42% of its revenue in 2024. ¶ 45. Defendant Christopher L. Winfrey is Charter's President and Chief Executive Officer, and Defendant Jessica M. Fischer is Charter's Chief Financial Officer. ¶¶ 23-24.

### B. The Affordable Connectivity Program

In November 2021, Congress passed the Infrastructure Investment and Jobs Act, which established a program to offer low-income households up to a $30 discount on their monthly internet bill—the Affordable Connectivity Program. ¶¶ 52, 54. The ACP "enabled millions of economically distressed customers to purchase broadband service they otherwise could not afford," and Charter participated in the ACP from its inception. ¶¶ 55, 59. By 2023, Charter was the largest ACP participant in the United States, with roughly five million broadband customers receiving ACP benefits through Charter. ¶ 63. Throughout their participation in the program, Charter disclosed the scale of its ACP participation, ¶ 49, and cautioned investors that changes to

---

[1] This background is drawn from the allegations of the Complaint and/or exhibits to the Declaration of [Alison/Ryan], which are referenced in the Complaint and/or are documents of which the Court may otherwise take judicial notice. *ATSI Commc'ns* v. *Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007) (court may consider "documents incorporated into the complaint by reference" and "disclosure documents filed with the SEC").

ACP's funding were possible and could negatively affect Charter's business. *See, e.g.*, Ex. 1 (2023 10-K) at 16 ("The ACP discount enables eligible households to purchase our [Internet services] at no cost to them . . . and we cannot predict whether Congress or the FCC will provide additional funding to extend the ACP, or on what terms."); Ex. 2 (2022 10-K) at 25 ("[T]he exhaustion of funding for the FCC's ACP or any changes to that program that could make it more difficult for us to provide services to low-income consumers.").

### C. The End of the ACP

In January 2024, the FCC announced that ACP funding was expected to run out by April 2024. ¶¶ 74-75. Charter publicly warned that, "unless Congress provides additional funding . . . this will be disruptive to our business. We will lose customers and revenues and could face greater difficulty in providing services to low-income households in the future." Ex. 3 (1Q24 10-Q) at 25. Ultimately, ACP customers received a reduced subsidy (a $14 discount per month) in May 2024, and all ACP were benefits eliminated as of June 1, 2024. ¶ 76.

As Charter had cautioned, the end of the ACP resulted in subscriber losses due to both "voluntary" terminations (subscribers who proactively canceled their internet when the ACP ended) and "nonpay" terminations (subscribers who failed to pay their bills for a specified amount of time). ¶ 7.[2] In 2Q24, Charter announced a loss of 149,000 Internet customers, noting that the termination of the ACP "resulted in customer losses during the quarter." Ex. 5 (2Q24 10-Q) at 13. In 3Q24, Charter announced a loss of another 110,000 subscribers, noting its "Internet customer growth was challenged by the end of the [ACP]." Ex. 6 (3Q24 10-Q) at 14.

[2] Charter reports overdue customer accounts in its quarterly and annual SEC filings, calculated "based on the monthly billing cycle for each account." The accounts are reported in tiers of accounts over 60, 90, and 120 days overdue. *See* Ex. 4 (2024 10-K) at 5.

Charter believed that most of the impact from the end of the ACP would be felt in FY24, reporting that it "expect[ed] the onetime impacts from ACP to be behind us" after 4Q24. ¶¶ 8, 255. Charter disclosed that it relied on retention programs to ease the transition of former ACP customers and that, despite these programs, investors should expect additional ACP-related losses. ¶ 235 ("While our retention programs for the customers impacted by the end of ACP subsidies have been successful . . . . We expect to see additional one-time impacts on customer net gains, revenue per customer and bad debt in the third and fourth quarters of this year."); *see also* Ex. 4 (2024 10-K) at 39 (noting that retention programs impacted revenue). Despite this, Charter retained 90% of its former ACP subscribers moving into 2025. ¶ 275; Ex. 7 (4Q24 Tr.) at 2.

Throughout 2024, Charter distinguished between what it characterized as one-time losses resulting from the end of the ACP and the inherent and ongoing risks of serving the low-income customers that it retained or signed up following the end of the ACP benefits. On earnings calls and in its SEC filings, Charter and its executives warned of the risk that these economically challenged customers would churn due to their inability to pay:

- "I do think that[,] ***in an environment where ACP or an equivalent doesn't exis***t, that, by definition, ***you have more customers coming in and out of broadband based on affordability***. . . . I think we're in good position to be able to address the base. But the market activity, for sure, is going to be higher than what it's been in the last couple of years." Ex. 8 (2Q24 Tr.) at 12.

- "***The end of the ACP benefit has been, and will continue to be, disruptive to our business***. We have lost and will continue to lose customers and revenues and could face greater difficulty in providing services to low-income households in the future." Ex. 5 (2Q24 10-Q) at 27.

- "So ***there's an immediate impact to ACP*** . . . . ***[Then] [t]here is a longer-term impact***. . . . what we think we'll see in the post ACP environment is . . . a little bit of [churn] ***will come back in the form of nonpay*** for those customers who would have had ACP[.]" Ex. 9 (9.4.24 BofA Tr.) at 3.

- "We'll still have approximately 100,000 nonpay to deal with from ACP that we expect to see early in the quarter, in the fourth quarter. . . . And so then I think the bigger question is, as you look out, where does that leave us? . . . ***We are still very***

> ***much in atypical low [overall] churn environment when you exclude ACP***. And despite that, it's still a competitive environment for new sales. So I think if you step back, it's too early to declare victory or even plateau[.]" Ex. 10 (3Q24 Tr.) at 6.

- "We are exposed to risks associated with the economic conditions of our current and potential customers, the ***potential financial instability of our customers and their financial ability to purchase our products***." Ex. 4 (2024 10-K) at 24.

### D. The Cox and Liberty Transactions

On November 13, 2024, Charter announced that it had signed a definitive agreement to acquire Liberty Broadband Corporation ("Liberty") in an all-stock transaction. ¶ 103. Liberty's principal asset was its stake in Charter—it held approximately 45.6 million shares. *Id.* At the time of the transaction, the value of Liberty stock and Charter stock were codependent: the net asset value of Liberty was determined by both Charter's and Liberty's financial advisors as primarily deriving from Liberty's existing holdings of Charter stock. *See* Ex. 11 (Lib. S-4) at 93, 99. Under the merger agreement, Charter would acquire the shares of Liberty Broadband common stock for 0.236 of a Charter share each, thus allowing Charter to repurchase and retire 45.6 million of its own shares for just 34 million new Charter shares. ¶¶ 103, 104. Liberty's shareholders voted to approve the transaction on February 24, 2025. ¶ 105.

In January 2025, Charter began negotiations to merge with cable provider Cox Communications, Inc. ("Cox"). ¶ 12. Charter announced the merger and signed the merger agreement on May 16, 2025. *Id.* Pursuant to it, approximately $12 billion of the estimated consideration value was based on Charter's volume weighted average stock price between February 24, 2025 and April 25, 2025. ¶ 113. The transaction's terms subjected it to termination by Cox in the event of a breach of a representation, which includes false or misleading statements or omissions in Charter's SEC filings. *See* Ex. 12 (Cox Ag.) at §§ 4.7, 8.2(b). On December 3, 2025—seven months after the deal was signed and over four months after the end of the Class

Period—Charter's Compensation and Benefits Committee approved an equity award, contingent on closing, for Charter's executives. ¶ 100.

### E. Charter Continues to Lose Internet Customers in 2025

Charter's broadband internet business had been "deteriorat[ing] due to a convergence of competition, pricing, and product-level pressures" since "late 2023," ¶ 65, a trend that continued in 2025. On April 25, 2025, Charter announced its quarterly results and reported that it lost another 60,000 internet customers in the first quarter of 2025. Ex. 13 (1Q25 8-K) at 3. On the earnings call, an analyst asked Charter's executives about its use of "promotions" to attract and retain customers and the risk of "promotional roll-off[]"; in response, Mr. Winfrey acknowledged that Charter does use "promotional pricing to drive acquisition" and that Charter needed "to minimize the promotional roll-offs." Ex. 14 (1Q25 Tr.) at 7–8. Winfrey also noted that, although ACP was "largely behind us," there nevertheless remained a risk of "higher nonpay disconnect" going forward that was due to "the lack of ACP." *Id.* at 10.

Winfrey had warned about the same issue at the Morgan Stanley Technology Conference in the prior month, March 2025, noting that it was still unclear "[t]o what extent do we have an uptick or a normalization in nonpay for the previous ACP remaining base[.]" Ex. 15 (3.3.25 MS Tr.) at 3. And, that same month, Fischer told investors at the 33rd Annual Deutsche Bank Media Conference that although "the onetime impact from the end of the ACP program is over," "we do [still] see . . . slightly higher nonpay rates across the business," which, she said, "is something that we've talked a lot about and that we expected to see." Ex. 16 (3.10.25 DB Tr.) at 2.

On July 25, 2025, Charter announced its second quarter results, reporting that internet customers had decreased by another 117,000. Ex. 17 (2Q25 8-K) at 1. On the investor call, Winfrey said that "nonpay" was up for two reasons: "One is you have former ACP customers who are economically challenged and have a higher nonpay rate systematically without the benefit of

the subsidy" and, two, Charter has "newly acquired customers who would have qualified for the ACP, [but] we don't have ACP today and therefore . . . those newly acquired customers have a higher nonpay rate than they would otherwise" have had if the subsidy were available. Ex. 18 (2Q25 Tr.) at 7.

According to analysts, Charter's 2Q25 results forecasted that Charter's broadband-based infrastructure was struggling to compete with its competitors' more modern fiber-optic and mobile networks: "The result drove a whopping nearly 20% decline in the shares . . . as investors fretted that converged wireless/wireline bundles (admittedly the key potential cable differentiator with [Charter's] peers) was not offsetting the competitive effects of FWA and fiber-builds." Ex. 19 (7.27.25 Pivotal Rep.) at 1; *see also* Ex. 20 (8.21.25 Wells Fargo Rep.) at 1 ("Competition for subs vs Fiber & FWA remains challenging."); Ex. 21 (7.28.25 RJ Rep.) at 1 ("[B]roadband subscriber growth will remain challenged . . . [as] increasing telco competitive pressure will weigh on results."). Charter's stock price declined from a closing price of $380.00 per share on July 24, 2025 to a closing price of $309.75 per share on July 25, 2025. ¶ 14.

### F. This Litigation

On January 28, 2026, Plaintiff filed its Corrected Amended Complaint. Dkt. 34. Plaintiff alleges that Charter misrepresented the impact of the ACP's termination by assuring investors that ACP-related losses were "onetime" and would be "behind" the Company by the end of 2024. ¶¶ 88-94. Plaintiff alleges, relying on the accounts of confidential witnesses, that Charter was aware internally, but failed to disclose, that ACP customers were being retained using temporary discounts and credits, and that ACP-related churn would persist through 2025 when the retention programs expired. ¶¶ 160-227. None of the confidential witnesses referenced in the complaint is or was a senior executive of the company; none even reported directly to a top executive, let alone to either of the two Individual Defendants. Plaintiff contends that ACP-related churn manifested

in 2Q25 and was revealed on July 25, 2025, when Charter disclosed subscriber losses, contradicting what plaintiff characterizes as Charter's assurances that ACP effects would be over by this time. ¶¶ 117-28. Plaintiff says that this disclosure caused the 18% stock price decline on that day. ¶ 14, 334. Plaintiff seeks relief under Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Count I) and Section 20(a) of the Exchange Act (Count II).

## ARGUMENT

## I. PLAINTIFF FAILS TO ALLEGE A SECTION 10(B) CLAIM

"To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb*, 28 F.4th 343, 351-52 (2d Cir. 2022). The Court need not "accept as true conclusions unsupported by the facts alleged, legal conclusions, bald assertions, or unwarranted inferences." *Kavanagh* v. *Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014).

Plaintiff here must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. Rule 9(b) requires that Plaintiff "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including "the who, what, when, where and how," *Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 642 (S.D.N.Y. 2015). Plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. *Novak* v. *Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

### A. Plaintiff fails to plead any actionable misstatements or omissions.

#### 1. The statements and alleged omissions concerning the timing of ACP-related losses are not actionable.

Plaintiff challenges Charter's statements about when ACP-related effects would occur or subside. *See, e.g.*, ¶¶ 230, 255, 286. These statements are inactionable for three independent

reasons: they were not false or misleading when made, they are inactionable opinions, and they are protected forward-looking statements. *See* App. A, Stmts. #1–22.

**i. The alleged statements and omissions were not misleading.**

Plaintiff challenges affirmative statements labeling the ACP transition as "temporary" or "onetime," *see* App. A, Stmts. #1–4, and describing ACP losses as limited to 2024 or "behind" Charter as of 2025, *see* App. A, Stmts. #5–22, because ACP-related losses "would repeat, well into 2025, driven primarily by post-ACP churn and continuing non-pay disconnects[.]" ¶ 234(b). Plaintiff also alleges that these statements were false or misleading because Defendants failed to disclose reliance on "temporary bridge promotions" or "short-term promotional offers" that would expire in 12 months and cause ACP-related losses in 2025. *See, e.g.*, ¶¶ 238, 260, 278, 280, 287, 291. These statements and alleged omissions are inactionable.

A statement is only false or materially misleading if, when read in context, it would mislead a reasonable investor. *Rombach* v. *Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). Challenged statements "must be considered in conjunction with the substance of the company's unchallenged disclosures[.]" *Livingston* v. *Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 218 (E.D.N.Y. 2013).

Defendants' affirmative statements that the "ACP transition is a onetime event," ¶ 89, were true. Plaintiff does not allege that the ACP's funding was terminated multiple times; the program ended once. On their face, the words "temporary" and "onetime" do not indicate how long the "onetime," "temporary" impact will last—they indicate only that the transition will not last forever. *Cf. In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 350 (S.D.N.Y. 2020) (statement that results were "excessive" was not misleading because defendants failed to specify exactly how "excessive"; the disclosure was accurate as stated), *aff'd*, 89 F.4th 408 (2d Cir. 2023). A reasonable investor would understand "onetime" to mean that the impact of ACP's end would not recur once realized.

Nor are defendants' statements concerning the duration of the ACP transition misleading. Over and over again, when discussing the end of the ACP benefits, Charter drew a distinction between the immediate challenges presented by the 2024 wind-down of the program and the longer-term challenges of retaining those ACP customers who stayed on with Charter and newly acquired customers that would have qualified for the now-defunct ACP subsidy. In the 2Q24 earnings call—the very beginning of the Class Period—Winfrey discussed the "voluntary churn" of ACP customers leaving Charter as the program expired and the "reduced gross additions" from "low-income segments that had been connecting at a higher rate" before "ACP disappeared"; he also said that this would be "temporary" and "onetime in nature." Ex. 8 (2Q24 Tr.) at 5. But in the same breath, he noted that Charter needed to "manag[e] through that onetime impact" and then "try[] to make sure that we're doing all the right things for preserving that base and keeping them connected" going forward. *Id.* In the ensuing months, Charter and its executives continued to make that same distinction, repeatedly warning investors that it "expect[ed]" ACP to be "behind" it after 2024, but that the end of the ACP would generate longer-term consequences, including in the form of elevated nonpay disconnects in 2025. *See* Ex. 9 (9.4.24 BofA Tr.) at 3 ("What we think we'll see ***in the post ACP environment*** is some of what we've talked about in that ***churn*** . . . . that will ***come back in the form of nonpay for those customers who would have had ACP*** . . . . So inside of ***next year***, I think, activity levels will be a bit higher, both churn and [connect]."); Ex. 16 (3.10.25 DB Tr.) at 2 ("What we do see on the other side is something ***that we've talked a lot about*** and ***that we expected to see***, which is slightly higher nonpay rates across the business."); *see also Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (holding that positive characterization of drug-trial result could not be understood to apply to all aspects of those results where company clarified that positive characterization was due to subgroup); *In re*

*Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 294 (E.D.N.Y. 2023), *aff'd*, 2024 WL 4023842 (2d Cir. Sep. 3, 2024) (holding that claims that an issue is resolved and that ongoing efforts were being made to avoid future issues were not misleading where the company made public disclosures that the issue might recur).

Plaintiff's claims fare no better when recast as alleged omissions. The duty to disclose arises where disclosure is required by law, or where a statement "would otherwise be inaccurate, incomplete, or misleading" without additional information. *Singh* v. *Cigna Corp.*, 277 F. Supp. 3d 291, 310 (D. Conn. 2017) (citation omitted). As such, liability arises for "half-truths," not "pure omissions." *Macquarie Infrastructure Corp.* v. *Moab Partners, L. P.*, 601 U.S. 257, 263–65 (2024). Even where a subject is addressed, there is no "duty to reveal all facts on the subject, so long as 'what was revealed would not be so incomplete as to mislead.'" *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) (citation omitted). In all events, there is no duty to disclose information "so basic that any investor could be expected to know it." *Monroe Cnty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014).

Defendants disclosed the very risks Plaintiff alleges were concealed: elevated post-ACP nonpay risk, *compare* ¶ 278 *with* App. A, Stmt. # 16; the number of nonpay accounts, *compare* ¶ 292 *with* Ex. 22 (1Q25 10-Q) at 14; the existence, use, and financial impact of retention programs, *compare* ¶ 260 *with* Ex. 4 (2024 10-K) at 34, 39; and that Charter's business was sensitive to the economic conditions of customers, *compare* ¶ 69 *with* Ex. 4 (2024 10-K) at 24. Plaintiff does not contend that these disclosures are false; Plaintiff argues instead that investors were misled because they were not told that retention programs were temporary. *See* ¶¶ 278, 280. That allegation ignores the multiple disclosures where Charter *did* explain the duration of its

promotions. *E.g.*, Ex. 8 (2Q24 Tr.) at 4 ("we've been offering all of our ACP customers a free mobile line for 1 year"); Ex. 14 (1Q25 Tr.) at 7-8 (discussing Charter's use of promotions). It also blinks common sense: all promotions are temporary. The alleged "expiration" was not "critical qualifying information" necessary to avoid a half-truth, but a fact "so basic" that any reasonable investor would assume it to be the case. *Cf.* 16 C.F.R. § 233.1(a) (FTC guidance noting that prices cannot be described as reduced unless they are reduced from a "bona fide price" ordinarily offered to the public "on a regular basis for a reasonably substantial period of time").

Additionally, Plaintiff contends that Charter did not disclose that it had leaned into ACP "far more aggressively than its competitors" and that this was a high-risk strategy due to the ACP customer base being "price-sensitive." *See* ¶¶ 222, 250, 288, 299, 325(a). But Charter did disclose the exact data on this: how many customers they had receiving ACP subsidies, which the market knew meant low-income, price-sensitive customers. ¶ 49. Plaintiff thus fails to allege any omitted fact that would "significantly alter[] the 'total mix' of information made available" to investors as all the information necessary for a reasonable investor to reach the conclusion that Charter had more exposure to the risk of the end of the ACP than competitors was already available. *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 471 (S.D.N.Y. 2017), *aff'd* 732 Fed. Appx. 37 (2d Cir. 2018).

**ii. The statements are inactionable opinion.**

The securities laws treat "inherently subjective . . . assessments" that require a "substantial exercise of judgment" as inactionable opinion statements. *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015); *New Eng. Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*, 122 F.4th 28, 41 (2d Cir. 2023) (statements "inherently requiring a substantial exercise of judgment" are opinion). This is particularly true where a statement is prefaced by words such as "I believe," or "I think." *See Omnicare*, 575 U.S.

at 183–84. A statement may also be an inactionable opinion even if does not use such qualifying language. *See Philip Morris*, 89 F.4th at 418.

Many of the challenged statements begin with qualifiers identifying them as opinions. *See, e.g.*, ¶¶ 7 ("I think"), 90 (same), 246 (same), 286 (same); 8 ("we expect"), 87 (same), 91 (same), 235 (same), 255 (same), 258 (same), 270 (same), 310(c) (same); 276 ("we believe"), 310(f) (same). All of them represent subjective assessments of when ACP losses would materialize; this involved weighing variables such as the mix of customers, including what portion of customers were previously on ACP, the uptake and stickiness of certain products amongst the target market, and competition for the same target market. *See, e.g.*, App. A, Stmt. # 8 ("And ***I think*** the level of what impact that is, it will be ***hard to see what it looks like*** until you've sort of settled out of the more immediate impact."); *Malin* v. *XL Cap. Ltd.*, 499 F. Supp. 2d 117, 145 (D. Conn. 2007) (statement that company had put "problems . . . behind us" was "not actionable" as it was a general statement of optimism), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).

An opinion is only actionable: "(1) if 'the speaker did not hold the belief [the speaker] professed,' (2) if the opinion 'embedded statements of fact,' or (3) if the opinion omits facts that 'ma[d]e [the] statement of opinion . . . misleading to an ordinary investor.'" *Police & Fire Ret. Sys. City of Detroit* v. *Argo Grp. Int'l Holdings, Ltd.*, 2024 WL 5089970, at *6 (S.D.N.Y. Dec. 12, 2024) (quoting *Omnicare*, 575 U.S. at 185-88). This Court has held that this "standard will not be easy to satisfy." *Gray* v. *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 400 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). Plaintiff fails to allege any of the above.

*First*, Plaintiff fails to plead particularized facts demonstrating that Defendants "did not hold the belief[s] [they] professed." Plaintiff alleges that Defendants were aware that nonpay disconnects were "elevated" and "continuing," and therefore could not have believed that ACP-

related losses would conclude by 4Q24. *See* ¶¶ 234(b), 249, 257. But Defendants distinguished the "onetime" ACP transition impacts in 2024 from the "post-ACP" elevated nonpay disconnects that would occur in 2025 onward. *See* Section I.A.1; *compare* Ex. 7 (4Q24 Tr.) at 7 ("[W]e won't have the ACP losses this year[.]") *with* Ex. 9 (9.4.24 BofA Tr.) at 3 (discussing "longer term impact" of elevated nonpay churn in 2025 from former ACP customers). Neither Plaintiff nor its CWs allege facts to show that Defendants had a different understanding. Plaintiff also alleges that Defendants were aware retention programs would eventually expire, leading to ACP-related churn. ¶¶ 234(b), 287. But this ignores the disclosures Defendants made acknowledging the risks of "promotional roll-offs" and the risk of elevated nonpay churn in the post-ACP world. Ex. 14 (1Q25 Tr.) at 8. Plaintiff may disagree with Defendants' beliefs that they could appropriately manage these risks, but Plaintiff cannot plead fraud by hindsight by alleging "that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Philip Morris,* 437 F. Supp. 3d at 351 (citation omitted).

*Second*, Plaintiff identifies no "embedded but complete statement of a material fact" within the challenged statements. *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (internal quotation marks omitted) ("A statement structured, 'I believe that x is so because y has occurred,' contains the factual and falsifiable statement, 'y has occurred.'").

*Third*, Plaintiff alleges no "omit[ted] facts that ma[ke] the statement[s] of opinion" misleading. The standard is whether the omitted facts make the opinion statement "misleading to a reasonable person" when read "fairly and in context," which is "no small task for an investor" to prove. *Omnicare*, 575 U.S. at 194. Further, reasonable investors "would not expect every known fact to align with the opinion of the speaker." *City of Sterling Heights Police & Fire Ret. Sys.* v. *Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 89 (S.D.N.Y. 2022). Plaintiff's alleged omission

of the fact that retention programs would eventually expire and cause nonpay disconnects, ¶ 234(b), cannot render the opinions misleading where, as discussed, Defendants distinguished between ACP-related losses occurring in 2024 and the elevated post-ACP nonpay risk in 2025, while also disclosing both the existence and financial impact of retention programs. *See* App. A, Stmt. # 16; Ex. 4 (2024 10-K) at 34, 39. The eventual expiration of retention programs would in fact "go[] to the basis" of the elevated nonpay risk that Defendants did disclose, supporting Defendants' opinions, not cutting against them. *See Omnicare,* 575 U.S. at 194.

**iii. The statements are inactionable forward-looking statements.**

Under the PSLRA, a statement is inactionable when the statement is: (i) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements"; ***or*** (ii) "immaterial"; ***or*** (iii) "the plaintiff fails to prove that the forward-looking statement" was made "with actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1)(A)-(B); *see also Slayton* v. *Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Forward-looking statements are "statements whose accuracy can only be verified after they are made," as opposed to statements of "historical and present facts" which "can be verified at the time they are made." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011). Statements of historical and present fact may also be inactionable as "too vague" where they fail to "provide specific information" and only serve to "make[] the future projection attainable." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 211 (S.D.N.Y. 2022) (citation omitted). Examples of forward-looking statements include "statement[s] of future economic performance," "statement[s] containing [] projection[s]

of revenues, income [and] earnings," and "assumptions underlying or relating" to such statements. 15 U.S.C. § 78u-5(i)(1)(A)-(D).[3]

Many of the statements Plaintiff challenges begin with qualifiers designating them as forward-looking—that is, they concern "expectations" of what "will" or "won't" "occur" "this year" or "looking forward." *See, e.g.*, ¶ 276 ("***Looking forward***, we believe . . . ."); ¶ 255 ("***[W]e expect*** the onetime . . . ."). Regardless, all the statements fall well within the bounds of the statute, as they represent predictions of Charter's "future economic performance." *See, e.g.*, ¶ 230 ("[N]onpay disconnects . . . ***will occur*** . . ."); ¶ 270 ("***[W]e expect*** to return . . ."); ¶ 277 ("[W]e ***won't*** have the ACP losses ***this year*** . . ."). Even statements regarding the "onetime" impact of the ACP, *see, e.g.*, ¶¶ 231, 255, 290, are intrinsically forward-looking as their truth cannot be ascertained until a future date. See *Vivendi*, 765 F. Supp. 2d at 569.

Even where the challenged statements are couched in the present tense, they lack specific, objectively verifiable information about Charter's performance or the ACP transition to date. The present-tense claims only serve to say that, with the ACP transition over, Charter believes that it is positioned to achieve its goals in 2025. *See, e.g.*, App. A, Stmt. #15 ("ACP, clearly behind us. ***There's a big benefit to that this year***. . . . And so ***I think the setup*** . . . . ***is a lot better in '25 than it was in '24.***"); App. A, Stmt. #19 ("[T]he end of ACP, ***it's largely behind us*** . . . I think, ***[we] are going to our direction*** in terms of industry growth."); *see also In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 (S.D.N.Y. Apr. 2, 2020) ("[S]tatements that the Company was 'on track' to reach the projected margin expansion and related growth are 'too vague to be actionable apart from the future projection.'"); *Inst. Invs. Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 254–55 (3d Cir. 2009)

[3] In addition to the statutory scheme, under the "bespeaks caution" doctrine, cautionary language must be credited and alleged misstatements or omissions must be considered in context "to determine whether a reasonable investor would have been misled" by a forward-looking statement. *Maso Cap. Invs. Ltd.* v. *E-House (China) Holdings Ltd.*, 2024 WL 2890968, at *3 (2d Cir. June 10, 2024) (citation omitted).

(holding that "[o]ur first quarter results position us to meet our goals for the year" was a forward-looking statement). Regardless, the only inaccuracy of present fact alleged by the Plaintiff is the existence of a higher nonpay disconnect rate, ¶ 234(b), but that was both disclosed and distinguished from the "onetime" ACP impact in 2024, as discussed in Section I.A.1.

These forward-looking statements qualify under each prong of the safe harbor. *First*, each statement is identified as such and accompanied by meaningful cautionary language. Charter's SEC filings identify as "forward-looking" statements regarding "plans, strategies and prospects, both business and financial" including specifically statements in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" portion of the filings, as well as statements using phrases such as "believe," "will", "expect," and "should," among others. *See, e.g.*, Ex. 4 (2024 10-K) at ii; Ex. 22 (1Q25 10-Q) at ii. Charter also identifies forward-looking statements in its earnings calls, including those concerning "expectations, predications, plans, and prospects." *See, e.g.*, Ex. 8 (2Q24 Tr.) at 2; Ex. 10 (3Q24 Tr.) at 2. All of the challenged statements are either statements of expectations or predictions regarding the timing of ACP losses, *see, e.g.*, App. A, Stmt. # 6 ("[T]he most dramatic effect is once you flush out the ACP impact[s] between Q2 and Q3 predominantly . . ."), or statements of Charter's prospects in the future, *see, e.g.*, App. A, Stmt. # 12 ("Looking forward, we believe we are past the onetime ACP-related impacts to our customers."), and are therefore identified as forward-looking.

Charter also paired these statements with "meaningful cautionary language." Each earnings call warned that forward-looking statements were "subject to risks and uncertainties," directed investors to the "risk factors and other cautionary statements" in Charter's SEC filings

and stated that management's views were as of the call and would not be updated.[4] *See, e.g.*, Ex. 8 (2Q24 Tr.) at 2; Ex. 10 (3Q24 Tr.) at 2; *see also Maso*, 2024 WL 2890968 at *4 (it is "difficult to conceive how a 'reasonable investor'" would be "misled about the nature [of] and risk" in relying on a projection that notes that it would not be updated) (citation omitted).

Indeed, Charter's 2024 SEC filings specifically named ACP's expiration as a risk factor and notes that there will be a long-term impact. *See* Ex. 5 (2Q24 10-Q) at 27 ("The end of the ACP benefit has been, ***and will continue to be***, disruptive to our business. We have lost and will continue to lose customers and revenues and ***could face greater difficulty in providing services to low-income households in the future***."). By the end of 2024, Charter considered the transition from the end of the ACP to be over: the program had ceased funding benefits for months, and Charter had absorbed and disclosed the one-time losses from ACP customers who declined to continue their subscriptions. At the same time, Charter continued to warn that the ACP customers it did retain would be at elevated risk of nonpay churn in the long term. *See* Section I.A.1. As a result, Charter removed the ACP as a specific risk from its disclosures, because the risk moving forward was the (disclosed) elevated nonpay risk inherent in servicing low-income customers no longer benefiting from a government subsidy reducing their costs. That risk was captured by other disclosures in Charter's SEC filings throughout the Class Period, particularly the "risks associated with the economic conditions of [Charter's] current and potential customers, ***the potential financial instability of our customers and their financial ability to purchase our products***[,]" *see* Ex. 4 (2024 10-K) at 24, and also in "the ***effects of governmental regulation on [Charter's] business including subsidies to consumers***[,]" *see, e.g.*, Ex. 22 (1Q25 10-Q) at ii. Charter was

---

[4] These cautionary statements also satisfied the requirements for oral forward-looking statements found in 15 U.S.C. §§ 78u-5(c)(2)(A) and (B), as they noted that the oral statements are forward-looking, that actual results might "differ from historical or anticipated results," and that additional information could be found in Charter's SEC filings which contain cautionary statements satisfying the standards under § 78u-5(c)(1)(A).

not obligated to continue to make specific risk disclosures regarding the ACP once it had determined that the transition was over, particularly where it continued to disclose the underlying elevated nonpay risk amongst the former ACP customer base. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 Fed. Appx. 93 (2d Cir. 2014) ("[W]here there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk.").

These cautionary statements satisfy the requirement of providing "substantive information" about factors that "could cause results to differ materially" from projections by making clear to investors that Charter was exposed to the risks of a low-income customer base that may face difficulties in affording Charter's products. *Gray*, 454 F. Supp. 3d at 392. Considering the explicit qualifiers, relevant risk disclosures, and Defendant's contemporaneous disclosure of elevated post-ACP nonpay risk, no reasonable investor would be misled to believe that further nonpay disconnects were unlikely simply because of the challenged forward-looking statements.

Moreover, as detailed in Section I.B., the safe harbor applies for the additional reason that Plaintiff does not allege particularized facts showing that any Defendant had actual knowledge that any statements were false or misleading.

#### 2. The statements concerning the management of the ACP transition are not actionable.

Plaintiff also challenges Defendants' statements describing Charter's performance in navigating the ACP transition, including statements that Charter was "doing really well" in preserving ACP customers and was "confident" in driving "long-term . . . growth." ¶¶ 232, 246, 254. These statements are inactionable opinion statements, are inactionable puffery, and were not false or misleading when made. *See* App. A, Stmts. #23–33.

**i. The statements are inactionable opinion.**

As noted, statements that express "inherently subjective . . . assessments" that cannot be resolved as "matters of objective fact" are considered inactionable opinion statements. *Philip Morris*, 89 F.4th at 418–19.

Many of the challenged statements in this category also use the language "I think," clearly demarcating them as opinion. *See, e.g.*, ¶ 246. Regardless, all of the statements within this category are opinion, as they represent Defendants' subjective judgments regarding the quality of Charter's performance in handling the ACP transition. *See, e.g.*, ¶ 232 ("[W]e're doing everything we can in the meantime to preserve all the ACP customers, doing really well."); ¶ 255 ("We continued to do a very good job in managing the end of the program . . ."). Such judgments require the assessment of a variety of factors, including the mix of residential Internet customers within the former ACP cohort, their relative economic means, product-market fit for both existing and new products within that cohort, seasonality of new subscribers and disconnects, and the competitive environment with mobile and fiber internet, rendering them quintessential opinion statements. *See New Eng. Carpenters*, 122 F.4th at 41 (statements "inherently requiring a substantial exercise of judgment" are opinion).

This kind of opinion statement is actionable only if Plaintiff plausibly alleges insincerity, an embedded false fact, or an omission that makes the opinion misleading. *See Argo*, 2024 WL 5089970 at *6. Plaintiff fails to allege any of the above.

*First*, Plaintiff fails to plead particularized facts demonstrating that Defendants "did not hold the belief[s] [they] professed," due to Plaintiff's reliance on the accounts of CWs who lacked contact with the Defendants and who fail to describe, with the required particularity, reports, meetings, or other information that are alleged to have been available to the Defendants. *See* Section I.B.

*Second*, Plaintiff identifies no "embedded but complete statement of a material fact" within the challenged statements. *Abramson*, 965 F.3d at 175 (internal quotation marks omitted).

*Third*, Plaintiff alleges no "omit[ted] facts that ma[ke] the statement[s] of opinion" misleading. The alleged omission of the future expiration of retention programs, ¶ 234(b), did not render Defendants' contemporaneous opinions about the transition being handled well misleading, as no reasonable investor would understand the challenged statements to be stating that there are no potential issues arising from that transition or that there would be none in the future. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 256 (S.D.N.Y. 2023) (holding that an opinion statement claiming confidence in retaining workers was not misleading where the company had worker retention issues as no reasonable investor would be misled to think there were no underlying issues). The omission is also not misleading because Defendants disclosed the underlying risk of elevated nonpay churn that Plaintiff alleges would arise from the future expiry of retention programs. *See* Ex. 9 (9.4.24 BofA Tr.) at 3; Ex. 16 (3.10.25 DB Tr.) at 2; *see also Lachman* v. *Revlon, Inc.*, 487 F. Supp. 3d 111, 132 (E.D.N.Y. 2020) (holding that the statement that a transition was "on schedule" did not imply that it was "smooth" particularly where "adverse consequences" were disclosed).

**ii. The statements are inactionable puffery.**

This category of statements is also inactionable puffery. "[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174. Officials need not adopt an "overly gloomy" tone where statements comport with "reasonably available data." *Novak*, 216 F.3d at 309. Vague assurances of confidence or qualitative performance related to the company are "precisely the type of puffery" that the 2nd Circuit has "held to be inactionable." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (internal quotation marks and citation omitted).

All of the challenged statements within this category constitute expressions of optimism that Charter is managing the transition "successfully" or "well," none of which convey any "meaningful, objective data" regarding that transition or Charter's performance. *Okla. Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018). Statements that the Defendants are "doing really well[,]" App. A, Stmt. # 24, and "remain confident in our ability to drive healthy long-term connectivity customer growth," App. A, Stmt. # 29, are archetypical examples of puffery. *See Pollio* v. *MF Glob.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) ("our volumes and revenues have remained strong" and "the franchise is performing well" were puffery); *AppHarvest*, 684 F. Supp. 3d at 259 n.12 (statements that the company is performing well "in market pricing" or retaining "workers with less churn" were puffery) (citation omitted). To the extent Defendants did provide data—such as the statements in early 2025 that Charter "kept roughly 90% of the former ACP customers connected" through the end of the ACP transition, Ex. 7 (4Q24 Tr.) at 2—Plaintiff does not challenge the truth of the data presented.

**iii. The statements were not false or misleading when made.**

Finally, to the extent this category of statements could be considered statements of fact, they are still inactionable, as Plaintiff fails to allege that these statements were false or misleading at the time they were made.

The majority of the challenged statements claim that Defendants are managing the transition from the ACP "well." *See, e.g.*, App. A, Stmts. # 23–32. Charter's public disclosures reported that it retained 90% of ACP customers in 2024, Ex. 7 (4Q24 Tr.) at 2, and disclosed contemporaneous subscriber, revenue, and nonpay data, none of which is challenged by Plaintiff. *See, e.g.*, Ex. 5 (2Q24 10-Q) at 13, 15, 17; Ex. 6 (3Q24 10-Q) at 14, 16, 18. Against that backdrop, statements that Charter managed the transition "well" and are "confident" are neither false nor

misleading to a reasonable investor, who has access to a collection of information that they would rely on to verify this claim.

Context also defeats Plaintiff's challenge to the specific statement that Defendants "have not seen anything significant with the consumer so far" and "neither in nonpay disconnect rates, they're up slightly only because of the lack of ACP." App. A, Stmt. # 33. This statement was an answer to a question regarding "macro uncertainty" in the economy, not ACP issues. Ex. 14 (1Q25 Tr.) at 9–10. Plaintiff makes no allegations regarding macroeconomics; instead they challenge this statement for omitting that "Charter was still experiencing elevated nonpay disconnects . . . ." ¶ 298. However, the challenged statement itself acknowledges that nonpay disconnect rates are up "because of the lack of ACP." ¶ 297.

### B. Plaintiff does not plead scienter.

Plaintiff's claims fail for the independent reason that the complaint fails to allege scienter. For each alleged misstatement, the PSLRA requires that Plaintiff plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). This requires particularized facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns* v. *Shaar Fund*, *Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). "If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior 'must be correspondingly greater' and show 'highly unreasonable' behavior or that which evinces 'an extreme departure from the standards of ordinary care.'" *Bristol-Myers*, 28 F.4th at 355 (citation omitted). For forward-looking statements, the bar is higher still: "knowing falsity." *Rein* v. *Dutch Bros*, *Inc.*, 2024 WL 3105004, at *9 (S.D.N.Y. June 24, 2024). Finally, for an inference of scienter to be "strong," it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in

light of other explanations." *Tellabs, Inc.* v. *Makor Issues & Rts.*, 551 U.S. 308, 324 (2007). Accordingly, the Court must "take into account plausible opposing inferences" to determine whether the inference of fraudulent intent is "at least as compelling as any opposing inference." *Id.* at 323-24.

**1. Plaintiff fails to allege motive.**

To plead motive, Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08. General motives "possessed by virtually all corporate insiders," such as "the desire to . . . sustain 'the appearance of corporate profitability,'" are insufficient. *Id.* at 307 (citation omitted). Rather, motive must "entail concrete benefits that could be realized" by a defendant from disseminating the alleged false and misleading statements. *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (citation omitted). That standard is generally only satisfied where "corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *JP Morgan*, 553 F.3d at 198.

Here, however, Plaintiff does not allege any insider sales. Instead, Plaintiff asserts that the Individual Defendants had "financial incentives to artificially inflate . . . Charter's stock price to complete the acquisitions of Liberty [] and Cox, which were funded, in large part, with Charter common stock." ¶ 308(b). Plaintiff further alleges that the Individual Defendants had "*personal* incentives" to commit fraud because of the "one-time contingent equity award" they were granted months later. ¶ 317.

These allegations fail. First, Courts in this Circuit have long held that an executive's desire to complete a particular transaction is precisely the kind of "generalized corporate motive" insufficient to support scienter. *See, e.g.*, *JP Morgan*, 553 F.3d at 198 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute "motive" for purposes

of this inquiry."); *Rombach*, 355 F.3d at 177 (desire to inflate stock to "complete a previously arranged corporate acquisition" insufficient); *Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *24 (S.D.N.Y. Mar. 30, 2021), *aff'd*, 49 F.4th 790 (2d Cir. 2022) (that defendants "were motivated to complete [a] merger" insufficient). What's more, Plaintiff's allegations here are illogical. Liberty was a holding company for Charter stock; its value is derived from Charter's. As a result, to the extent misrepresentations artificially inflated Charter's value, they also artificially inflated Liberty's. *See* Ex. 24 (Lib. Med. Tr.) at 1; Ex. 11 (Lib. S-4) at 93, 99. As for the Cox acquisition, had the drop in Charter's stock price in July 2025 resulted from false or misleading statements made by Charter regarding the ACP or any other subject, Cox could have sought to terminate the transaction. *See* Ex 12 (Cox Ag.) at §§ 4.7, 8.2(b).

Second, Plaintiff's scienter allegations concerning the "one-time contingent equity award" make even less sense. The Second Circuit has made clear that "the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter," *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995), and, in any event, Plaintiff does not (and cannot) allege that the Individual Defendants knew about the award during the Class Period, as it was not even approved until months later. ¶ 317.

**2. Plaintiff does not allege conscious misbehavior or recklessness.**

Having failed to allege motive, Plaintiff must plead "correspondingly greater" allegations of conscious misbehavior or recklessness. *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted). Plaintiff fails to do either.

**i. Plaintiff's allegation that Defendants "closely monitored" ACP impacts is insufficient to establish scienter.**

In support of its scienter argument, Plaintiff first points to the fact that "Defendants repeatedly told investors that Charter had successfully managed the termination of the ACP . . .

even as they closely tracked ACP-related risks and impacts at the executive level." *See* ¶¶ 309-11. These allegations do not to establish scienter.

As a baseline matter, "simply alleging that executive defendants are 'closely involved' in running their business is not enough to show that they had access to contrary information." *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021), *aff'd*, 2021 WL 5142702 (2d Cir. Nov. 5, 2021); *see also In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 537-38 (S.D.N.Y. 2009), *aff'd*, 357 F. App'x 393 (2d Cir. 2009) (allegation of " intimate corporate culture" insufficient to support a finding of conscious misbehavior or recklessness when there was nothing indicating that defendants were "directly informed" of contrary information). Further, that the Individual Defendants spoke on and responded to analysts' questions about the topics of the alleged false statements does not show that they were aware of any information showing that their statements were false or misleading. *See, e.g.*, *Bolling* v. *Dendreon Corp.*, 2014 WL 2533323, at *14 (W.D. Wash. 2014) ("[I]t does not demonstrate scienter to point out that analysts asked questions . . . "); *cf. Plumbers & Steamfitters Loc. 773 Pension Fund* v. *Can. Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) ("[K]nowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate or defraud.").

**ii. The "core operations" doctrine cannot supply scienter.**

Plaintiff next says that the court can "infer[]" scienter because the ACP was "critical to Charter's core operations," based specifically on the fact that "broadband subscriptions made up the vast majority of Charter's revenues." *See* ¶¶ 319-324. This effort to invoke the narrowly applied "core operations" doctrine is unavailing. Even assuming the doctrine survived the PSLRA (which the Second Circuit has not determined, *see Frederick* v. *Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012)), it "typically applies only where the operation in question constitutes nearly

all of a company's business," and, regardless, is "supplementary," *i.e.*, "not 'independently sufficient'" to plead scienter. *Saraf* v. *Ebix, Inc.*, 632 F. Supp. 3d 389, 398 (S.D.N.Y. 2022) (citations omitted). Plaintiff alleges that Charter's residential broadband segment "represent[ed] over 50%" of Charter's revenue base in FY23 and FY24," ¶ 320, and that 17% of Charter's residential broadband subscribers were ACP recipients, ¶ 3. Even the total revenue Charter earned from residential broadband would be insufficient to invoke the doctrine, and Plaintiff does not attempt to segregate the portion of that revenue actually attributable to ACP recipients. *See, e.g.*, *Holbrook* v. *Trivago N.V.*, 2019 WL 948809, at *22 n.25 (S.D.N.Y. Feb. 26, 2019) (rejecting doctrine where business "was only responsible for less than 45% of Trivago's revenues").

**iii. Plaintiff's confidential witness allegations fail to plead scienter.**

Plaintiff also points to the statements of thirteen confidential witnesses ("CW"s) in support of its scienter argument. "[C]onfidential source allegations must show that individual defendants *actually possessed* the knowledge highlighting the falsity of public statements." *AppHarvest*, 684 F. Supp. 3d at 261 (emphasis in original). Courts recognize the risk in inferring scienter from "facts attributed to unidentified witnesses," and thus acknowledge "the need to view such attributions with caution and care." *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 797 (S.D.N.Y. 2020). Plaintiff's CW allegations fail in numerous respects.

*First*, the CWs held low-level roles "whose descriptions do not suggest that they had been in position to know the facts attributed to them." *Id.* at 799. None is or was an executive at Charter, let alone a senior executive. One worked at a call center, ¶ 34; one held an "an auditing, fraud, and compliance role," ¶ 40; and another's role is described only as "in Digital Analytics," ¶ 35. The most senior of the CWs were **three to four levels below** Charter's executive team and the Individual Defendants. ¶¶ 38, 42. The complaint thus lacks any particularity to support the

probability that the CWs were "in a position to know" what the Individual Defendants "knew," as is required to plead scienter. *AppHarvest*, 684 F. Supp. 3d at 243.

In particular, the complaint has no allegations whatsoever of any direct, personal interaction between any of the CWs and either of the Individual Defendants. That alone is dispositive. *Miao*, 442 F. Supp. 3d at 799 n.19 ("[W]here a complaint relies on information from a CW to establish scienter, the complaint must describe the nature of the CW's contact with the individual defendants that would be probative of [the] defendants' mental state."); *see also Woolgar* v. *Kingstone Cos., Inc.,* 477 F. Supp. 3d 193, 219–20 (S.D.N.Y. 2020) ("The majority of the CWs are not alleged to have had any direct contact with the Individual Defendants at all, let alone know what information they possessed."); *Wilbush* v. *Ambac Fin. Grp*., 271 F. Supp. 3d 473, 497 (S.D.N.Y. 2017) ("[T]he Amended Complaint does not allege that two of the four 'confidential witnesses' . . . had any contact with the Individual Defendants. In such a case, 'the law is abundantly clear that their allegations are insufficient to support scienter.'" (quoting *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011))).

*Second*, two of Plaintiff's CWs were not employed by Charter during the Class Period, and eight left Charter before the Class Period ended, from as early on as August 2024. *See* ¶¶ 31-43; *see also Francisco* v. *Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) ("[C]ourts have rejected confidential witness allegations where the confidential witnesses 'left the company before the class period.'") (citation omitted). Further, many CW allegations are untethered in time, *see, e.g.*, ¶¶ 174, 180, 200, making it impossible to "match[] CW allegations" to challenged statements as they do not show "specific contradictory facts available to Defendants" when each statement was made. *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011); *see also*

*Miao,* 442 F. Supp. 3d at 803 ("The failure to anchor the witness statements in the Class Period is particularly problematic[.]").

*Third*, the CW allegations do not "allege any information conveyed" to or from the Individual Defendants "that contradicted the substance of [their] [s]tatements," *In re UiPath, Inc. Sec. Litig.*, 2025 WL 2065093, at *14 (S.D.N.Y. July 23, 2025), including with respect to:

***Internal Meetings.*** The CWs describe attending various meetings at which the ACP was discussed by management. *See* ¶ 144 (CW-9 describing "Monthly Business Reviews with Senior Vice Presidents"); ¶ 153 (CW-12 describing weekly meetings regarding the ACP with no details of the meetings' content or attendance); ¶ 210 (CW-6 describing monthly meetings regarding the ACP ending that included "members of Charter's C-Suite"). But only CW-2 and CW-3 are alleged to have ever been in any meetings with either of the Individual Defendants—a "[q]uarterly [o]perational [r]eview" in February 2024, ¶¶ 212-14, and a "quarterly townhall" in February 2025, ¶¶ 219-22—and there are no particularized allegations concerning what was said at those meetings or how that information contradicted the alleged misstatements. CW-2 claims that Winfrey attended a meeting where participants discussed "an effort to get even more granular information including income levels on the ACP recipients," but Plaintiff makes no effort to plead how this contradicts anything Winfrey ever said. ¶ 211. CW-3 claims that "ACP subscriber numbers" were discussed at quarterly meetings that Winfrey attended, but Plaintiff does not allege that those numbers differed from any numbers that Charter reported publicly. ¶ 213. CW-3 also claims that Winfrey stated at a town hall that Charter had more ACP subscribers "than Comcast and other competitors," noted that it was thus "exposed to more of an impact when ACP ended," and said that "Charter would mitigate that impact" with a promotional program. ¶ 222. But all of that is consistent with Winfrey's public statements. *See* Ex. 25 (1Q24 Tr.) at 4-5 (noting that Charter has

five million of twenty-three million total ACP subscribers, and that Charter intended to retain ACP subscribers with promotional programs); Ex. 15 (3.3.25 MS Tr.) at 3 (noting that Charter's broadband customer growth in 2025 would depend in part on "normalization in nonpay for the previous ACP remaining base").

Because Plaintiff does not and cannot plead any particularized information from any meeting attended by any CW that contradicts what Charter publicly disclosed, Plaintiff does not and cannot meet its burden to plead scienter. *See, e.g.*, *Tyler* v. *Liz Claiborne*, 814 F. Supp. 2d 323, 340-41 (S.D.N.Y. 2011) (no scienter where complaint "does not even plead what was said at [a] meeting" that was "contradictory to the statements"); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *19 (S.D.N.Y. 2015), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. 2015) (allegations insufficient absent "details about the timing of the meetings in relation to defendants' statements, or how discussions at those meetings were contradictory.").

***Tracking of ACP Metrics.*** The CWs detail internal reporting and metrics that were purportedly available to Charter's management during the Class Period. For instance, CW-3 stated that "senior management had regular, detailed visibility of what was happening with former ACP subscribers" through "a combination of a proprietary system called Realtime, along with Power BI, Tableau, and Salesforce," which "flowed into daily and weekly reports that . . . were rolled up for regional and corporate leadership," ¶ 198, including a "daily Offers Report" that "included many metrics including new customer numbers, subscriber attrition numbers, and subscriber churn" and was purportedly received by Winfrey, ¶¶ 202-03. CW-5 stated that he "saw [a] slide on residential data that was . . . included in [] weekly and monthly PowerPoint presentations" sent to Charter's management "to be reviewed with CEO Chris Winfrey and other Charter executives in [] weekly Tuesday Afternoon meetings and separate monthly meetings," and that he saw "a

separate slide called 'ACP Review'" in such presentation at an unspecified time. ¶ 206. But, again, none of the CWs allege any information or reporting that was accessed by the Individual Defendants at any particular time during the Class Period, or how that information would have specifically contradicted the Individual Defendants' public statements. *See, e.g.*, *In re UiPath*, 2025 WL 2065093, at *14 ("Plaintiffs rely on general descriptions of Enslin's and Gupta's . . . access to company-wide sales tools. Courts in this District have consistently rejected such generalized allegations as insufficient to plead scienter."); *Woolgar*, 477 F.Supp. 3d at 220 ("The Complaint fails to identify the specific information contained in [the] monthly reports, or . . . how such information contradicted Defendants' public statements."); *Plumbers*, 694 F. Supp. 2d at 299 ("Plaintiffs should, but do not, provide specific instances in which Defendants received [contrary] information.").

***Internal Discussion.*** The CWs also discuss internal chatter related to the ACP: for instance, CW-2 recalled EVP Ruiz saying "on a Webex call . . . around the end of ACP" that "they all 'needed to brace themselves and to hold on and we will get through the loss of ACP.'" ¶ 158. CW-10 reported that "in approximately March or April 2024 . . . [EVP] Ruiz acknowledged that growth had been 'exponential' but that there were concerns of future 'pain' and a possibility of a 'rough couple of years' ahead for the Company once ACP concluded." ¶ 155. And one CW described a February 2025 "quarterly town hall meeting" at which "Winfrey and [CCO] Ray discussed ACP 'quite a bit' . . . and admitted that the Company was 'still discussing the pain points' associated with ACP customers continuing to churn." ¶ 288. Yet again, the CWs fail to provide the requisite connective tissue between this internal chatter and the alleged misstatements, failing to specify how this chatter was heard, understood, and believed by the Individual Defendants to be contradictory to any of their contemporaneous statements. *See, e.g.*, *AppHarvest*,

684 F. Supp. 3d at 243 (allegations that "everyone was aware" were insufficient); *Jones* v. *Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) (allegations regarding company's "internal[]" view insufficient where witnesses did not "assert direct knowledge that this view was held by defendants"); *Xie* v. *Nano Nuclear Energy*, 2026 WL 63715, at *8 (S.D.N.Y. Jan. 8, 2026) ("the subjective opinion of one employee" is not enough to create "a strong inference of conscious misbehavior or recklessness").

*Fourth*, Plaintiff fails to explain how—even if internal meetings were regularly held discussing the impact of the ACP's end, Charter's internal reporting systems reflected increasing subscriber churn, and Charter's employees frequently discussed the "pain" that would be caused by the end of the ACP—those things would have rendered Defendants' public statements false or misleading. Throughout the Class Period, Charter disclosed that the end of the ACP would, and did, impact its business, *see* Ex. 4 (2024 10-K) at 34 ("Our Internet customer growth was challenged by the end of the FCC's ACP[.]"); its increasing subscriber losses, including those associated with the ACP, *see* Ex. 26 (4Q24 8-K) at 3 ("Fourth quarter total Internet customers decreased by 177,000, primarily driven by the end of the [ACP][.]"); and its expectation that churn would be higher in the long-term, post-ACP world, *see, e.g.*, Ex. 9 (9.4.24 BofA Tr.) at 3 ("[W]hat we think we'll see in the post ACP environment is . . . [churn] will come back in the form of nonpay for those customers who would have had ACP."); Ex. 15 (3.3.25 MS Tr.) at 3 (responding to a question about headwinds in broadband growth) ("[The] extent . . . we have an uptick or a normalization in nonpay for the previous ACP remaining base[.]"). None of the CW allegations refute Charter's public narrative.

### 3. The more compelling inference is that there was no fraud.

A court evaluating scienter "must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551

U.S. at 314. "It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." *Id.* Rather, the inference of fraudulent intent "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

Here, the far more compelling inference is that there was no fraud. Charter knew (and disclosed) that the end of the ACP benefit would be disruptive, knew (and disclosed) that it needed to manage through the one-time transition from ACP, and knew (and disclosed) that former ACP-benefit recipients would be challenging customers to retain or recruit in the longer term. Charter nevertheless believed it could manage the transition, and it disclosed that belief. Its view turned out to be optimistic, as the 2Q25 subscriber losses—while still 22% better year-over-year from 2Q24—reflected the challenge (which Charter both expected and disclosed) of keeping former ACP-benefit recipients and attracting new customers that previously would have qualified for those benefits in addition to other challenges unrelated to ACP. But Charter's misplaced hope does not establish scienter. *Wachovia*, 753 F. Supp. 2d at 367 ("The more compelling inference, at least based on the facts as they are alleged in the complaints, is that Defendants simply did not anticipate the full extent of the mortgage crisis and the resulting implications for the Pick–A–Pay loan portfolio." (emphasis omitted)). The allegation that Charter engaged in a scheme to delay ACP churn that came to light in 2Q25 is undercut by the Plaintiff's own cited analyst reports, which blame the stock drop not on undisclosed ACP impacts but on stiff competition from fiber and fixed wireless providers. See Ex. 19 (7.27.25 Pivotal Rep.) at 1; Ex. 21 (7.28.25 RJ Rep.) at 1; Ex. 27 (7.25.25 GS Rep.) at 1 (noting that "much of the headwind for cable is coming from fiber and FWA share shifts").

**4. Plaintiff fails to allege corporate scienter.**

Because Plaintiff has failed to allege that "someone whose intent could be imputed to the corporation acted with the requisite scienter," they fail to plead scienter by Charter. *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (citation omitted).

**C. Plaintiff fails to plead loss causation.**

To plead loss causation, Plaintiff must allege that (1) "a corrective disclosure informed the market of the fraud, and the market reacted negatively," or (2) "the risk concealed from investors materialized and caused a foreseeable loss." *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *18 (S.D.N.Y. Mar. 31, 2015). Plaintiff here tries to establish loss causation by pleading a corrective disclosure but fails to do so. Plaintiff also fails to plead more than a conclusory allegation regarding the materialization of a concealed risk.

To satisfy the pleading test for loss causation, a corrective disclosure must reveal the falsity of a prior statement, not merely reframe public information. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511–12 (2d Cir. 2010). Plaintiff alleges that Defendant Winfrey made a corrective disclosure on July 25, 2025 by stating that Charter's former ACP customers and new low-income customers who would have had the benefit in the past had a higher nonpay rate in the second quarter. ¶ 334. But that statement did not "correct" anything—Charter had already disclosed that nonpay rates would be elevated for economically challenged customers post-ACP. *See* App. A, Stmts. # 8, 16; Ex. 14 (1Q25 Tr.) at 9–10. Plaintiff also alleges, as an afterthought, that Charter disclosed that it failed to meet EBITDA forecasts. ¶ 334. The failure to meet EBITDA forecasts is not a corrective disclosure, as it does not disclose, and therefore does not correct, an alleged scheme. *See Francesca's*, 2015 WL 1600464 at *21 (holding that a plaintiff cannot rely on missed earnings forecasts to plead loss causation). "Because all relevant information was

already available to investors, these purported disclosures cannot possibly be 'corrective.'" *Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 177 (S.D.N.Y. 2012).

Plaintiff also asserts that loss causation is established because the risks concealed by Defendant's misstatements and omissions materialized on July 25, 2025. *See* ¶ 327. But "loss causation cannot be alleged plausibly in so conclusory a fashion." *In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 406 (S.D.N.Y. 2014). The only "risk" Plaintiff says was concealed was the fact that the retention programs Charter used to induce ACP customers to keep their subscriptions would expire; but this risk *was* disclosed, as Charter made clear that these customers were susceptible to higher risk of nonpay churn. *See* Section I.A.1. Where, as here, the allegedly concealed risk is substantially indicated by other disclosures, a plaintiff must allege either proximate causation or facts sufficient to apportion the losses between the disclosed and concealed portions of the risk. *See Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005). Plaintiff does neither.

Plaintiff does not allege proximate causation. To the contrary, the analysts cited in the complaint ascribe the losses to stiff competition—not the expiration of retention programs. *See, e.g.*, Ex. 19 (7.27.25 Pivotal Rep.) at 1; Ex. 21 (7.28.25 RJ Rep.) at 1; Ex. 27 (7.25.25 GS Rep.) at 1 (noting that "much of the headwind for cable is coming from fiber and FWA share shifts"); *see also In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) (holding that plaintiff failed to allege loss causation where plaintiff did not "allege facts to show that the price decline was due wholly or partly" to the concealed risk, "rather than to other causes"). Plaintiff only makes vague allegations that nonspecific retention programs existed that would expire up to 12 months after the end of the ACP. *See* ¶¶ 160–61, 163, 172–73. Nor does Plaintiff allege what portion of the loss was attributable to the supposedly concealed portion of the

risk. The risk of elevated nonpay disconnects and of the economic sensitivity of Charter's customer base were both disclosed, as was the expiry date of at least one retention program. *See* Section I.A.1. Charter was also clear that it faced "intense competition for residential customers" from both fixed wireless and fiber. Ex. 4 (2024 10-K) at 12. Plaintiff has failed to allege any facts sufficient to apportion the loss between these disclosed risks and the allegedly concealed risk of retention programs expiring. *See Kusnier* v. *Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 382 (E.D.N.Y. 2022) ("There is nothing in the Complaint suggesting that the . . . announcement was the materialization of a concealed risk as opposed to a disclosed risk[.]"); *In re Flag Telecom Holdings, Ltd. Securities Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (holding that Plaintiff must "disaggregate" losses caused by other factors "from disclosures of the truth behind alleged misstatements").

## II. PLAINTIFF FAILS TO ALLEGE A SECTION 20(A) CLAIM.

Because Plaintiff fails to plead a Section 10(b) violation, its Section 20(a) claims fail. *Bristol-Myers*, 28 F.4th at 356-57. Additionally, for the same reasons that Plaintiff fails to allege scienter, it fails to allege the necessary "'culpable participation.'" *See, e.g.*, *Janbay* v. *Canadian Solar, Inc.*, 2012 WL 1080306, at *17 (S.D.N.Y. Mar. 30, 2012) (citation omitted).

## III. CONCLUSION

The Court should dismiss the Complaint in full, with prejudice, and without leave to amend. Defendants respectfully request oral argument.

Dated: March 31, 2026

Respectfully submitted,

**WACHTELL, LIPTON, ROSEN & KATZ**

Ryan A. McLeod
Alison B. Brockman
51 West 52nd Street
New York, New York 10019
Tel.: 212.403.1000
Fax: 212.403.2000
ramcleod@wlrk.com
abbrockman@wlrk.com

*Counsel for Defendants Charter Communications, Inc., Jessica Fischer, and Chris Winfrey*