**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARK SANDOVAL, individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

CHARTER COMMUNICATIONS, INC., JESSICA FISCHER, and CHRIS WINFREY,

*Defendants*.

Case No. 1:25-cv-06747-LJL

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ....................1

ARGUMENT ....................3

I. PLAINTIFF FAILS TO ALLEGE A SECTION 10(B) CLAIM....................3

A. Plaintiff pleads no actionable misstatements or omissions....................3

1. Defendants' statements were not false or misleading....................3

2. Most of the challenged statements qualify as forward-looking....................9

3. Most of the challenged statements are protected as opinion....................10

4. Certain statements are inactionable puffery....................11

B. Plaintiff fails to plead a strong inference of scienter....................12

1. Plaintiff fails to plead motive to commit fraud....................12

2. Plaintiff fails to plead conscious misbehavior or recklessness....................14

i. Defendants' statements do not establish scienter....................14

ii. The CW allegations are insufficient to allege scienter....................15

3. Plaintiff incorrectly relies on the "core operations" doctrine....................18

4. Plaintiff fails to present a more compelling inference....................19

C. Plaintiff fails to plead loss causation....................20

II. PLAINTIFF FAILS TO ALLEGE A SECTION 20(A) CLAIM ....................20

CONCLUSION....................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuhamdan* v. *Blyth, Inc.*,
9 F. Supp. 3d 175 (D. Conn. 2014)....................9

*Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022)....................14

*ATSI Commc'ns* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).................... 12-13

*Baxter* v. *MongoDB, Inc.*,
2026 WL 1192420 (S.D.N.Y. Apr. 30, 2026)....................9

*Beleson* v. *Schwartz*,
599 F. Supp. 2d 519 (S.D.N.Y. 2009)....................8

*Campo* v. *Sears Holding Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009)....................18

*Chapman* v. *Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)....................17

*Constr. Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020).................... 5-6

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)....................12, 14

*Frederick* v. *Mechel OAO*,
475 F. App'x 353 (2d Cir. 2012)....................18

*Fresno Cnty. Emps. Ret. Ass'n* v. *comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017).................... 12-13

*Freudenberg* v. *E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................17

*Galestan* v. *OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)....................16 n.14

*Gimpel* v. *Hain Celestial Grp.*,
156 F.4th 121 (2d Cir. 2025)....................14 n.11

*Harris* v. *Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ....................................................................................10

*In re Ambac Fin. Grp. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010)..........................................................................12

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)..................................................9, 16 n.14, 18

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)................................................... 5, 8-9, 16, 19

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)..........................................................17 n.15

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)...........................................................................9 n.6

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)..............................................................................16

*In re Complete Mgmt. Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001)......................................................................13 n.10

*In re HD Supply Holdings Sec. Litig.*,
341 F. Supp. 3d 1342 (N.D. Ga. 2018) ......................................................................10 n.9

*In re Nokia Corp. Sec. Litig.*,
2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ..................................................................5

*In re Skechers USA, Inc. Sec. Litig.*,
444 F. Supp. 3d 498 (S.D.N.Y. 2020)...............................................................................6

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
675 F. Supp. 3d 273 (E.D.N.Y. 2023) ..........................................................................9 n.6

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022).....................................................................15, 18

*In re UiPath, Inc. Sec. Litig.*,
2025 WL 2065093 (S.D.N.Y. July 23, 2025) ..................................................................15

*In re Ultrafem Inc. Sec. Litig.*,
91 F. Supp. 2d 678 (S.D.N.Y. 2000)...............................................................................14

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003)......................................................................14 n.11

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)........................................................................ 9-10

*Kalnit* v. *Eichler*,
99 F. Supp. 2d 327 (S.D.N.Y. 2000)..........................................................................14

*Karinski* v. *Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ..................................................17 n.14

*KBC Asset Mgmt. NV* v. *Discover Fin. Servs.*,
2025 WL 976120 (N.D. Ill. Mar. 31, 2025)..............................................................5

*Kleinman* v. *Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013)....................................................................................9 n.6

*Leone* v. *ASP Isotopes Inc.*,
811 F. Supp. 3d 563 (S.D.N.Y. 2025)....................................................................5 n.4

*Leykin* v. *AT&T Corp.*,
423 F. Supp. 2d 229 (S.D.N.Y. 2006)..........................................................................20

*New England Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*,
122 F.4th 28 (2d Cir. 2023) ........................................................................................10

*New Orleans Emps. Ret. Sys.* v. *Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) .............................................................................16 n.13

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000)................................................................................12, 20

*Pearlstein* v. *BlackBerry Ltd.*,
93 F. Supp. 3d 233 (S.D.N.Y. 2015)..........................................................................15

*Plumbers & Steamfitters Loc. 137 Pension Fund* v. *Am. Express Co.*,
2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017)..............................................................6

*Richman* v. *Goldman Sachs Grp.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012)..........................................................................11

*Rothman* v. *Gregor*,
220 F.3d 81 (2d Cir. 2000).....................................................................................13 n.10

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996)........................................................................................16

*Saraf* v. *Ebix, Inc.*,
632 F. Supp. 3d 389 (S.D.N.Y. 2022)..........................................................................18

*SEC* v. *Farnsworth*,
692 F. Supp. 3d 157 (S.D.N.Y. 2023)........................................................................5 n.4

*Woolgar* v. *Kingstone Cos., Inc.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020)............................................................ 15-16, 19

**Statutes and Rules**

15 U.S.C. § 78u-4 ........................................................................................................ 11-12

**PRELIMINARY STATEMENT**

Plaintiff's Opposition to Defendants' Motion to Dismiss—much like Plaintiff's Complaint—pretends that Charter told the market it would never lose a broadband internet subscriber again after 2024. But Charter said no such thing. It disclosed that the end of a federal subsidy for low-income customers to obtain broadband access (the Affordable Connectivity Program, or "ACP") would be disruptive to its business and cause the Company to lose subscribers. It disclosed that it expected to realize one-time losses from the program's end throughout all of 2024, but it maintained that it had plans to manage the transition, retain former ACP recipients, and recruit others who would have been eligible for the benefit. At the same time, Charter and its executives over and over again cautioned that those economically challenged customers would likely exhibit higher non-payment rates and risk of churn. That distinction is why it was neither false nor misleading for Charter to say that the impact of the ACP's elimination was behind the Company in 2025—the one-time ACP termination was in fact over, but Charter nevertheless had to continue to manage the (disclosed) risk of higher nonpay churn in the post-ACP world.

Confronted with Charter's repeated disclosures about that ongoing risk, Plaintiff uses its Opposition to shift position. Now, Plaintiff says, the fraud was in Charter's failure to confess its plan to hold on to former ACP customers through one-year promotions. Plaintiff says that the loss of 50,000 supposedly former ACP-recipient subscribers in 2Q25 stemmed from the expiration of Charter's supposedly undisclosed giveaways. But this revised theory crumbles under scrutiny.

*First*, Charter never said it lost 50,000 former ACP beneficiaries as subscribers in 2Q25. Plaintiff pulls that number from Charter's second-quarter earnings release, but the number refers to losses from the second quarter of *2024*—not 2025. Charter was making a year-over-year comparison in which it noted that 2024 marked significant ACP-related losses. Charter never quantified any lost subscribers in 2025 as ACP-related. Plaintiff has misread the document.

*Second*, Plaintiff's theory that the subscriber losses in 2Q25 were caused by the expiration of Charter's promotions defies logic. Plaintiff alleges that the promotions expired at the end of June 2025 and that customers who had been receiving them stopped paying once they stopped getting the benefits. But any such losses would not be reported in Charter's 2Q25 results, because those results are as of June 30, 2025, when Plaintiff says the promotions were still in effect.

*Third*, Charter's use of promotions cannot have been fraudulent because it was disclosed. Charter told investors that it was deploying promotions for ACP customers, explained the nature of those promotions, and detailed how long they would last. The market listened: Analysts even criticized the Company for using one-year promotions, pointing out in July 2024 that they would only defer, and not prevent, customer losses—the very risk that Plaintiff says materialized.

Finally, nothing about Plaintiff's retuned theory can cure the Complaint's utter failure to plead scienter. Plaintiff's attempt to argue that executives had a motive to inflate the Company's stock price hinges on the unsupported and unsupportable conjecture that they somehow knew that, if they signed up a merger, the board would—six months later—grant them discretionary equity awards. Nothing in the pleaded facts supports this. And Plaintiff's parade of confidential witnesses—most of whom had zero contact with the Individual Defendants and many of whom did not work for Charter during the Class Period—offers only hand-waving about possible churn, the exact risk Charter disclosed. What they do not offer are facts, let alone particularized facts, showing that the Individual Defendants had any internal data that contradicted any of their public statements.

The Complaint fails to meet the PSLRA's strict requirements at every level. It should be dismissed, in full, and with prejudice.

## ARGUMENT[1]

### I. PLAINTIFF FAILS TO ALLEGE A SECTION 10(B) CLAIM

#### A. Plaintiff pleads no actionable misstatements or omissions.

##### 1. Defendants' statements were not false or misleading.

Plaintiff alleges that Charter misled the market by saying it expected the "onetime impacts from [the ACP's termination] to be behind us" after 2024 and then by saying the "impact of the elimination of the ACP is now behind us" in January 2025. But Plaintiff concedes that the ACP only ended once, Opp. 18, and it nowhere challenges the accuracy of the subscriber numbers that Charter ever reported. In short, Plaintiff pleads fraud by hindsight based on subscriber losses that Charter reported later, in 2Q25. There are multiple problems with this argument.

To begin, Plaintiff says Charter disclosed that 50,000 disconnects in 2Q25 were "directly attributable to 'the end of the FCC's Affordable Connectivity Program subsidies.'" Opp. 3. But that is not what Charter disclosed; Plaintiff is misquoting Charter's July 25, 2025 8-K, which stated: "Second quarter total Internet customers decreased by 117,000, compared to a decline of 149,000 during the second quarter of 2024, which included the impact of approximately 50,000 disconnects related to the end of the FCC's Affordable Connectivity Program subsidies in the second quarter of 2024." Ex. 17 (2Q25 8-K) at 3.[2] In other words, the 50,000 number referred to losses in 2Q *2024*, not 2025; Charter did not quantify the number of ACP-related disconnects in 2Q25.[3] All Charter said about the ACP in connection with its 2Q25 earnings was that "nonpay" churn had increased year-over-year, for which CEO Chris Winfrey offered two reasons: "One is

[1] References to the "Motion" and "Opposition" refer to Defendants' Memorandum of Law in Support of their Motion to Dismiss, ECF No. 37 ("Br."), and Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, ECF No. 40 ("Opp."), respectively. Capitalized terms retain the definitions ascribed to them in the Motion.

[2] Exhibits #1-29 are appended to the Declaration of Alison B. Brockman, ECF No. 38, submitted with the Motion. Exhibits #30-34 are appended to the Reply Affirmation of Alison B. Brockman submitted herewith.

[3] This is confirmed by Defendant Fischer's statements on the 2Q25 Earnings Call. *See* Ex. 18 (2Q25 Tr.) at 4.

you have former ACP customers who are economically challenged and have a higher nonpay rate systemically without the benefit of the subsidy from a year-over-year standpoint. But in addition to that, from a year-over-year standpoint, you have newly acquired customers who would have qualified for the ACP, we don't have ACP today and therefore . . . those newly acquired customers have a higher nonpay rate than they would otherwise." Ex. 18 (2Q25 Tr.) at 7.

This higher nonpay churn was expressly, and repeatedly, forecasted by Charter throughout the putative Class Period. From the time it was clear that the ACP would be terminated, Charter drew a distinction between (i) the immediate consequences of the 2024 wind-down of the ACP and (ii) the longer-term challenges and consequences associated with retaining and acquiring the lower-income customers who would have qualified for the now-defunct ACP subsidy. *See* Br. 15-16, 20-21. For example, Charter made each of the following sets of statements on the same day:

| | |
|---|---|
| "During the second quarter, we lost 149,000 Internet customers, most of which was driven by the end of the [ACP]." | "The real question is ***customers' ability to pay, not just now, but over time***. . . . The lack of ACP will also drive ***higher levels of market churn*** and selling opportunities for connectivity services over time." Ex. 8 (2Q24 Tr.) at 2 |
| "[M]ost of the highest risk nonpay sort of makes its way through over the next 2 months from right now. So some of that will fall in Q3. Some of it will fall in Q4 . . . I would be remiss not to remind folks, it's a onetime issue, right, in terms of the impact of ACP going away." | "So there's an immediate impact to ACP, right . . . [then] [t]here is a longer-term impact. . . . And so what ***we think we'll see in the post ACP environment*** is some of what we've talked about in that ***churn*** . . . ***will come back in the form of nonpay for those customers who would have had ACP***[.]" Ex. 9 (9.4.24 BofA Tr.) at 2-3 |
| "So the onetime impact from the end of the ACP program is over." | "What we do see on the other side [of ACP] is something ***that we've talked a lot about*** and ***that we expected to see***, which is slightly ***higher nonpay rates*** across the business." Ex. 16 (3.10.25 DB Tr.) at 2 |

In the context of these repeated warnings about the longer-term, ongoing risk of higher churn in lower-income subscribers, Charter's statements that the impact of ACP's termination "either would be, or w[as], 'behind' the Company by the end of 2024," Opp. 20, were neither false

nor misleading. *See In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *15 (S.D.N.Y. Mar. 29, 2021) (holding statement that integration of Alcatel into Nokia was "behind us" not false or misleading where Nokia warned of potential issues going forward); *KBC Asset Mgmt. NV* v. *Discover Fin. Servs.*, 2025 WL 976120, at *17 (N.D. Ill. Mar. 31, 2025) (holding no reasonable investor would consider claim that share buyback suspension was "behind us" to mean Discover had resolved all underlying compliance issues causing suspension); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F.Supp.3d 507, 532 (S.D.N.Y. 2020), *aff'd*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (public statements that AT&T "believed churn to be an issue, albeit one that they believed [they] could address" not false or misleading).[4]

Plaintiff seeks to collapse the distinction Charter made between the immediate end of ACP and higher churn in the post-ACP world, arguing that the one-time termination of a subsidy somehow amounted to "an ongoing, structural drag on Charter's business" and that all economically challenged Charter customers, regardless of where they stand in time, are and will always be "ACP customers"—and, relatedly, that any loss of such a low-income customer is an "ACP-related subscriber loss." *See* Opp. 1, 12, 17-19. Plaintiff thus contends that Charter misled the market by removing its ACP-specific risk factor from its 2025 disclosures. Opp. 20-22. Under Plaintiff's logic, companies would be required to maintain risk factors about the expiration of any subsidy in perpetuity. But that is not the law: A company must only disclose fairly the risks to its business. *Constr. Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*, 433 F.Supp.3d 515, 542

[4] *ASP Isotopes* and *Farnsworth* are inapposite, as both cases involved a situation where the defendant disclosed an issue and then made later statements disclaiming that issue's existence. *See Leone* v. *ASP Isotopes Inc.*, 811 F.Supp.3d 563, 590-91 (S.D.N.Y. 2025) (disregarding earlier disclosures that uranium enrichment research required approvals when company made later claims indicating that approval had been obtained); *SEC* v. *Farnsworth*, 692 F.Supp.3d 157, 183-85 (S.D.N.Y. 2023) (disregarding earlier risk disclosures where company made later statements that implied additional information was available minimizing those risks). Indeed, applying the logic of these cases, Defendant Fischer's March 10, 2025 disclosure of higher nonpay rates should supersede her "preceding declaration" that the "onetime impact from the end of the ACP program is over." Opp. 20.

(S.D.N.Y. 2020) (requiring disclosure of "every possible risk" counter to purpose of securities laws and would "bury the shareholders in an avalanche of trivial information."). Charter removed its ACP-specific risk factor because it no longer needed to warn investors about the impact of the "onetime" expiration of the ACP, but it continued to warn of the risk of retaining and acquiring lower-income customers (*i.e.*, those who might have qualified for the now-defunct ACP subsidy): Namely, "risks associated with the economic conditions of [Charter's] current and potential customers, the potential financial instability of our customers and their financial ability to purchase our products[,]" among others. Ex. 4 (2024 10-K) at 24; *see* Br. 19-21.

Plaintiff relies on analyst statements to contend that investors were misled. Opp. 18-19. This Court, however, has rejected efforts "to reverse-engineer a non-actionable statement into an actionable misstatement based on . . . securities analysts' interpretation[s] or reaction[s]," as it is "impossible to determine whether the analysts who are cited are the few who were wrong, or whether their mistaken estimates are indicative of a broader market understanding." *In re Skechers USA, Inc. Sec. Litig.*, 444 F.Supp.3d 498, 520-21 (S.D.N.Y. 2020) (quoting *Plumbers & Steamfitters Loc. 137 Pension Fund* v. *Am. Express Co.*, 2017 WL 4403314, at *14 (S.D.N.Y. Sept. 30, 2017)). As important, plenty of analysts understood that Charter's disclosures did not guarantee no further subscriber losses among the former ACP base. As early as July 2024, Wolfe Research opined that, without the ACP, "***we expect steady-state churn across the business to increase***." Ex. 30 (7.30.24 Wolfe Rep.) at 8. Moffett Nathanson questioned, "will we know the full impact of ACP even next quarter? Or in Q4? ***Probably not***," noting that they "think ***it will be hard to tell what's ACP and what isn't***, and until the smoke clears, non-ACP trends will look weaker than they actually are." Ex. 31 (7.26.24 MN Rep.) at 1-2. And, in March 2025, Citi "recognize[d]" that its "thesis" regarding Charter's ability to remain competitive was threatened

by "***greater variability of performance within lower income customer verticals in the absence of ACP*** . . . ." Ex. 32 (3.13.25 Citi Rep.) at 4.

Because Plaintiff's original theory of falsity crumbles when held to the light of Charter's full disclosures, the Opposition pivots to a new one. Plaintiff now argues that Charter's statements about its management of the ACP termination were false because Charter did not disclose that it was supposedly only retaining former ACP customers through "temporary 12-month credits set to expire in mid-2025." Opp. 23. Plaintiff says Charter knew its retention programs "would expire at the end of June 2025" and, as such, the so-called "churn bomb" that manifested in 2Q25 was foreseeable. *See* Opp. 22, 24-25, 27-28, 38. This new twist fails for two independent reasons.

*First*, Plaintiff's contention that the subscriber losses in 2Q25 were caused by the end of the year-long promotions falls under the weight of its own logic. In its 2Q25 earnings announcement, Charter disclosed that "[s]econd quarter total Internet customers decreased by 117,000," leaving "29.9 million Internet customers" as of "June 30, 2025." Ex. 17 (2Q25 8-K) at 1. Plaintiff says that this decrease occurred because Charter offered promotions to "former ACP customers on a limited-time basis of 12 months," that those customers stopped paying once "the offers expired and customers were required to pay the full price for services," and that the offers expired "exactly at the end of the Class Period." Opp. 13. The problem with this theory is that it is self-defeating: Per Plaintiff's own allegations, the promotions were still in effect as of the end of June 2025, so losses from their expiration (if any) would be reflected in 3Q25, not 2Q25. The subscriber decline in 2Q25 occurred while the alleged promotions were ongoing, and Plaintiff pleads nothing to explain why former ACP customers who were allegedly retained only through the use of promotions would churn before those promotions expired.[5] In fact, Charter disclosed

[5] Of further note, although Charter's Internet customers decreased in 3Q25 (as they had quarter after quarter since

*lower* "voluntary" churn in 2Q25, which Plaintiff has not challenged. *See* Ex. 18 (2Q25 Tr.) at 8.

*Second*, Plaintiff's argument that Charter failed to tell the market about its use of promotions is groundless: Charter made substantial disclosures about these promotions, including their existence, use, financial impact, risk of "promotional roll-offs," and duration. Br. 13-14, 16; *compare* CAC ¶ 161 (alleging Charter relied on "monthly credits" of "$10-15 per month" and a "bundled Internet and mobile phone promotion where the mobile portion was free") *with* Ex. 8 (2Q24 Tr.) at 4 ("[W]e've been offering all of our ACP customers a free mobile line for 1 year"), *and* Ex. 33 (Ch. Pol.) (detailing Charter's one-year promotional packages "to help households with the transition [from ACP]"). The market got the picture. In July 2024, for example, analysts expressed concern that "Management's plans to offer a free line to retain ACP customers may dilute its impact in the coming quarters, but the impact will likely be modest, and it simply makes for a larger tailwind at a later point in time when those lines are 'priced.'" Ex. 31 (7.26.24 MN Rep.) at 10; *see also* Ex. 34 (7.12.24 MS Rep.) at 1 ("[W]e aren't enamored with the extremely heavy discount on broadband and wireless services . . . [because] this type of promotion tends to attract disloyal customers[.]"). Analysts thus predicted the exact risk that Plaintiff says came to pass, undermining any argument that Charter failed to disclose adequate information. *See, e.g.*, *Beleson* v. *Schwartz*, 599 F.Supp.2d 519, 525-26 (S.D.N.Y. 2009), *aff'd*, 419 F. App'x 39 (2d Cir. 2011) (market cannot have been "misled" where analysts predicted very risk that materialized).

To the extent Plaintiff is trying to allege that Charter was obligated to update the market in real time as to churn rates of subscribers enjoying promotions, that claim fails too. This Court and others have rejected the contention that issuers must disclose churn rates even where they are alleged to have a "major churn problem" related to the "heavy use of promotions." *AT&T*, 480

4Q23), the decrease in 3Q25 was smaller than the decrease in 2Q25. *See* Ex. 28 (3Q25 8-K) at 1 (reflecting decrease of 109,000 Internet customers).

F.Supp.3d at 528-29; *see also Abuhamdan* v. *Blyth, Inc.*, 9 F.Supp.3d 175, 201-02 (D. Conn. 2014) (failure to disclose risk arising from use of payments to drive "aggressive recruitment" not material where company otherwise disclosed risk of employee turnover); *Baxter* v. *MongoDB, Inc.*, 2026 WL 1192420, at *32-33 (S.D.N.Y. Apr. 30, 2026) (cautionary language not "rendered meaningless 'simply because it fails to discuss the specific risk'" (citation omitted)).[6]

**2. Most of the challenged statements qualify as forward-looking.**

Plaintiff fails to address the majority of the statements that Defendants characterized as forward-looking and instead argues that Defendants failed to demonstrate that "all" of the challenged statements are forward-looking. Opp. 23-25. This is a red herring: Defendants' Motion contended only that statements #1-22[7] are forward-looking.[8] Br. 17-21. Plaintiff does not challenge the forward-looking nature of statements #1-8, 12-13, 16, and 20-22, and their non-actionability is accordingly conceded. *See In re AppHarvest Sec. Litig.*, 684 F.Supp.3d 201, 255 (S.D.N.Y. 2023) ("Because Plaintiff do[es] not oppose this argument in his opposition to Defendants' motion to dismiss, Plaintiff's 'silence concedes the point.'" (citation omitted)).

The remainder are forward-looking too. Plaintiff argues that any statement that something is "behind" a company cannot be forward-looking. The law says otherwise. Statements are "forward-looking" if their "accuracy can only be verified after they are made." *In re Vivendi*

[6] Plaintiff attempts to distinguish *AIG* by arguing that the risks in this case were not in the public domain and that Charter had not warned of "rising liability." But the risks here were public, and Defendants' statements explicitly noted the equivalent of rising liability: Rising nonpay churn. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014). Plaintiff's attempt to distinguish *Kleinman* and *Telefonaktiebolaget* is also unavailing. To the former, Defendants' contemporaneous statements that the ACP was behind them and that nonpay churn has risen are analogous to the contemporaneous statements in the press release that the Court held should be interpreted in the context of each other. *See Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013). To the latter, the "compliance failures" here are the potential subscriber losses represented by increased nonpay and the economic sensitivity of customers, both disclosed. *See In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F.Supp.3d 273, 294 (E.D.N.Y. 2023).

[7] Numbered statements refer to the index set forth in Appendix A to Defendants' Motion, ECF No. 37-1.

[8] Plaintiff focuses on other statements that Defendants did not contend were forward-looking—for instance, statements #28, 31, 32—to argue that none of Defendants' statements are protected by the safe harbor.

*Universal, S.A. Sec. Litig.*, 765 F.Supp.2d 512, 569 (S.D.N.Y. 2011). Applying that standard, the Eleventh Circuit held that Ivax's statement that "the challenges unique to this period in our history are now behind us" was a forward-looking statement, because "[w]hether the worst of Ivax's challenges were behind it was a matter verifiable only after the chairman so declared." *Harris* v. *Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999). The same is true of Charter's statements.[9]

Here, too, Plaintiff tries to rely on its newly emphasized "hidden promotion" theory to avoid dismissal, arguing that Charter's "behind us" statements cannot be forward-looking because they omitted the "present fact[]" that subscriber losses were "temporarily forestalled" by Charter's one-year promotions. Opp. 24. The argument fares no better in this context. The subscriber losses Charter experienced at the end of the Class Period were not a "present fact" at the time the statements were made—they had not yet occurred. Plaintiff has not alleged that Charter knew how many subscribers would churn after the expiration of promotions, it has alleged only that Charter was using undisclosed promotions to forestall some indeterminate amount of churn. But, as discussed above, the allegation that those promotions were undisclosed is refuted by Charter's public disclosures and the analysts that follow the Company. *See supra* Sec. I.A.1.

**3. Most of the challenged statements are protected as opinion.**

Statements "inherently requiring a substantial exercise of judgment" are inactionable opinion. *New England Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*, 122 F.4th 28, 41 (2d Cir. 2023). Defendants established that most of the challenged statements fall within this category. Br. 14-17, 22-23. To try to survive dismissal, Plaintiff argues that the speakers who offered their opinion knew facts that undermined those views or that the expressed opinions omitted material information. Opp. 26-28. Neither argument prevails.

---

[9] Plaintiff's authorities on this point are inapposite. For example, in *In re HD Supply*, Opp. 23-24, the Court did not ever address whether the statements at issue were forward-looking. 341 F.Supp.3d 1342, 1358-59 (N.D. Ga. 2018).

*First*, Plaintiff contends that Charter's executives could not have honestly believed that "the ACP impacts were 'behind' Charter" because "internal data showed accelerating disconnects" and "elevated nonpay churn." Opp. 27. As discussed at length below, however, the Complaint does not allege with particularity any such knowledge on the part of the Individual Defendants. *See infra* Sec. I.B. What's more, Plaintiff's argument continues to conflate the one-time effects of the end of ACP and the (acknowledged and disclosed) risk of higher nonpay churn among economically challenged customers in the post-ACP world.

*Second*, Plaintiff says the opinion statements were misleading because Defendants expressed them without disclosing that Charter "had merely deferred the losses through stop-gap measures"—*i.e.*, the promotions. Again, as discussed above, this argument relies on the false premise that the promotions were undisclosed. The opposite is true. *See supra* Sec. I.A.1.

**4. Certain statements are inactionable puffery.**

Finally, statements #22-33 constitute puffery. Plaintiff's response to this is to point to other statements to argue that none of the challenged statements constitute puffery. Opp. 25-26. Such denials do not meet Plaintiff's burden to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B).

Beyond citing statements Defendants did not contend were puffery, Plaintiff argues that the challenged statements cannot qualify as puffery because they were repeated "over and over." Opp. 26. But there is no legal support for the proposition that making the same disclosure multiple times transforms puffery into fraud. For example, *Richman* v. *Goldman Sachs Grp.*, cited at Opp. 25, found Goldman's repeated statements regarding its compliance with the law to be actionable not because they were repeated, but rather because the complaint alleged particularized facts showing that Goldman knew the statements were not true when made. 868 F.Supp.2d 261, 278-80 (S.D.N.Y. 2012). The Complaint here contains no such allegations. Plaintiff says that the

statements that Charter was managing the ACP transition successfully were not puffery because they were "made in the specific context of quantifiable subscriber metrics." Opp. 26. But Plaintiff does not allege that Charter misreported any metrics during the Class Period, and—unlike the defendant in *In re Ambac Fin. Grp. Sec. Litig.* (cited at Opp. 26)—Charter did not make statements that it was "outperforming the market" in terms of ACP transition management or otherwise "convey something concrete and measurable." 693 F.Supp.2d 241, 272 (S.D.N.Y. 2010).

**B. Plaintiff fails to plead a strong inference of scienter.**

The PSLRA requires a plaintiff to plead, for each alleged misstatement and "with particularity[,] facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To do so, a plaintiff must offer particularized facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Plaintiff does neither.

**1. Plaintiff fails to plead motive to commit fraud.**

To plead motive, Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *Novak* v. *Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). The Complaint does not come close. In this Circuit, this standard is generally only satisfied where "corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Plaintiff does not even try to meet that test here and instead contrives a narrative concerning the Individual Defendants' purported "financial incentives to artificially inflate . . . Charter's stock price to complete the acquisitions of Liberty [] and Cox." CAC ¶ 308(b). That position lacks merit, *see* Br. 26-27, and the authority Plaintiff cites is of little help. In *Fresno Cnty. Emps. Ret. Ass'n* v. *comScore, Inc.*, for example, it was the "timeline of events" that made the

difference—the scheme to inflate the stock price came to be *after* negotiations had begun and was revealed *after* the merger closed. *See* 268 F.Supp.3d 526, 554 (S.D.N.Y. 2017). Negotiations with Cox, however, began well after Charter stated that ACP impacts would end in 2024, and the so-called corrective disclosure happened well before closing.[10] *See* CAC ¶ 315.

In response to Defendants' Motion, Plaintiff shifted its position on this too. Where it used to argue that each transaction was an independent basis of motive, CAC ¶¶ 312-18, Plaintiff now asserts that the Liberty deal "was merely a predicate for the far larger Cox acquisition." Opp. 36 n.11. With respect to the Cox transaction, Plaintiff continues to argue that the Individual Defendants were motivated to inflate Charter's stock because it was being offered to Cox as acquisition currency and because the Individual Defendants received equity awards contingent on the closing of the Cox deal. Opp. 35-37. But those alleged personal benefits were not awarded until *December 2025*—half a year after the alleged corrective disclosure. CAC ¶ 317.

Plaintiff's response to this is more unsupported conjecture. The Opposition asserts, citing nothing, that individuals involved in acquisitions like the Cox transaction "routinely receive substantial deal-related compensation." Opp. 35. This unpleaded speculation cannot be credited. *ATSI*, 493 F.3d at 98 (confining court to facts alleged in complaint and certain other limited categories of documents on a Rule 12(b)(6) motion). But even taking it at face value cannot establish motive, because allegations that defendants had "illicit motive because they could be

---

[10] Plaintiff's reliance on *Complete Management* and *Rothman* is similarly inapposite. In *Rothman*, the court noted that the inflation of a stock price for an acquisition is sufficient to allege scienter only "in some circumstances" and only found the allegation sufficient "in combination with other allegations," while specifically noting that it was not deciding "[w]hether sufficient motive could be shown solely by an allegation of a high stock price artificially maintained in the context [of] one impending acquisition." *Rothman* v. *Gregor*, 220 F.3d 81, 93-94 (2d Cir. 2000). The other allegations in that case included extensive public evidence of recklessness and financial misstatements. *See id.* at 90-92. Likewise, in *Complete Management*, the Court noted that its finding was "extremely contextual" to the situation where the defendant was seeking to use their artificially high stock price to engage in serial acquisitions of legitimate assets to cover for their "uncollectable receivables." *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.Supp.2d 314, 327-28 (S.D.N.Y. 2001). That case also involved extensive insider sales. *See id.* at 328-29.

entitled to additional compensation" have been time and again held to be "generalized interest" and "insufficient motive" for fraud. *In re Ultrafem Inc. Sec. Litig.*, 91 F.Supp.2d 678, 702 (S.D.N.Y. 2000).[11] Without facts alleging any knowledge of this incentive on the part of the Individual Defendants at the time they made the statements, Plaintiff's claim fails. *See JP Morgan*, 553 F.3d at 201 (finding that, in contrast to where plaintiffs sufficiently alleged motive by establishing a "direct link between the compensation package and the fraudulent statements," a generalized inference that defendants received bonuses was insufficient).

Plaintiff's argument also bucks common sense: The December 2025 grant ***was an award of stock***. CAC ¶ 100. It "defies economic reason" that the Individual Defendants would perpetrate a fraud resulting in a significant decline in Charter's stock price for a completely hypothetical equity award, the value of which was tied entirely to that stock price. *See Kalnit* v. *Eichler*, 99 F.Supp.2d 327, 344 (S.D.N.Y. 2000) ("[W]here 'plaintiff's view of the facts defies economic reason, . . . it does not yield a reasonable inference of fraudulent intent.'" (citation omitted)).

**2. Plaintiff fails to plead conscious misbehavior or recklessness.**

Because Plaintiff has not alleged motive, Plaintiff must instead plead "correspondingly greater" allegations amounting to conscious misbehavior or recklessness. *Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022). Plaintiff has not done so.

**i. Defendants' statements do not establish scienter.**

Plaintiff argues that Defendants' own statements establish scienter due to their "specificity" and "temporal proximity" to the corrective disclosure, Opp. 30, combined with assurances that they had "visibility" into the situation, Opp. 29. Not so. "'[T]emporal proximity alone does *not*

[11] Plaintiff's reliance on *In re Vivendi Universal, S.A. Sec. Litig.* is misplaced: There, one defendant received an incentive-based performance bonus tied to EBITDA results, not a discretionary, post-hoc stock award issued months after the underlying transaction. *See* 381 F.Supp.2d 158, 184-85 (S.D.N.Y. 2003). Their reliance on *Gimpel* v. *Hain Celestial Grp.* is similarly unavailing, as the stock award in that case was in place when the fraud was committed. *See* 156 F.4th 121, 144-45 (2d Cir. 2025).

raise a circumstantial inference of fraud.' Rather, Plaintiff must '*specifically allege* defendants' knowledge of facts or access to information contradicting their public statements.'" *Pearlstein* v. *BlackBerry Ltd.*, 93 F.Supp.3d 233, 247 (S.D.N.Y. 2015), *aff'd*, 660 F. App'x 23 (2d Cir. 2016) (citations omitted). Allegations of "visibility" are insufficient without additional facts showing that defendants had specific information contradicting the statements at issue. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F.Supp.3d 164, 238 (S.D.N.Y. 2022). Plaintiff's assertion that Defendants were "keeping 'a close eye on ACP'" is not enough to allege recklessness. Opp. 29.

**ii. The CW allegations are insufficient to allege scienter.**

To try to show recklessness, then, the Opposition reasserts the Complaint's litany of CW statements, but it fails to address their critical weakness: They do not "allege any information conveyed" to or by the Individual Defendants "that contradicted the substance of [their] [s]tatements." *In re UiPath, Inc. Sec. Litig.*, 2025 WL 2065093, at *14 (S.D.N.Y. July 23, 2025).

For example, Plaintiff says that CW-3 described Defendant Winfrey reviewing "ACP metrics" at a meeting, "which ***would have*** showed the high number of at-risk former ACP customers relying on time-limited promotional credits to maintain their subscriptions." Opp. 31 (emphasis added). Plaintiff's speculation about the contents of that report cannot make up for the lack of pleaded allegations in the Complaint. *See Woolgar* v. *Kingstone Cos., Inc.*, 477 F.Supp.3d 193, 220 (S.D.N.Y. 2020) ("The Complaint fails to identify the specific information contained in [the] monthly reports, or . . . how such information contradicted Defendants' public statements."). CW-3's assertions that "senior executives," including potentially Defendant Winfrey, received a "daily[12] 'Offers Report'" "containing detailed metrics on subscriber attrition numbers, subscriber churn, and non-pay customers," and that Winfrey attended Quarterly Operational Reviews where

[12] The Opposition elsewhere describes this report as weekly, not daily. *See* Opp. 14.

"ACP subscriber figures were specifically discussed" suffer from this same failure. Opp. 31-32.

Even where a plaintiff alleges access to information such as "churn statistics" and "performance metrics for various promotions," she must still explain how that information "contradicted or undermined . . . [d]efendants' public statements." *AT&T*, 480 F.Supp.3d at 531-32. Merely "[a]ssuming Defendants reviewed such information and assuming that it showed a 'high' churn rate" is inadequate. *Id.* But that is all Plaintiff does. Without pleading facts as to the contradictory contents of these "metrics," "reports," and "figures," the CWs' assertions do not establish recklessness: Plaintiff must allege the Individual Defendants themselves "*knew of* and *disregarded* such information." *Woolgar*, 477 F.Supp.3d at 220 (emphasis added); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 812-13 (2d Cir. 1996) (mere "existence" of contradictory reports insufficient); *In re BioScrip, Inc. Sec. Litig.*, 95 F.Supp.3d 711, 739 (S.D.N.Y. 2015) ("conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge" is insufficient (citation omitted)). Plaintiff pleads no such facts here.[13]

Plaintiff also says that CW-6 attended meetings with Charter executives—but not the Individual Defendants—where the ACP was discussed. Opp. 32. Again, Plaintiff has not pleaded that anything discussed in those meetings contradicted Charter's disclosures. What's more, the highest ranked of the other "executives" was several levels below the Individual Defendants.[14]

[13] Plaintiff's citation of *New Orleans Emps. Ret. Sys.* v. *Celestica, Inc*. to argue that it is not required to plead the contents of internal documents or conversations with the Individual Defendants is misleading. 455 F. App'x 10, 15 (2d Cir. 2011). That Court never held the contents need not be pleaded, it noted only that the contents did not need to be pleaded in "*more detail*" (emphasis added) because sufficient facts were otherwise alleged. *Id.* at 14. Notably, the CWs there also all had direct contact with the individual defendants regarding the exact subjects at issue. *Id.* at 13.

[14] That the CWs themselves are low-level employees makes it less likely they were "in a position to know" what the Individual Defendants knew. *AppHarvest*, 684 F.Supp.3d at 243; Br. 29-30. Plaintiff attempts to cite cases rejecting this proposition but fails to do so. In *Karinski* v. *Stamps.com, Inc.*, low-level employee accounts were considered secondary to other proof of scienter—and though the Court refused to discount CWs solely on the grounds of their status as low-level employees, the Court in fact agreed they did not have much value on their own. *See* 2020 WL

Courts in this Circuit have more consistently credited CWs who had direct contact with defendants, as opposed to those with no interaction or significantly down the reporting chain.[15] *Compare Chapman* v. *Mueller Water Prods., Inc.*, 466 F.Supp.3d 382, 400-01 (S.D.N.Y. 2020) (CW allegations insufficient where CWs "did not report to any of the Individual Defendants") *with Freudenberg* v. *E*Trade Fin. Corp.*, 712 F.Supp.2d 171, 196-97 (S.D.N.Y. 2010) (recklessness pleaded where CWs had "first-hand interactions with the Defendants concerning the matters alleged in the Complaint"). And in the few instances where Plaintiff alleges that CWs attended meetings with the Individual Defendants, Opp. 31—namely, a "[q]uarterly [o]perational [r]eview" in February 2024, CAC ¶¶ 213-14, and a "quarterly townhall" in February 2025, CAC ¶¶ 220-22—there are no particularized allegations concerning how what was said at those meetings contradicted the alleged misstatements, *see* Br. 31-32. Plaintiff says that Charter was "still discussing the pain points" of ACP at the latter, Opp. 31, but the Complaint does not allege that this referred to an expected 2025 loss as opposed to losses two months earlier in 2024. *Id.* Notably, the Complaint states that Winfrey "confirmed that the ACP subscriber loss ***was*** 'impactful[.]'" CAC ¶ 221. Even if "pain points" referred to future churn, this still aligns with Defendants' warnings about future nonpay churn. *See supra* Sec. I.A.1. Plaintiff argues that Charter "recognized that subscriber losses were continuing" in that meeting, but that allegation is not pleaded in the Complaint and is unsourced in the Opposition. *See* Opp. 15; CAC ¶¶ 220-22.

Plaintiff's recklessness allegations fail on the basis of this critical weakness alone. While Plaintiff takes issue with Defendants' other scienter arguments, those objections too fall flat. For

281716, at *16 (C.D. Cal. Jan. 17, 2020). Plaintiff's citation to *Galestan* v. *OneMain Holdings, Inc.* similarly fails. 348 F.Supp.3d 282, 300-01 (S.D.N.Y. 2018). There, the CWs *did* contact the individual defendants and alleged that they had access to specific information contradicting public statements. *See id.*

[15] Plaintiff cites *In re Avon Sec. Litig.* for the proposition that direct interaction is unnecessary. 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019). But this is inapposite: *Avon* involved CW allegations of top-level meetings with defendants reviewing documents containing contradictory data, as well as a CW whose direct superior reported to an individual defendant and attended such meetings. *See id.* at *6, *19, *21.

instance, regarding Defendants' argument "that the CWs should be discounted because two CWs were not employed during the Class Period, and eight left before the Class Period's end," Plaintiff points to the fact that "courts regularly accept allegations from CWs even when they leave a defendant company before the class period." Opp. 33-34. But courts have also outright rejected such allegations—and, regardless, have always acknowledged the impact that the CWs' tenure has on the validity of their allegations. *See, e.g.*, *Campo* v. *Sears Holding Corp.*, 635 F.Supp.2d 323, 335 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) (rejecting CW allegations where the CWs "left the company before the Class Period" and "none had any contact" with the defendants); *AppHarvest*, 684 F.Supp.3d at 262 (allegations of a CW who left before class period had "little bearing on the issue of 'contemporaneous falsity' during the Class Period"); Br. 30-31.

**3. Plaintiff incorrectly relies on the "core operations" doctrine.**

Plaintiff also seeks to invoke the "core operations" doctrine. Opp. 34. In doing so, Plaintiff fails to engage with Defendants' argument that this doctrine's post-PSLRA weight in this Circuit is tenuous at best. *See, e.g.*, *Frederick* v. *Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) (explaining this Circuit has not determined "whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter"); Br. 28-29. Nor does Plaintiff address the fact that the core operations theory is not "independently sufficient" to plead scienter; at most, it is "supplementary." *Saraf* v. *Ebix, Inc.*, 632 F.Supp.3d 389, 398 (S.D.N.Y. 2022) (citation modified); *see also In re Turquoise Hill*, 625 F.Supp.3d at 239-40.

Even assuming the doctrine persists, that Charter was "the largest ACP provider in the country" is not enough to invoke it. Opp. 34. Charter's residential broadband segment may have represented just "over 50%" of Charter's revenue base in FY23 and FY24, CAC ¶ 320, but only 17% of Charter's residential broadband subscribers were ACP recipients, CAC ¶ 3. The doctrine (if it applies at all) "typically applies only where the operation in question constitute[s] nearly all

of a company's business." *Woolgar*, 477 F.Supp.3d at 239 (citation modified). Plaintiff's allegation that the ACP's end imperiled a "significant source of income" is not enough. Opp. 34.

**4. Plaintiff fails to present a more compelling inference.**

Plaintiff's narrative—that Defendants knowingly manufactured a fraudulent scheme to inflate Charter's stock price in order to facilitate a merger, based on a hypothetical future stock incentive tied to closing that merger, even though the alleged fraud would have undermined both the stock incentive and the merger itself before it materialized—is the opposite of compelling. It makes no sense. The only compelling inference here is the one Defendants offered: Charter knew (and disclosed) that the end of the ACP would be disruptive, knew (and disclosed) that it needed to manage through the one-time transition from ACP, and knew (and disclosed) that former ACP-benefit recipients would be challenging customers. Charter believed it could manage the transition, a view that turned out to be optimistic, as the 2Q25 subscriber losses, while still 22% better year-over-year, reflected the challenge (that Charter both expected and disclosed) of retaining and attracting low-income customers after the ACP's expiration, in addition to other challenges unrelated to ACP—namely, stiff competition from fiber and fixed wireless providers. *See* Ex. 19 (7.27.25 Pivotal Rep.) at 1; Ex. 21 (7.28.25 RJ Rep.) at 1; Ex. 27 (7.25.25 GS Rep.) at 1 (noting that "much of the headwind for cable is coming from fiber and FWA share shifts").

*AT&T* is instructive. There, AT&T believed it could address anticipated subscriber churn by adding features, gathering more user data, and using bundling as a strategy to retain customers. 480 F.Supp.3d at 532. That their "optimism may have proven to be unwarranted" was neither reckless nor misleading. *Id.* So too here. Just like AT&T recognized the potential for churn, Charter anticipated and disclosed that the end of the ACP would cause not only a one-time drop in customers, but ongoing difficulties in reducing nonpay churn from low-income customers. And just as AT&T anticipated it could address churn through retention strategies, Charter adopted

strategies to retain low-income customers, including bundling, promotions, and credits. CAC ¶ 161. Much like AT&T, that Charter's hopes were not entirely fulfilled is insufficient to plead recklessness. *See also Novak*, 216 F.3d at 309 ("[C]orporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.").

### C. Plaintiff fails to plead loss causation.

The burden of loss causation may not be heavy at this stage, but Plaintiff has still failed to meet it, as the alleged cause for the stock drop cannot factually be the cause of the loss. *Leykin* v. *AT&T Corp.*, 423 F.Supp.2d 229, 246 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007) (dismissing claims where "claimed concealment" did not cause losses). Plaintiff's entire theory of loss causation relies on Charter's July 25, 2025 disclosure that it "had lost 117,000 internet customers in Q2 2025 . . . with at least 50,000 of these disconnects directly attributable to 'the end of the [ACP],'" and the related alleged omission that Charter was "only retaining ACP customers through temporary 12-month credits set to expire in mid-2025." Opp. 3, 21. As discussed above, Plaintiff misconstrued the 50,000 disconnects number, and its "churn-bomb" theory does not square with Charter's disclosures. *See supra* Sec. I.A.1. Regardless, Charter disclosed the risk of nonpay churn that Plaintiff alleges was concealed, and therefore the 2Q25 statements cannot be corrective, nor can the stock drop be a materialization of a concealed risk. Br. 36-38.

## II. PLAINTIFF FAILS TO ALLEGE A SECTION 20(A) CLAIM

Plaintiff concedes that its Section 20(a) and 10(b) claims rise and fall together. Opp. 40. Because the Complaint states no 10(b) claim, the 20(a) claim must be dismissed. *See* Br. 38.

## CONCLUSION

The Court should dismiss the Complaint in full, with prejudice, and without leave to amend. Defendants respectfully request oral argument.

Dated: July 1, 2026

Respectfully submitted,

**WACHTELL, LIPTON, ROSEN & KATZ**

/s/ Ryan A. McLeod
Ryan A. McLeod
Alison B. Brockman
51 West 52nd Street
New York, New York 10019
Tel.: 212.403.1000
Fax: 212.403.2000
ramcleod@wlrk.com
abbrockman@wlrk.com

*Counsel for Defendants Charter Communications, Inc., Jessica Fischer, and Chris Winfrey*